IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LYNDA G. CARLYLE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-CV-00920-RK |
| | ) | |
| AMERICAN HEALTH PARTNERS, LLC, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Table of Authorities ........ ii

I. Preliminary Statement ........ 1

II. Plaintiff's Responses to Defendants' Statement of Unconverted Material Facts ........ 4

A. Background Facts and Parties ........ 4

B. TruHealth Issues Plaintiff a Coaching for Poor Performance on June 23, 2020 ........ 6

C. TruHealth Issues Plaintiff a Written Warning for Insubordination ........ 8

D. TruHealth Issues Plaintiff a Written Warning for Referring to Two Members of Management at a Customer Location as "Butt Buddies." ........ 13

E. TruHealth Issues Plaintiff a Performance Improvement Plan ........ 14

F. TruHealth Issues Plaintiff a Written Warning for Providing Treatment to a Non-TruHealth Member ........ 15

G. Plaintiff Files Internal Complaints with TruHealth ........ 16

H. TruHealth Terminates Plaintiff ........ 22

I. Uncontroverted Facts That TruHealth Did Not Discriminate Against Plaintiff Because of Her age ........ 27

J. Uncontroverted Facts That TruHealth Did Not Discrimination Against Plaintiff Because of Her Alleged Disabilities ........ 30

K. Uncontroverted Facts That TruHealth Did Not Retaliate Against Plaintiff Because of Her Complaint to DHSS or Her Internal Complaint to TruHealth ........ 36

III. Plaintiff's Statement of Additional Material Facts ........ 42

Plaintiff Helps Administer Emergency Aid and Gets Written-Up ........ 45

Plaintiff's Report of Resident Abuse and Neglect to the DHSS ........ 47

Ms. Ketchum Issues Plaintiff a Retaliatory PIP ........ 50

Plaintiff's Complaints of Retaliation to the Proper Authorities ........ 56

Plaintiff's Termination ........ 58

Other employees were terminated shortly after making reports of non-compliance ........ 60

IV. Argument ........ 66

A. Summary Judgment Should Be Denied on Plaintiff's WPA Claim ........ 66

1. Plaintiff is a "Protected Person" under the WPA ........ 67

a. Plaintiff is a Protected Person as Defined in the WPA. ........ 67

b. Plaintiff is a Protected Person Because She Reported Misconduct of Her Employer. ........ 71

c. Plaintiff is a Protected Person Because She Refused a Directive That if Completed Would Have Been a Violation of Law ........ 72

d. Plaintiff is a Protected Person Under the WPA Because She Reported to the Proper Authorities Retaliation for Reporting to the DHSS. ........ 74

2. Plaintiff's Status as a Protected Person was the Motivating Factor in Her Termination. ........ 74

3. Defendants Demonstrate a Pattern or Practice of Retaliating Against Employees Who Make Whistleblower Complaints. ........ 77

B. Summary Judgment Should Be Denied On Plaintiff's Disability Discrimination Claim. ........ 79

1. Plaintiff Can Establish a Prima Facie Case of Disability Discrimination ........ 80

2. Defendants' Proffered Reasons Are Pretextual. ........ 80

V. Conclusion ........ 81

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). ........................................................66

*Bell v. Conopco, Inc.*, 186 F.3d 1099, 1102 (8th Cir. 1999). ........................................................66

*Bibbs v. Block*, 749 F.2d 508, 511 n.1 (8th Cir. 1984) ..........................................................80

*Cox. v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 116 (Mo. banc 2015). ..........77, 79

*Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 871 (8th Cir. 2009) .............................81

*Eivins v. Mo. Dep't of Corr.*, 636 S.W.3d 155, 166 (Mo. App. 2021). ........................................79

*Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. banc 2010). ...............................68

*Johnson v. Securitas Sec. Servs.*, 728 F.3d 754, 759 (8th Cir. 2013) ...........................................66

*Kopman v. City of Centerville*, 871 F. Supp. 2d 875, 896 (D.S.D. 2021).....................................81

*Mirax Chem. Pro. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). ...........................................................................................................66

*Mobley v. St. Luke's Health Sys.*, No. 4:19-CV-00764-BCW, 2021 U.S. Dist. LEXIS 124718 at *12 (W.D. Mo. June 1, 2021) .........................................................................79

*Muhammad v. Wilkins Grp.*, No. 4:09-CV-247 CAS, 2010 U.S. Dist. LEXIS 18622 at *5-6 (E.D. Mo. Mar. 2, 2010) ...........................................................................................73

*Newsome v. Kan. City, Mo. Sch. Dist.*, 520 S.W.3d 769, 777 (Mo. banc 2017)...........................72

*Peterson v. Scott Cnty.*, 406 F.3d 515, 524-25 (8th Cir. 2005).....................................................75

*R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 658 S.W.3d 420, 429 (Mo. banc 2019)). .........................................................................................................69

*Saffels v. Rice*, 40 F.3d 1546, 1549-50 (8th Cir. 1994)................................................................73

*Smith v. Allen Health Syus.*, 302 F.3d 827, 833 (8th Cir. 2002)..................................................75

*Spears v. Mo. Dept. of Corr. & Human Resources*, 210 F.3d 850, 854 (8th Cir. 2000). ........75, 80

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008)...................................................77

*Sprenger v. S. Fed. Home Loan Bank*, 253 F.3d 1106, 1113-14 (8th Cir. 2001) .........................75

*State v. Kaiser*, 139 S.W.3d 545, 554 (Mo. App. 2004) ....................73

*Steak N Shake, Inc. v. White*, No. 4:18-cv-00072-SRC, 2020 U.S. Dist. LEXIS 3769 at *30 (E.D. Mo. Jan. 7, 2020). .................... 67, 75

*Ward v. G4s Secure Solutions (USA), Inc.*, No. 4:20CV891 JCH, 2020 U.S. Dist. LEXIS 161894 (E.D. Mo. Sept. 4, 2020). .................... 70, 71

*Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). ....................66

*Yount v. Keller Motors, Inc.*, 639 S.W.3d 458 (Mo. App. 2021). ....................68, 69, 70, 71

**STATUTES**

RSMo. § 198.070 .................... 72, 74

RSMo. § 198.070.1 .................... 68, 72, 73

RSMo. § 198.070.3 .................... 68, 70, 73

RSMo. § 285.575.2(2) .................... 69

RSMo. § 285.575.2(4) .................... 67, 72, 74

RSMo. § 285.575.3. .................... 67

## I. PRELIMINARY STATEMENT

This lawsuit presents Plaintiff Lynda Carlyle's claims of age and disability discrimination and retaliation in violation of the Missouri Human Rights Act ("MHRA")[1] and retaliation in violation of the Missouri Whistleblower's Protection Act ("WPA"). Plaintiff's claims arise from the wrongful termination of her employment following a mandated report of abuse and neglect to the Department of Health and Senior Services ("DHSS") and subsequent complaints of retaliation for making that report.

Plaintiff was a Nurse Practitioner ("NP") for Defendants who traveled to various long-term care facilities throughout the Kansas City area. These facilities are not owned by Defendants; rather, they partner and contract with these facilities to provide nursing services. One such facility is Highland Rehabilitation. On July 7, 2020, Plaintiff learned that a staff member at Highland walked in on two residents in a sexual position. (SOF 128). The male was standing directly in front of a wheelchair-bound woman with his penis exposed in front of her face. (SOF 128). The victim was mentally disabled, and the male had a long history of similar sexual misconduct in the facility, including sexually harassing Plaintiff's supervisor, Dawn Ketchum. (SOF 129). During this week, Plaintiff called Ketchum and let her know what had happened. (SOF 135). After several meetings over the course of the next week in which many healthcare providers agreed the male should be discharged, it became clear to Plaintiff that no one was going to stop the repeated sexual misconduct. (SOF 133-34, 136-37).

On July 14, 2020, as a mandated reporter under RSMo. § 198.070, Plaintiff made a report to the DHSS explaining the situation, the history, and her concerns that no one would act to stop the abuse and neglect. (SOF 137-39). The next day Plaintiff informed Ms. Ketchum of her

---

[1] Plaintiff's Complaint asserts claims for MHRA age discrimination and retaliation. Plaintiff hereby concedes dismissal of only those claims. However, Plaintiff will show that genuine issues of material fact exist such that summary judgment is not appropriate on her claims for MHRA disability discrimination and WPA retaliation.

concerns, but Plaintiff did not tell her that she had already called the DHSS, nor was she required to do so. (SOF 140-41). Ketchum called her supervisor, Kami Carlson, and they decided that the DHSS should not be called. (SOF 142). Ketchum called Plaintiff back and illegally told her not to call the DHSS. (SOF 143). Plaintiff then informed her that she already had. (SOF 144). Neither Ketchum nor Carlson ever spoke to *anyone* else who was present during the meetings or who worked at the facility. (SOF 145).

Less than two weeks later, Ketchum began to draft a PIP for Plaintiff, including an allegation of insubordination for calling the state after she was told not to. Ketchum said, "she was directly insubordinate." (SOF 148). Ketchum sent a draft of the PIP and accompany Personnel Action Forms ("PAF") to Human Resources employee Peter Boguski for his input, and Boguski sent the drafts to his HR colleague for her input. (SOF 154-55). His colleague, Ms. Brush, replied, "I'm not so sure about the one for insubordination. Lynda could see that as retaliation because she reported to the state something she thought no one was doing anything about." (SOF 155). Boguski responded that he was thinking about cutting out language he had highlighted in red "for that reason." (SOF 158). Boguski deleted the language then sent the drafts back to Ketchum. (SOF 157). Ketchum then delivered the PIP and the PAFs to Plaintiff.

Ketchum, Carlson, and Boguski all knew that Plaintiff had a legal obligation to report the abuse and neglect. (SOF 161). Nevertheless, they retaliated against her for doing so. Ketchum admitted as much.

> Q: And then you say, "I asked why she [called the State] after I told her not to. She was directly insubordinate" Did I read that correctly?
> A: Yes.
> Q Was it your position here that she was insubordinate because she called the State after you told her not to?
> A: I guess that's where I was going with it.

(SOF 160). Subsequently, Plaintiff complained in writing about this retaliation three different

times to Boguski and Carlson. (SOF 190-192). No investigation was ever conducted into Plaintiff's complaints – an investigation that would have revealed that two different HR professionals thought Ketchum's write-up and PIP appeared retaliatory. (SOF 194-200).

Less than one week after Plaintiff's most recent complaint of retaliation, she was terminated. On August 18, 2020, Ketchum was in Plaintiff's locked office and found a prescription of Hydrocodone on Plaintiff's desk: a prescription for her diagnosed disabilities. (SOF 203, 208). Even though Ketchum and Carlson were well aware of Plaintiff's disabilities, they terminated her allegedly for suspicion of working under the influence of opioids and failing to secure a controlled substance. (SOF 207, 210). No one ever asked if Plaintiff took the medication while working. (SOF 209). And no one acknowledged the very limited access to the locked office. In fact, only three people had access to the office; Ketchum needed to ask Plaintiff for the code to access the office that day. (SOF 204). As Plaintiff will demonstrate, any alleged reason for termination is pretextual.

Furthermore, Plaintiff's "me too" witnesses will expose a pattern of retaliation against whistleblowers. The first was another NP who preceded Plaintiff, Deborah Asberry, who made repeated reports of non-compliance regarding working as a NP with a collaborative practice agreement as well as incapacitated patients who were without durable powers of attorneys ("DPOA"), both in violation of law and public policy. (SOF 222, 229, 238). After Asberry lodged her complaints, Ketchum called her a "liability" and put her on a PIP to manage her out. (SOF 230-31). The other "me too" witness was Ms. Ketchum herself who likewise raised DPOA non-compliance reports. (SOF 249-252). Both Asberry and Ketchum were terminated shortly after their reports, and both believe they were fired in retaliation for blowing the whistle.

As set forth below, there are substantial disputed material facts in this case that a jury

needs to decide. Defendants' Motion for Summary Judgment should be denied on Plaintiff's MHRA disability and WPA claims.

## II. PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### A. Background Facts and Parties.

1. American Health Companies, LLC, d/b/a American Health Partners ("AHP") is a Tennessee limited liability company. (Declaration of Jonathan Cooper, ¶ 3, Exhibit 4)

**RESPONSE:** Uncontroverted.

2. TruHealth, LLC, f/k/a TruHealth, Inc., d/b/a TruAdvantage, Inc. ("TruHealth") is a Tennessee limited liability company authorized to do business in the State of Missouri. (Declaration of Jonathan Cooper, ¶ 4, Exhibit 4)

**RESPONSE:** Uncontroverted.

3. TruHealth is a wholly owned subsidiary of AHP. (Declaration of Jonathan Cooper, ¶ 5, Exhibit 4)

**RESPONSE:** Uncontroverted.

4. TruHealth provides nurse practitioner ("NP") and physician assistant services in skilled nursing facilities in Missouri. (Declaration of Jonathan Cooper, ¶ 6, Exhibit 4)

**RESPONSE:** Uncontroverted.

5. On December 2, 2019, TruHealth hired Plaintiff as a NP in the Kansas City area.

(Plt. Dep., p. 31:13-31:20, Exhibit 1; Dep. Ex. 2, Exhibit 5)

**RESPONSE:** Uncontroverted.

6. As a NP for TruHealth, Plaintiff's duties included directing the care and treatment of patients in a skilled nursing setting. (Plt. Dep., 30:20-31:12, Exhibit 1; Dep. Ex. 3, Exhibit 6)

**RESPONSE:** Uncontroverted.

7. As a NP for TruHealth, Plaintiff provided services at various different facilities that were not owned by TruHealth but at which TruHealth had patients. (Plt. Dep., p. 28:9-29:5, 39:3-39:23, Exhibit 1)

**RESPONSE:** Controverted. Defendants did not own the facilities; however, Defendants partnered with the facilities to provide health care services to patients. [Exhibit 1, Ketchum Depo., at 125:01-03; 159:19-24; 172:17-21; Exhibit 13, Cooper Depo., at 55:04-05; 87:19-22]. Defendants are contracted with the facilities to provide these services. [Exhibit 2, Carlyle Depo., at 157:23-24].

8. Plaintiff's immediate supervisor during her entire tenure at TruHealth was Clinical Program Manager Dawn Ketchum. (Plt. Dep., p. 31:21-31:24, Exhibit 1; Ketchum Dep., p. 14:2-14:4, Exhibit 2)

**RESPONSE:** Uncontroverted.

9. Ketchum's immediate supervisor during the time that Plaintiff worked at TruHealth was Director Kami Carlson. (Plt. Dep., p. 46:9-46:13, Exhibit 1; Carlson Dep., p. 10:21-10:23,

Exhibit 3)

**RESPONSE:** Uncontroverted.

10. Plaintiff asserts claims of age and disability discrimination and retaliation under the Missouri Human Rights Act, as well as retaliation under the Missouri Whistleblower Protection Act. (*See Notice of Removal*, Doc. #1)

**RESPONSE:** Uncontroverted.

**B. TruHealth Issues Plaintiff a Coaching for Poor Performance on June 23, 2020.**

11. On June 23, 2020, TruHealth issued Plaintiff an Employee Coaching Form. (Plt. Dep., p. 61:4-61:14, Exhibit 1; Dep. Ex. 11, Exhibit 11)

**RESPONSE:** Uncontroverted.

12. The Employee Coaching Form lists eight (8) areas of constructive feedback needing improvement including Plaintiff's failure to get her charts completed within five (5) days. (Plt. Dep., p. 69:4-70:1, Exhibit 1; Dep. Ex. 11, Exhibit 11)

**RESPONSE:** Uncontroverted.

13. Plaintiff's failure to timely complete charts had been an ongoing problem with her performance. (Plt. Dep., p. 44:2-45:8, 49:22-51:11, 57:5-57:15, 59:11-59:25, Exhibit 1; Dep. Exs. 5, 6, 9, 10, and 11, Exhibits 7, 8, 9, 10, 11)

**RESPONSE:** Controverted. While Plaintiff acknowledged that she was having trouble keeping up with the charting workload, this SOF omits the facts that Plaintiff performed well prior to her workload being doubled and that she was drastically improving her performance even before the PIP was issued. First, Plaintiff had no struggles completing her charting prior to Defendants doubling her workload, and she received a favorable review in March 2020. [Ex. 1, Ketchum Depo., 73:21-74:04; 79:10-17; Ex. 10, Depo. Ex. 78; Ex. 4, Carlyle Affidavit, at ¶¶ 6-7]. Indeed, shortly after Plaintiff's review, Defendants raised the nurse-to-patient ratio from below 40 patients per nurse to 70-80 patients per nurse. [Exhibit 2, Carlyle Depo., at 97:03-10; Exhibit 11, Depo. Ex. 79]. Plaintiff began struggling to keep up with charting after her workload was doubled. [Exhibit 4, Carlyle Affidavit, at ¶ 7]. Second, through informal coaching and strategies provided by Ms. Ketchum, Plaintiff improved her charting from 40 late charts to 14 late charts by the end of July. [Ex. 1, Ketchum Depo., at 102:24-103:20, 108:22-109:10]. And this improvement came even though Plaintiff could not visit patients for a week due to Covid-19 exposure. [Ex. 1, Ketchum Depo., at 103:06-09; Ex. 2, Carlyle Depo., at 76:20-77:03; Ex. 8, Depo. Ex. 18]. Furthermore, Plaintiff was not alone being late with charting. Ms. Ketchum testified that "everybody was a little bit behind [because] we were rolling all these new facilities out and adding continued patients and was trying to get to those facilities and [] getting patients seen. It was a lot for some of them." [*Id.* at 82:10-16].

14. Plaintiff continued to have problems with timely completing charts following the June 23, 2020, coaching. (Plt. Dep., p. 71:25-72:9, 81:3-82:4, 82:23-84:4, 87:6-87:12, Exhibit 1; Dep. Exs. 12, 13, 14, and 15, Exhibits 12, 13, 14, 15)

**RESPONSE:** Controverted. While Plaintiff acknowledged that she was having trouble

keeping up with the charting workload, this SOF omits the facts that Plaintiff performed well prior to her workload being doubled and that she was drastically improving her performance even before the PIP was issued. First, Plaintiff had no struggles completing her charting prior to Defendants doubling her workload, and she received a favorable review in February 2020. [Ex. 1, Ketchum Depo., 73:21-74:04; 79:10-17; Ex. 10, Depo. Ex. 78; Ex. 4, Carlyle Affidavit, at ¶¶ 6-7]. Indeed, shortly after Plaintiff's review, Defendants raised the nurse-to-patient ratio from below 40 patients per nurse to 70-80 patients per nurse. [Ex. 11, Depo. Ex. 79]. Furthermore, through informal coaching and strategies provided by Ms. Ketchum, Plaintiff improved her charting from 40 late charts to 14 late charts by the end of July. [Ex. 1, Ketchum Depo., at 102:24-103:20, 108:22-109:10]. And this improvement came even though Plaintiff could not visit patients for a week due to Covid-19 exposure. [Ex. 1, Ketchum Depo., at 103:06-09; Ex. 2, Carlyle Depo., at 76:20-77:03; Ex. 8, Depo. Ex. 18]. Furthermore, Plaintiff was not alone being late with charting. Ms. Ketchum testified that "everybody was a little bit behind [because] we were rolling all these new facilities out and adding continued patients and was trying to get to those facilities and [] getting patients seen. It was a lot for some of them." [*Id.* at 82:10-16].

### C. TruHealth Issues Plaintiff a Written Warning for Insubordination.

15. On July 14, 2020, Plaintiff called the State Department of Health and Senior Services ("DHSS") to report alleged abuse by a male resident at Highland Rehabilitation (a facility at which she provided services) against a female resident at Highland Rehabilitation. (Plt. Dep., p. 94:20-95:12, 108:16-109:5, Exhibit 1; Dep. Exs. 17 & 18, Exhibits 17 & 18)

**RESPONSE:** Controverted. Plaintiff called the DHSS to report not only the abuse of the male resident, but more specifically, the *continued* abuse by that resident against multiple female residents. [Ex. 2, Carlyle Depo., at 95:25-96:02; 114:08-13; Ex. 4, Depo. Ex. 17].

However, Plaintiff's primary concern was that no one took any action to stop the abuse and neglect of the female residents. [Ex. 2, Carlyle Depo., at 108:16-20; Ex. 1, Ketchum Depo., at 109:21-110:06]. In fact, Plaintiff had reported the male resident's conduct to Ms. Ketchum even prior to this incident. [Ex. 1, Ketchum Depo., at 109:21-110:17; Ex. 2, Carlyle Depo., at 105:16-106:03].

16. The following day, on July 15, 2020, Plaintiff called Ketchum and reported this same alleged abuse. (Plt. Dep., p. 109:13-109:18, 111:13-112:2, 128:24:129:2, Exhibit 1; Ketchum Dep., p. 63:24-64:15, Exhibit 2; Dep. Exs. 17 & 18, Exhibits 17 & 18)

**RESPONSE:** Uncontroverted that Plaintiff reported the abuse and neglect to Ms. Ketchum on July 15, but this SOF is controverted to the extent it implies that this report was the first time Plaintiff reported the male resident's conduct to Ms. Ketchum. Plaintiff had previously reported his continuing sexual misconduct to Ms. Ketchum. [Ex. 1, Ketchum Depo., at 109:21-110:17; Ex. 2, Carlyle Depo., at 105:16-106:03].

17. During this July 15, 2020, telephone call with Ketchum, Plaintiff told Ketchum that the female resident denied any abuse occurred to multiple members of management at Highland Rehabilitation who had investigated the issue. (Plt. Dep., p. 103:22-104:22, 115:3-116:13, Exhibit 1; Ketchum Dep., p. 115:22-116:4, 116:16-119:2, Exhibit 2; Dep. Exs. 17 & 18, Exhibits 17 & 18)

**RESPONSE:** Controverted. Plaintiff only assumed that the female resident denied the allegations of abusive conduct; no one told Plaintiff she denied the allegations. [Ex. 2, Carlyle Depo., at 105:06-15]. Furthermore, the cited authority does not support that Plaintiff told Ms. Ketchum that the female resident had denied the allegations. Rather, the cited information

supports that Ms. Ketchum erroneously included that in Plaintiff's write-up in addition to her erroneous claim that Plaintiff had spoken to the female resident. [Ex. 4, Depo. Ex. 17; Ex. 2, Carlyle Depo., at 104:23-25].

18. During this July 15, 2020, telephone call with Ketchum, Plaintiff did not tell Ketchum that she (Plaintiff) had already reported the alleged abuse to DHSS. (Plt. Dep., p. 129:11-130:11, 130:23-131:16, 131:20-132:5, 192:14-192:25, Exhibit 1; Ketchum Dep., p. 115:22-116:4, 116:16-119:2, Exhibit 2; Dep. Exs. 17, 18, & 30, Exhibits 17, 18 & 25)

**RESPONSE:** Uncontroverted.

19. During this July 15, 2020, telephone call, Ketchum (unaware that Plaintiff had already reported the incident to DHSS) told Plaintiff that she would call Carlson and Kelly Helms (Vice President of Tutera – the company that owned Highland Rehabilitation) to see if this alleged abuse was reportable to DHSS given that the alleged victim denied anything happened and there were no witnesses to the incident. (Plt. Dep., p. 116:1-117:5, Exhibit 1; Ketchum Dep., p. 115:8-116:4, 116:16-119:2, Exhibit 2; Dep., Ex. 17, Exhibit 17)

**RESPONSE:** Controverted. Plaintiff did not know whether the victim had denied the allegations. [Ex. 2, Carlyle Depo., at 105:06-15]. Furthermore, it is indisputable that there was a witness to the incident; a certified nurse assistant witnessed and reported the incident. [Ex. 1, Ketchum Depo., at 114:19-115:02, 120:11-17; Ex. 2, Carlyle Depo., at 94:25-95:12]. This SOF is also controverted to the extent it implies that Ms. Ketchum first learned about the incident on July 15, 2020; Plaintiff previously reported it to her. [Exhibit 1, Ketchum Depo., at 109:21-110:17; Exhibit 2, Carlyle Depo., at 105:16-106:03].

20. On July 15, 2020, Ketchum called Carlson as soon as she got off the telephone with Plaintiff. (Plt. Dep., p. 120:12-120:20, Exhibit 1; Ketchum Dep., p. 115:8-116:10, 118:8-118:20, Exhibit 2; Carlson Dep., p. 35:9-36:12, Exhibit 3; Dep. Ex. 17, Exhibit 17)

**RESPONSE:** Uncontroverted.

21. Ketchum and Carlson agreed that there was nothing to report to DHSS because the alleged abuse was based on hearsay and Highland Rehabilitation had already conducted an investigation. (Plt. Dep., p. 120:21-121:3, Exhibit 1; Ketchum Dep., p. 115:22-116:10, 116:16-119:2, Exhibit 2; Carlson Dep., p. 35:9-36:12, Exhibit 3; Dep. Ex. 17, Exhibit 17)

**RESPONSE:** Controverted. The abuse was not based on hearsay because a certified nurse assistant witnessed the abuse and reported it. [Ex. 1, Ketchum Depo., at 114:19-115:02, 120:11-17; Ex. 2, Carlyle Depo., at 94:25-95:12]. Furthermore, neither Ms. Ketchum nor Ms. Carlson ever spoke to anyone who allegedly investigated the abuse or who were present in any meetings, other than Plaintiff. [Ex. 1, Ketchum Depo., at 116:08-15; Ex. 5, Carlson Depo., at 36:13-24]. Additionally, neither Ms. Ketchum nor Ms. Carlson spoke with Heather Crouch, a TruHealth employee who was present in the meetings about this incident. [*Id.*; Ex. 2, Carlyle Depo., at 98:16-18]. Moreover, the health care providers in the meetings agreed that because the male resident's behavior was recurring, he should be discharged from the facility. [Ex. 2, Carlyle Depo., at 102:07-103:09].

22. On July 15, 2020, Ketchum called Plaintiff after getting off the telephone with Carlson and told Plaintiff that she (Ketchum) and Carlson agreed that there was nothing to report

to DHSS. (Plt. Dep., p. 121:4-121:13, Exhibit 1; Ketchum Dep., p. 115:22-116:4, 116:16-119:2, Exhibit 2; Carlson Dep., p. 35:9-36:12, Exhibit 3; Dep. Ex. 17, Exhibit 17)

**RESPONSE:** Uncontroverted.

23. During this second telephone call on July 15, 2020, when Ketchum told Plaintiff there was nothing to report to the DHSS, Plaintiff told Ketchum that "it was a little late" because she had already reported the incident to DHSS on July 14, 2020 – prior to ever calling Ketchum.[2] (Plt. Dep., p. 129:11-130:11, 130:23-131:16, 131:20-132:5, 192:14-192:25, Exhibit 1; Dep. Exs.18 & 30, Exhibits 18 & 25)

**RESPONSE:** Controverted. Plaintiff previously informed Ms. Ketchum of the incident of sexual abuse; Ms. Ketchum was aware of what happened. [Exhibit 1, Ketchum Depo., at 109:21-110:17; Exhibit 2, Carlyle Depo., at 105:16-106:03]. Furthermore, Defendant's footnote 1 is controverted in that Plaintiff telling Ms. Ketchum that she had called DHSS is not a "significant" piece of information that should have been reported to Ms. Ketchum. Plaintiff had every right to confidentiality in her report to the DHSS, and both Ms. Ketchum and Ms. Carlson unequivocally admitted as much. [Exhibit 6, Depo. Ex. 75; Exhibit 1, Ketchum Depo., at 28:22-29:07, 58:08-14; Exhibit 5, Carlson Depo., at 16:12-23, 49:07-18]. In fact, Ms. Carlson acknowledged this, "She absolutely did not have to tell us." [Exhibit 5, Carlson Depo., at 110:16-19].

---

[2] There is a fact dispute as to when Plaintiff told Ketchum about reporting the incident to DHSS, but the dispute is not material to the outcome of this case. The facts outlined in the Statement of Facts accept Plaintiff's testimony for purposes of summary judgment. However, according to Ketchum, Plaintiff did not tell Ketchum that she (Plaintiff) called DHSS during the second telephone call on July 15. Ketchum testified that it was the next day (July 16) that Plaintiff called Ketchum and told her that DHSS was at the facility due to a report that she (Plaintiff) made following the July 15 call when Ketchum instructed Plaintiff there was nothing to report. (Ketchum Dep., p. 115:8-119:2, 121:15-123:11, Exhibit 2; Dep. Ex. 17, Exhibit 17) This fact dispute is immaterial because it is uncontroverted that Plaintiff did not tell Ketchum about her report to DHSS during their initial call and that this "fact" was a significant piece of information that should have been reported to Ketchum. (Plt. Dep., p.130:23-132:5, Exhibit 1)

24. Plaintiff agrees that the fact she had already reported the alleged abuse to DHSS on July 14, 2020, was an important piece of information for her to convey to Ketchum when they originally spoke on July 15, 2020, which she failed to do. (Plt. Dep., p.130:23-132:5, Exhibit 1)

**RESPONSE:** Controverted. Plaintiff had no duty to convey such information to Ms. Ketchum. Plaintiff had a legal right to confidentiality in her report to the DHSS. [Ex. 6, Depo. Ex. 75; Ex. 1, Ketchum Depo., at 28:22-29:07, 58:08-14; Ex. 5, Carlson Depo., at 16:12-23, 49:07-18]. In fact, Ms. Carlson acknowledged this, "She absolutely did not have to tell us." [Ex. 5, Carlson Depo., at 110:16-19].

25. On August 4, 2020, TruHealth issued Plaintiff a written warning on a Personnel Action Form ("PAF") for insubordination. (Plt. Dep., p. 111:4-111:9, Exhibit 1; Dep. Ex. 17, Exhibit 17)

**RESPONSE:** Uncontroverted.

## D. TruHealth Issues Plaintiff a Written Warning for Referring to Two Members of Management at a Customer Location as "Butt Buddies."

26. On August 4, 2020, TruHealth issued Plaintiff a written warning on a PAF for referring to two members of a customer's management team as "butt buddies." (Plt. Dep., p. 157:14-157:19, Exhibit 1; Dep. Ex. 22, Exhibit 20)

**RESPONSE:** Uncontroverted

27. The PAF TruHealth issued to Plaintiff for referring to two members of a customer's management team as "butt buddies" reads as follows:

> On multiple occasions in several meetings, Lynda has repeatedly used the words, "butt buddies" in regard to the administrator and DON [Director of Nursing] at one of the facilities we are contracted with. I had an employee make a complaint about her using these words. They found it offensive and inappropriate. I sent an email out to all staff on my team saying that all meetings from here on out would need to be professional and that everyone needs to think about what they say before saying it and to make sure not to use language that is offensive to others. That afternoon we had a meeting and Lynda used the words, "butt buddies" regarding the Admin and DON again and the person that made the complaint was on the teams meeting. Lynda even said on the call she should [not] say it, and I said no you shouldn't say it and she said but I'm going to say it and then said the words.

(Plt. Dep., p. 157:14-159:17, Exhibit 1; Dep. Ex. 22, Exhibit 20)

**RESPONSE:** Uncontroverted that the document states as such; however, this SOF is controverted because it misrepresents the number and frequency of the occurrences. Plaintiff used the term twice, and she never used it again once she was informed that it was offensive. [Ex. 2, Carlyle Depo., 158:04-06, 160:12-17].

28. Plaintiff admits that she referred to two members of a customer's management team as "butt buddies." (Plt. Dep., p. 153:14-154:1, 157:20-158:16, Exhibit 1)

**RESPONSE:** Uncontroverted.

## E. TruHealth Issues Plaintiff a Performance Improvement Plan.

29. On August 5, 2020, TruHealth issued Plaintiff a Performance Improvement Plan ("PIP") that outlines the following five (5) areas of concern:

> 1. Charts not being completed within the 5-day requirement. Currently (7/27/200) has 14 charts in Gehrimed that are incomplete some are from 7/8/2020, 2 weeks past due. Already received coaching form and still no improvement. Needs to work on time management.
>
> 2. Insubordination/following through with directives from supervisor and/or management. See Personnel Action [F]orm from 8/4/2020.
>
> 3. Liability Concerns: Lynda stated on a conference call in front of other staff that she gave orders on a patient that wasn't ours. The patient had fallen, and

> Lynda stated no other providers were in the facility and that the patient was going to be our member on the first of the month. I [Dawn Ketchum] had several people come to me with concern regarding this. This could be a liability issue. Also, staff could have called the provider on call.
>
> 4. Professionalism: show professionalism while on calls/meetings. I had a staff member come to me with complaints that some of the words you are using are offensive. I sent an email out to the entire team addressing professionalism during meetings. I said to think about words that you are using that could be offensive to others, and that from here on out ALL meetings would be professional. Later that day in one of our meetings she again used some unprofessional language regarding the Admin and DON at Monterey that was offensive to one of the staff on the call.
>
> 5. Heather hasn't been getting her work done on time (HRA's) because she didn't want to overwhelm you because she said she knew you were behind in your work. You can affect the work of co-workers because you are behind.

(Plt. Dep., 90:23-91:3, 91:15-91:24, 92:4-92:23, 93:14-93:23, 136:4-136:20, 152:10-153:5, 161:21-162:3, Exhibit 1; Dep. Ex. 16, Exhibit 16)

**RESPONSE:** Uncontroverted.

30. Following delivery of the PIP to Plaintiff on August 5, 2020, TruHealth issued Plaintiff a revised PIP and removed items 3 and 5 based on Plaintiff's dispute of those items. (Ketchum Dep., p. 62:6-63:1, 144:7-145:6, 145:17-146:6, Exhibit 2; Dep. Ex. 24 & 60, Exhibits 21 & 30)

**RESPONSE:** Controverted. However, item 3 was reprised in a written warning the next day which still included false allegations. [See SOF 31, Response to SOF 31].

**F. TruHealth Issues Plaintiff a Written Warning for Providing Treatment to a Non-TruHealth Member.**

31. On August 5, 2020, TruHealth issued Plaintiff a written warning on a PAF for

providing treatment/services to a non-TruHealth member. (Plt. Dep., p. 140:7-140:10, Exhibit 1; Dep. Ex. 19, Exhibit 19)

**RESPONSE:** Uncontroverted that Defendant issued such a written warning on August 5, 2020.

32. The PAF TruHealth issued to Plaintiff for providing treatment/services to a non-TruHealth member reads as follows:

> During a PIP review with you on 8/2/2020, I told you I had two team members state[d] that you had said on one of the meetings that you gave orders on a patient that fell that wasn't one of our members. You stated that is not what happened that you called the PCP and the PCP said to send the patient in to the hospital. The issue is that you shouldn't have involved yourself with a patient that wasn't one of our members. You shouldn't have called the PCP, the staff should have called the provider. This could have become a liability issue with our company since that patient wasn't our member. You had to pass the order to the staff to initiate ambulance pick up. This also creates an issue with regards to the facility having documentation on who spoke to the doctor and what was said and discussed.

(Plt. Dep., p. 140:7-140:17, 141:6-142:6, 142:23-143:5, 144:16-144:20, 145:9-145:14, Exhibit 1; Dep. Ex. 19, Exhibit 19)

**RESPONSE:** Uncontroverted that the PAF issued to Plaintiff stated as such. However, this SOF is controverted in its characterization of what Plaintiff's actions were. [*See* SOF 118-127]. Plaintiff checked the patient's airways, breathing, and pulse. Plaintiff performed duties required as a licensed nurse practitioner in the State of Missouri. [Exhibit 2, Carlyle Depo., at 137:21-138:06].

**G. Plaintiff Files Internal Complaints with TruHealth.**

33. On August 9, 2020, Plaintiff submitted a grievance to TruHealth Employee Relations Specialist Peter Boguski complaining that the three PAFs and PIP issued to her the week before "were either lacking in most of their accuracy, the information was false, or it was made up

completely or backwards . . ." (Plt. Dep., p. 175:5-175:8, 175:17-175:23, 177:7-177:21, Exhibit 1; Dep. Ex. 27, Exhibit 22)

**RESPONSE:** Uncontroverted.

34. Plaintiff's August 9, 2020, grievance did not allege that any of the PAFs or PIP were issued to her because of her age, her alleged disabilities, or in retaliation for her complaint to DHSS. (Plt. Dep., p. 186:12-186:16, 186:19-186:25, 187:16-187:21, Dep. Ex. 27, Exhibit 22)

**RESPONSE:** Controverted. Plaintiff complained about unethical behavior and differential treatment from her supervisor, Ms. Ketchum. [Ex. 7, Depo. Ex. 27]. Furthermore, Plaintiff incorporated by reference her PAF responses which specifically cited the mandatory reporter statute, RSMo. 198.070, and her report to the DHSS thereunder. [Ex. 8, Depo. Ex. 18].

35. On August 10, 2020, Boguski asked Plaintiff by email if he could forward her grievance to Carlson – and Plaintiff agreed. (Plt. Dep., p. 188:13-189:1, Exhibit 1; Dep. Ex. 28, Exhibit 23)

**RESPONSE:** Uncontroverted that Plaintiff ultimately agreed to Boguski's suggestion despite initially indicating to Mr. Boguski that she was uncomfortable sending it to Ms. Carlson. [Ex. 9, Depo. Ex. 28]. However, Mr. Boguski testified that Ms. Carlson would be an inappropriate person to conduct the investigation. [Ex. 12, Boguski Depo., at 87:18-88:01, 99:15-22].

36. On August 10, 2020, Carlson emailed Plaintiff that she had received the grievance from Boguski. (Plt. Dep., p. 189:12-189:16, Exhibit 1; Dep. Ex. 29, Exhibit 24)

**RESPONSE:** Uncontroverted.

37. On August 13, 2020, Plaintiff sent an email to Boguski complaining further about the three PAFs and PIP issued to her earlier in the month. (Plt. Dep., p. 189:24-190:2, 190:21-191:7, Exhibit 1; Dep. Ex. 30, Exhibit 25)

**RESPONSE:** Uncontroverted.

38. In her August 13, 2020, email, Plaintiff complains for the first time that she believed the PAF issued to her for insubordination was in retaliation for her calling DHSS. (Plt. Dep., p. 190:21-191:7, Exhibit 1, Dep. Ex. 30, Exhibit 25)

**RESPONSE:** Controverted. Plaintiff also complained in her August 9 complaint that the differential treatment was due to her mandated call to the DHSS. [Ex. 7, Depo. Ex. 27].

39. Plaintiff's August 13, 2020, email did not allege that any of the PAFs or PIP were issued to her because of her age or her alleged disabilities. (Dep. Ex. 30, Exhibit 25)

**RESPONSE:** Uncontroverted.

40. On August 14, 2020, Plaintiff sent an email to Carlson (which was largely a cut and paste of her August 13 email to Boguski) complaining further about the three PAFs and PIP issued to her earlier in the month. (Plt. Dep., p. 196:13-196:23, Exhibit 1; Dep. Ex. 31, Exhibit 26)

**RESPONSE:** Controverted. Plaintiff sent a complaint to Ms. Carlson on August 14, 2020. However, not only is the Defendants' comment that Plaintiff's complaint to Ms. Carlson "was largely a cut and paste" not a material fact, but it is also controverted. Plaintiff adapted

each report of retaliation to its recipient. Though, Plaintiff complained about retaliation for calling the DHSS in both complaints, the first on August 13 to Mr. Boguski, she then reported retaliation again on August 14 to Ms. Carlson. [Exhibit 16, Depo. Ex. 30; Exhibit 59, Depo. Ex. 31].

41. Plaintiff's August 14, 2020, email did not allege that any of the PAFs or PIP were issued to her because of her age or her alleged disabilities. (Dep. Ex. 31, Exhibit 26)

**RESPONSE:** Uncontroverted.

42. Carlson investigated the issues raised by Plaintiff regarding the three PAFs and PIP. (Carlson Dep., p. 105:5-106:4, 106:14-107:12, Exhibit 3; Dep. Ex. 32, Exhibit 27)

**RESPONSE:** Controverted. Ms. Carlson did not investigate Plaintiff's complaints; she merely "looked back at the timeline." [Ex. 5, Carlson Depo., at 105:15-24]. In fact, she stated, "I don't think I was investigating it as such" and she expected Human Resources to investigate these types of complaints. [Ex. 5, Carlson Depo., at 19:12-22, 99:11-14, 100:09-12]. Mr. Boguski and Mr. Cooper (both HR professionals) also expect Human Resources to investigate such complaints. [Ex. 12, Boguski Depo., at 21:08-19; Ex. 13, Cooper Depo., at 27:04-14]. Furthermore, Mr. Cooper stated that HR would conduct the investigation in coordination with the business leader unless the complaint involved the business leader, and Ms. Carlson was the business leader in this circumstance. [Ex. 13, Cooper Depo., at 27:11-15]. And Mr. Boguski testified that Ms. Carlson would be an inappropriate person to conduct the investigation. [Ex. 12, Boguski Depo., at 87:18-88:01, 99:15-22].

43. On August 17, 2020, Carlson drafted a summary of her investigation regarding the three PAFs and PIP concluding that the documents were properly issued to Plaintiff. (Carlson, Dep., p. 106:14-107:12, 107:20-108:8, 110:16-111:22, Exhibit 3; Dep. Ex. 32, Exhibit 27)

**RESPONSE:** Controverted. Ms. Carlson did not investigate Plaintiff's complaints; she merely reviewed the PAF and PIP. [Response to SOF 42]. Ms. Carlson did not intend for her review to be a response to either of Plaintiff's complaints from August 9 and August 13; rather, she intended to "go back and look at what [Plaintiff] said as opposed to what got written . . . ." [Ex. 5, Carlson Depo., at 107:05-11].

44. Plaintiff has no information or knowledge that her age was factor of any kind in Carlson's conclusions that the PAFs and PIP were properly issued.

> Q. Do you have any information or knowledge that your age was a factor of any kind in Ms. Carlson's -- Ms. Carlson's conclusions as shown here in Exhibit 32?
>
> A. No.

(Plt. Dep., p. 211:12-211:16, Exhibit 1)

**RESPONSE:** Uncontroverted.

45. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in Carlson's conclusions that the PAFs and PIP were properly issued.

> Q. Do you have any information or knowledge that your physical or mental condition was a factor of any kind in Ms. Carlson's conclusions as shown here in Exhibit 32?
>
> A. Not -- no.

(Plt. Dep., p. 211:17-211:21, Exhibit 1)

**RESPONSE:** Controverted. Plaintiff suffered a non-work injury earlier in June, and Ms. Ketchum and Ms. Carlson were both aware of this fact. [Ex. 2, Carlyle Depo., 119:01-05, 237:15-238:19; Ex. 15, Depo. Ex. 77]. Plaintiff was in physical therapy three days a week to treat her injury. [Ex. 15, Depo., Ex. 77]. Prior to her injury, Plaintiff and Ms. Ketchum had a cordial and friendly relationship; however, the friendly relationship ceased after Plaintiff's injury. [*Id.* at 119:06-12]. Ms. Ketchum was also aware of Plaintiff's anxiety and ADHD diagnoses, and her treatment of Plaintiff adversely changed following Ms. Ketchum's awareness. [Ex. 2, Carlyle Depo., at 240:12-241:04, 241:16-21, 242:15-21].

46. Other than her personal, subjective belief, Plaintiff has no information or knowledge that her reporting the alleged abuse to DHSS was factor of any kind in Carlson's conclusions that the PAFs and PIP were properly issued.

> Q. [] Do you have any information or knowledge that your complaint to the State DHSS on July 14th of 2020 was a factor of any kind in Ms. Carlson's conclusions as shown here in Exhibit 32?
>
> A. I feel it was, but...
>
> Q. Other than your subjective feelings, do you have any other information or knowledge that your complaint to the State on July 14, 2020, was a factor of any kind in Ms. Carlson's conclusions as shown here in Exhibit 32?
>
> A. No.

(Plt. Dep., p. 212:2-212:13, Exhibit 1)

**RESPONSE:** Controverted. Ms. Carlson admitted that Plaintiff was not insubordinate by calling the DHSS. [Ex. 5, Carlson Depo., at 113:03-11, 115:07-13]. Ms. Carlson stated that she was willing to dismiss the insubordination related to calling the DHSS, but she did not dismiss it. [*Id.* at 115:14-21, 116:07-10]. Ms. Carlson acknowledged that Plaintiff complied

with both company policy and the mandatory reporter statute in reporting the suspected abuse and neglect to her supervisor and to the DHSS. [Ex. 5, Carlson Depo., at 79:13-19]. Furthermore, before Plaintiff filed either of her complaints, Ms. Carlson "[did]n't want to leave [Plaintiff] any loophole to do her own reporting" and she expected any statutory mandatory reporting to be done by the program manager. [Ex. 14, Depo. Ex. 63]. Ms. Carlson knew Plaintiff had a legal *obligation* to report to the DHSS any suspected abuse or neglect, and she knew Plaintiff had a legal right to confidentiality in making such a report. [Ex. 5, Carlson Depo., at 78:11-12, 110:16-19].

## H. TruHealth Terminates Plaintiff.

47. On August 18, 2020, Ketchum was at Highland Rehabilitation with a new NP (Leslie Bunyar). (Plt. Dep., p. 220:18-221:3, Exhibit 1; Ketchum Dep., p. 195:3-195:22, Exhibit 2; Dep. Ex. 33, Exhibit 28)

**RESPONSE:** Uncontroverted.

48. Ketchum and Bunyar went into the office at Highland Rehabilitation that is shared by the TruHealth NPs such as Plaintiff and the Case Manager. (Plt. Dep., p. 220:18-221:3, Exhibit 1; Ketchum Dep., p. 195:3-195-22, 196:21-197:12, Exhibit 2; Dep. Ex. 33, Exhibit28)

**RESPONSE:** Controverted. The Highland Rehabilitation office is shared by *only* Plaintiff and the Case Manager, Heather Crouch. [Ex. 2, Carlyle Depo., at 226:02-10; Ex. 3, Carlyle Affidavit, at ¶ 10].

49. People other than Plaintiff had access to this office. (Plt. Dep., p. 223:23-223:25, 225:24-226:10, 227:8-227:25, Exhibit 1; Ketchum Dep., p. 195:3-195:11, 196:21-198:8, 199:17-199:25, Exhibit 2; Dep. Ex. 33, Exhibit 28)

**RESPONSE:** Controverted as misleading. Other than Plaintiff, only two people had access to the office, Ms. Crouch and the Maintenance Supervisor. [Ex. 2, Carlyle Depo., at 226:02-18; Exhibit 3, Carlyle Affidavit at ¶ 13]. The office was secured by number keypad lock as were most of the rooms and offices at Highland. [Exhibit 3, Carlyle Affidavit at ¶ 11]. Highland's maintenance supervisor programmed the number codes for the locks, and only the occupants of the offices or rooms and the maintenance supervisor knew the code to each respective office or room. [*Id.* at ¶ 12]. Ms. Ketchum did not have independent access to the office. Plaintiff had to share the code with her on August 18 so Ketchum could access required PPEs. [Exhibit 36, text message].

50. On one of the desks in the office at Highland Rehabilitation was a pill bottle containing Hydrocodone sitting in plain sight. (Plt. Dep., p. 220:18-222:1, Exhibit 1; Ketchum Dep., p. 195:3-195:7, 200:1-200:21, Exhibit 2; Dep. Exs. 33 & 89, Exhibits 28 & 31)

**RESPONSE:** Uncontroverted that the pill bottle was on a desk. However, this SOF is controverted in that the term "plain sight" is argumentative because the office is secured by a number code lock to which only three people had access. [Ex. 2, Carlyle Depo., at 223:17-20; Response to SOF ("RSOF") 49].

51. The pill bottle containing the Hydrocodone sitting in plain sight had Plaintiff's name on it. (Plt. Dep., p. 220:18-222:1, 233:3-233:7, Exhibit 1; Ketchum Dep., p. 195:3-195:7,

200:1-200:21, Exhibit 2; Dep. Exs. 33 & 89, Exhibits 28 & 31)

**RESPONSE:** Uncontroverted that the pill bottle was Plaintiff's. However, this SOF is controverted in that the term "plain sight" is argumentative because the office is secured by a number code lock to which only three people had access. [Ex. 2, Carlyle Depo., at 223:17-20; RSOF 49].

52. The pill bottle containing the Hydrocodone sitting in plain sight belonged to Plaintiff. (Plt. Dep., p. 220:18-222:1, 222:15-222:24, 233:3-233:7, Exhibit 1; Ketchum Dep., p. 195:3-195:7, 200:1-200:21, Exhibit 2; Dep. Exs. 33 & 89, Exhibits 28 & 31)

**RESPONSE:** Uncontroverted that the pill bottle was Plaintiff's. However, this SOF is controverted in that the term "plain sight" is argumentative because the office is secured by a number code lock to which only three people had access. [Ex. 2, Carlyle Depo., at 223:17-20; RSOF 49].

53. The pill bottle containing the Hydrocodone sitting in plain sight was unsecured. (Plt. Dep., p. 220:18-222:1, 224:6-224:11, Exhibit 1; Ketchum Dep., p. 195:3-195:7, 200:1-200:21, Exhibit 2; Dep. Exs. 33 & 89, Exhibits 28 & 31)

**RESPONSE:** Controverted. The office was secured by a number code lock to which only three people had access. [Ex. 2, Carlyle Depo., at 223:17-20; RSOF 49].

54. Leaving a bottle of Hydrocodone sitting in plain sight and unsecured at a long-term care rehabilitation center like Highland Rehabilitation is improper. (Plt. Dep., p. 224:6-224:11, 228:18-229:8, 230:3-230:7, 233:3-233:7, Exhibit 1; Ketchum Dep., p. 200:1-200:21, Exhibit 2;

Carlson Dep., p. 124:1-124:19, Exhibit 3; Cooper Dep., p. 70:23-71:14, 93:15-94:4, 99:11-100:7 Exhibit 32; Dep. Exs. 33 & 89, Exhibits 28 & 31)

**RESPONSE:** Controverted that the pill bottle was left in plain sight and that it was unsecured. [Ex. 2, Carlyle Depo., at 223:17-20; RSOF 49].

55. Plaintiff admits that she left a bottle of Hydrocodone sitting in plain sight and unsecured at Highland Rehabilitation. (Plt. Dep., p. 229:24-230:7, 233:3-233:7, Exhibit 1; Dep. Ex. 33, Exhibit 28)

**RESPONSE:** Controverted. Plaintiff admitted that the pill bottle was left on her desk secured in a locked office to which only two other people had access. [Ex. 2, Carlyle Depo., at 223:17-20; 224:21-24; RSOF 49].

56. Plaintiff admits that her conduct in leaving a bottle of Hydrocodone in plain sight and unsecured at Highland Rehabilitation warranted discipline.

> Q. Would you agree with me that leaving opioids in an unsecured area as you did on August 18th of 2020 was grounds for discipline?
>
> A. I would say some type of discipline, yes.

(Plt. Dep., p. 230:3-230:7, Exhibit 1)

**RESPONSE:** Uncontroverted, but incomplete and misleading. Plaintiff believed that it could have warranted discipline short of termination, but she believed Defendants used it to terminate her in retaliation for calling the DHSS and for making complaints about retaliation. [Ex. 2, Carlyle Depo., at 230:08-15, 230:25-231:04]. Ms. Carlson also admitted that discipline short of termination was discussed. [Ex. 5, Carlson Depo., at 130:18-131:12].

57. On August 19, 2020, TruHealth called Plaintiff and terminated her employment. (Plt. Dep., p. 214:5-214:11, 215:7:215:11, Exhibit 1; Ketchum Dep., p. 207:14-209:3, Exhibit 2; Dep. Ex. 34, Exhibit 29)

**RESPONSE:** Controverted. Plaintiff had requested a meeting with Ms. Carlson to discuss her August 9 and 13 complaints. [Ex. 2, Carlyle Depo., at 214:01-11, 215:03-06]. Rather than discuss her complaints, Defendants terminated her employment. [*Id.* at 215:07-11].

58. TruHealth sent Plaintiff a PAF notifying her of her termination that reads:

> Today when I [Dawn Ketchum] was walking in the office at Highland (with a new employee) that TruHealth NP's and RN Case Managers share, it was noted that there was a bottle of Hydrocodone on one of the desk[s] with the name Lynda Carlyle on it. This was sitting out in plain site [sic]. There is cause for suspicion of working under the influence of Opiods. [sic] Also negligence in securing a controlled substance properly, which is concerning. The Admin, DON, and maintenance have access to this room. It would also be a concern that patients could break into the room and take this medication or distribute to other patients and cause injury or harm. There has been a history of rooms in the facility being broken into. This would be considered Gross Misconduct.

(Plt. Dep., p, 220:6-220:14, Exhibit 1; Dep. Ex. 33, Exhibit 28)

**RESPONSE:** Uncontroverted that the termination notice states as such.

59. Plaintiff is unaware of any other employee who left opioids in an unsecured area like she did who was not terminated.

> Q. Are you aware of any other employee of TruHealth who left opioids in an unsecure area like you did who was not terminated?
>
> A. I'm not aware of any.

(Plt. Dep., p. 229:24-230:2, Exhibit 1)

**RESPONSE:** Controverted that Plaintiff's prescription was left in an unsecured area.

[Ex. 2, Carlyle Depo., at 223:17-20; 224:21-24].

## I. Uncontroverted Facts That TruHealth Did Not Discriminate Against Plaintiff Because of Her Age.[3]

60. Plaintiff was 47 years old at the time she was terminated. (Plt. Dep., p., 13:12-13:13, Exhibit 1)

**RESPONSE:** Uncontroverted.

61. Ketchum was 52 years old at the time Plaintiff was terminated. (Ketchum Dep., p. 41:11-41:12, Exhibit 2)

**RESPONSE:** Uncontroverted.

62. Plaintiff has no information or knowledge that her age was a factor of any kind in TruHealth's decision to issue her the June 23, 2020, Coaching Form.

> Q. Do you have any information or knowledge that your age was a factor of any kind in Ms. Ketchum issuing you this coaching form that's shown here in Exhibit Number 11?
>
> A. Not that I can see, no. (Plt. Dep., p. 71:14-71:18, Exhibit 1)

**RESPONSE:** Uncontroverted.

63. Plaintiff has no information or knowledge that her age was factor of any kind in TruHealth's decision to issue her the PAF on August 4, 2020, for insubordination.

[3] Plaintiff will not pursue her age discrimination claims at trial. However, Plaintiff will demonstrate that there are genuine issues of material facts regarding her remaining claims such that summary judgment is not appropriate on those claims.

Q. With respect to Exhibit Number 17, do you have any information or knowledge that your age was a factor of any kind in the company's decision to issue you Exhibit Number 17 for insubordination?

A. Not that I can find, no. (Plt. Dep., p. 132:6-132:11, Exhibit 1)

**RESPONSE:** Uncontroverted.

64. Plaintiff has no information or knowledge that her age was factor of any kind in TruHealth's decision to issue her the PAF on August 4, 2020, for referring to the managers of a customer's facility as "butt buddies."

Q. Do you have any information or knowledge that your age was a factor of any kind in the company issuing you the PAF shown in Exhibit 22?

A. No.

(Plt. Dep., p. 160:23-161:2, Exhibit 1)

**RESPONSE:** Uncontroverted.

65. Plaintiff has no information or knowledge that her age was factor of any kind in TruHealth's decision to issue her the PIP.

Q. Do you have any information or knowledge that your age was a factor of any kind in the company's decision to issue you the PIP that is shown here in Exhibit 16?

A. No.

(Plt. Dep., p. 168:14-168:18)

**RESPONSE:** Uncontroverted.

66. Plaintiff has no information or knowledge that her age was factor of any kind in

TruHealth's decision to issue her the revised PIP.

> Q. Do you have any information or knowledge that your age was a factor of any kind in the company issuing you the Performance Improvement Plan as revised shown here in Exhibit 24?
>
> A. No.

(Plt. Dep., p. 171:21-172:1, Exhibit 1)

**RESPONSE:** Uncontroverted.

67. Plaintiff has no information or knowledge that her age was factor of any kind in TruHealth's decision to issue her the PAF on August 5, 2020, for providing treatment to a non-TruHealth member.

> Q. Do you have any information or knowledge, going back to Exhibit Number 19, which is the PAF that you were issued for this incident. Do you have any information or knowledge that your age was a factor of any kind in the company issuing you Exhibit Number 19?
>
> A. No.

(Plt. Dep., p. 149:3-149:9, Exhibit 1)

**RESPONSE:** Uncontroverted.

68. Plaintiff has no information or knowledge that her age was factor of any kind in TruHealth's decision to terminate her employment.

> Q. [] Do you have any information or knowledge of any kind that your age was a factor in TruHealth's decision to terminate your employment on August 19, 2020?
>
> A. Not that -- no.

(Plt. Dep., p. 236:1-236:5, Exhibit 1)

**RESPONSE:** Uncontroverted.

69. Plaintiff has no information or knowledge that her age was a factor of any kind with respect to anything that happened to her at TruHealth.

Q. Do you have any information or knowledge that your age was a factor of any kind with respect to anything that happened to you at TruHealth?

A. Not right here, no. (Plt. Dep., p. 236:6-236:10, Exhibit 1)

**RESPONSE:** Uncontroverted.

70. No one at TruHealth ever said anything derogatory towards Plaintiff because of her age.

Q. Did anyone at TruHealth ever say anything derogatory towards you because of your age?

A. Not that I can recall, no. (Plt. Dep., p. 236:11-236:14, Exhibit 1)

**RESPONSE:** Uncontroverted.

**J. Uncontroverted Facts That TruHealth Did Not Discriminate Against Plaintiff Because of Her Alleged Disabilities.**

71. Plaintiff alleges that her disabilities include the following four conditions: (1) osteoarthritis and inflammatory arthritis in her back and knee, (2) depression, (3) anxiety, and (4) ADHD. (Plt. Dep., p. 236:20-237:6, Exhibit 1)

**RESPONSE:** Uncontroverted.

72. Plaintiff never requested any accommodation because of her (1) osteoarthritis and

inflammatory arthritis in her back and knee, (2) depression, (3) anxiety, and (4) ADHD. (Plt. Dep., p. 244:4-244:21, Exhibit 1)

**RESPONSE:** Uncontroverted.

73. Plaintiff does not believe that TruHealth denied her any accommodation because of her (1) osteoarthritis and inflammatory arthritis in her back and knee, (2) depression, (3) anxiety, and (4) ADHD. (Plt. Dep., p. 244:22-245:9, Exhibit 1)

**RESPONSE:** Uncontroverted.

74. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in TruHealth's decision to issue her the June 23, 2020, Coaching Form.

Q. Do you have any information or knowledge that any physical condition or mental condition that you had was a factor of any kind in Ms. Ketchum issuing you the coaching form that's shown here in Exhibit Number 11?

A. Not that I can see, no.

(Plt. Dep., p. 71:19-71:24, Exhibit 1)

**RESPONSE:** Controverted. Plaintiff suffered a non-work injury earlier in June, and Ms. Ketchum and Ms. Carlson were both aware of this fact. [Ex. 2, Carlyle Depo., 119:01-05, 237:15-238:19; Ex. 15, Depo. Ex. 77]. Plaintiff was in physical training three days a week to treat her injury. [Ex. 15, Depo., Ex. 77]. Prior to her injury, Plaintiff and Ms. Ketchum had a cordial and friendly relationship; however, the friendly relationship ceased after Plaintiff's injury. [*Id.* at 119:06-12]. Ms. Ketchum was also aware of Plaintiff's anxiety and ADHD diagnoses, and her treatment of Plaintiff adversely changed following Ms. Ketchum's awareness. [Ex. 2, Carlyle Depo., at 240:12-241:04, 241:16-21, 242:15-21].

75. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in TruHealth's decision to issue her the PAF on August 4, 2020, for insubordination.

> Q. And do you have any information or knowledge that your physical or mental condition was a factor of any kind in the company's decision to issue you the Personnel Action Form shown here in Exhibit Number 17?
>
> A. No, not directly in here, no.
>
> Q. Well, I'm not asking you if it's directly in the document itself, I'm asking you as you sit here today on May 17th of 2022, do you have any information or knowledge of any kind that you can tell me that would support a conclusion that your physical or mental condition was a factor in the company's decision to issue you Exhibit Number 17?
>
> A. I don't believe so.

(Plt. Dep., p. 132:12-133:1, Exhibit 1)

**RESPONSE:** Controverted. While the insubordination PAF was in direct retaliation for her report of abuse and neglect to the DHSS [Ex. 16, Depo. Ex. 30]. Plaintiff's disabilities also played a factor in her write-ups. [RSOF 74].

76. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in TruHealth's decision to issue her the PAF on August 4, 2020, for referring to the managers of a customer's facility as "butt buddies."

> Q. Do you have any information or knowledge that your physical or mental conditions were a factor of any kind in the company's decision to issue you Exhibit Number 22?
>
> A. No.

(Plt. Dep., p. 161:3-161:7, Exhibit 1)

**RESPONSE:** Controverted. While each of her write-ups were in direct retaliation for

her report of abuse and neglect to the DHSS, [Ex. 16, Depo. Ex. 30], Plaintiff's disabilities also played a factor in each of her write-ups. [RSOF 74].

77. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in TruHealth's decision to issue her the PIP.

> Q. Do you have any information or knowledge that your physical or mental condition was a factor of any kind in the company's decision to issue you the Performance Improvement Plan shown here in Exhibit 16?
>
> A. No. Not directly.
>
> Q. Well, either directly or indirectly?
>
> A. It's just my opinion.

(Plt. Dep., p. 168:19-169:1)

**RESPONSE:** Controverted. While the PIP was issued in direct retaliation for her report of abuse and neglect to the DHSS, [Ex. 16, Depo. Ex. 30], Plaintiff's disabilities also played a factor in each of her write-ups and the PIP. [Response to SOF 74].

78. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in TruHealth's decision to issue her the revised PIP.

> Q. Do you have any information or knowledge that your physical or mental condition was a factor of any kind in the company's decision to issue you the revised Performance Improvement Plan shown here in Exhibit 24?
>
> A. No.

(Plt. Dep., p. 172:2-172:7, Exhibit 1)

**RESPONSE:** Controverted. While the PIP was issued in direct retaliation for her report of abuse and neglect to the DHSS, [Ex. 16, Depo. Ex. 30], Plaintiff's disabilities also played a

factor in each of her write-ups and the PIP. [Response to SOF 74].

79. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind in TruHealth's decision to issue her the PAF on August 5, 2020, for providing treatment to a non-TruHealth member.

Q. Do you have any information or knowledge that your physical or mental condition was a factor of any kind in the company's decision to issue you Exhibit Number 19?

A. No.

(Plt. Dep., p. 149:10-149:14, Exhibit 1)

**RESPONSE:** Controverted. While the PIP was issued in direct retaliation for her report of abuse and neglect to the DHSS, [Ex. 16, Depo. Ex. 30], Plaintiff's disabilities also played a factor in each of her write-ups and the PIP. [Response to SOF 74].

80. Other than the fact that the opioids which Plaintiff left unsecured on a desk were for her back and knee, Plaintiff has no information or knowledge that her alleged disabilities were factor of any kind in TruHealth's decision to terminate her employment.

Q. Other than the fact that the opioids that were left unsecured on your desk were for your back and knee condition –

A. Right.

Q. -- do you have any other information or knowledge that your arthritis in your back and knee, your depression, your anxiety, or your ADHD were a factor of any kind in TruHealth's decision to terminate your employment in August of 2020?

A. No.

(Plt. Dep., p. 246:1-246:10, Exhibit 1)

**RESPONSE:** Controverted. First, Plaintiff's medication was not unsecured; it was in a locked office to which only two other people had access. [Ex. 2, Carlyle Depo., at 226:02-18]. Second, as stated in response to the previous several SOFs, Ms. Ketchum's treatment of Plaintiff adversely changed after she learned about Plaintiff's diagnosed disabilities. [Response to SOF 74-79]. Third, Plaintiff's termination PAF and phone call both reveal an alleged reason for termination being "suspicion of working under the influence of opioids." [Ex. 17, Depo. Ex. 33; Ex. 18, Depo. Ex. 34]. In other words, Defendants stated that they terminated her for suspicion of taking prescribed medication for her disabilities. However, no one asked Plaintiff whether she took the medication while working. [Ex. 18, Depo. Ex. 34; Ex. 5, Carlson Depo., at 123:04-11; Ex. 1, Ketchum Depo., at 210:05-10; Ex. 13, Cooper Depo., at 99:11-14]. Defendants' policies provide if an employee is reasonably suspected to be using or abusing drugs in the workplace, they may be subjected to testing. [Exhibit 34, at TruHealth 178, Depo. Ex. 4]. Plaintiff was not asked to take a drug test either. [Exhibit 5, Carlson Depo., at 123:12-14].

81. Plaintiff has no information or knowledge that her alleged disabilities were a factor of any kind with respect to anything that happened to her at TruHealth.

> Q. [] Other than the fact that you were terminated for having opioids that were left on your desk.
>
> A. Right.
>
> Q. Other than that, do you have any information or knowledge that your four conditions, your arthritis, your depression, your anxiety, or your HD -- ADHD were a factor of any kind with respect to anything that happened to you at TruHealth?
>
> A. I don't have anything in front of me for -- or any proof, but -- no.

(Plt. Dep., p. 246:18-247:4, Exhibit 1)

**RESPONSE:** Controverted. [Response to SOF 80].

82. No one at TruHealth ever said anything derogatory towards Plaintiff because of her alleged disabilities.

Q. Did anyone at TruHealth ever say anything derogatory to you about your arthritis in your back and knee, your depression, your anxiety, or your ADHD?

A. No.

(Plt. Dep., p. 247:5-247:9, Exhibit 1)

**RESPONSE:** Uncontroverted.

## K. Uncontroverted Facts That TruHealth Did Not Retaliate Against Plaintiff Because of Her Complaint to DHSS or Her Internal Complaint to TruHealth.

83. Other than her personal, subjective belief, Plaintiff has no information or knowledge that her reporting the alleged abuse to DHSS was factor of any kind in TruHealth's decision to issue her the August 4, 2020, PAF for insubordination.

Q. Well, let me ask this question: You understood that -- you understood that the -- that from Ms. Ketchum's standpoint, she was issuing you -- and she told you she was issuing you Exhibit Number 17?

A. Uh-huh, yes.

Q. Because according to her, you reported this to the State and didn't let her know about it, that's what you understood she was issuing you this document for; correct?

A. That's what her understanding is. I would say yes.

*****

Q. Other than your personal subjective belief that that's not the reason she

issued you Exhibit 17, do you have any facts or information of any kind that you can point me to that would support your subjective belief?

A. Not right now. Not right at the moment, no.

(Plt. Dep., p. 134:6-134:17, 135:22-136:3, Exhibit 1)

**RESPONSE:** Controverted. Neither Ms. Ketchum nor Ms. Carlson ever spoke to anyone about the incident who was present in any of the meetings, other than Plaintiff. They did not speak to Ms. Crouch, their employee, any of the health care providers who agreed with Plaintiff, or the certified nursing assistant who eye-witnessed the incident. And they never spoke with the administration of Tuterra or Highland about the incident. [*Id.* at 116:08-15, Exhibit 5, Carlson Depo., at 36:13-24]. On July 31 Ms. Ketchum sent her draft to Mr. Boguski for his review. She remarked in the email, "Another problem child." [Exhibit 38, at TruHealth 362, Depo. Ex. 55]. In the draft, Ketchum stated, "Lynda called me again the next day or so and told me that she called the state about the male patient and they were at the facility. She said the state "dinged them." I asked her why she did that after I told her not to[]. She was directly insubordinate." [*Id.* at TruHealth 363]. The first of which was "Charts not being completed within the 5-day requirement. Ms. Ketchum referenced the June 23rd Coaching Form and stated, "Already received coaching form and still no improvement." [*Id.* at TruHealth 666].

Yet, Ms. Ketchum admitted that by this time, Plaintiff had made substantial improvements to her charting. [Ex. 1, Ketchum Depo., at 102:24-103:20, 108:22-109:10]. Mr. Boguski sent the PAF drafts to an HR colleague, Toni Brush, for her input. She responded, "I'm not so sure about the one for insubordination. Lynda could see that as retaliation because she reported to the state something she thought no one was doing anything about." [Exhibit 29, at TruHealth 398, Depo. Exs. 58 & 59]. Mr. Boguski responds, "I was thinking of cutting out the entire section that I highlighted in red, for that reason. Does that make sense?"

The entire section highlighted in red states:

> Will not take it upon herself to do what she wants after having discussed with leadership. Lynda will not tell any staff members at any of the facilities that she turned a home into the state as this could jeopardize her ability to do her job. She could be asked not to return to the facilities due to burden now placed on facility financially or otherwise. [*Id.* at TruHealth 395].

Two HR professionals saw Ms. Ketchum's language in the PAF and thought that Plaintiff could view it as retaliation. [*Id.*; Exhibit 12, Boguski Depo., at 42:17-43:07]. Ms. Ketchum admitted that this language was referring to Ms. Carlyle's report to the DHSS. [Exhibit 1, Ketchum Depo., at 140:01-04]. Ms. Ketchum admitted that she wrote-up Plaintiff for insubordination for calling the DHSS after Ms. Ketchum told her not to. [*Id.* at 122:04-07]. Ms. Ketchum, Ms. Carlson, and Mr. Boguski all understood that Plaintiff had a legal right and obligation to call the DHSS if she suspected abuse and neglect of patients. [Exhibit 1, Ketchum Depo., at 28:14-21, 56:01-11; Exhibit 5, Carlson Depo., at 16:04-15, 47:11-23; Exhibit 12, Boguski Depo., at 18:06-13]. Following the delivery of the PIP and the Insubordination PAF, Ms. Carlson and Ms. Ketchum attempted to devise new policies to prevent Plaintiff from reporting to the DHSS in the future. Ms. Carlson "[did]n't want to leave her any loophole to do her own reporting." [Exhibit 5, Carlson Depo. 77:24-78:12; Exhibit 14, Depo. Ex. 63]. Ms. Carlson and Ms. Ketchum also attempted to set the expectation that "[Plaintiff] need[s] to notify the facility and [her] manager/supervisors before reporting to the state. [Exhibit 14, Depo. Ex. 63]. "Even if [Plaintiff is] positive that something needs to be reported [she] needs to notify [her] supervisor first." [Exhibit 30, Depo. Ex. 64]. Ms. Ketchum admitted that she did not agree with this expectation. [Exhibit 1, Ketchum Depo., at 171:02-07]. Defendants have a policy

requiring an employee to inform her supervisor of any suspected abuse and neglect. [Exhibit 31, at TruHealth 176, Depo. Ex. 4; Exhibit 5, Carlson Depo., at 38:22-39:13]. Plaintiff had reported the male resident's conduct to Ms. Ketchum even prior to this incident, and she reported the specific incident to Ms. Ketchum on July 15, 2020. [Exhibit 1, Ketchum Depo., at 109:21-110:17; Exhibit 2, Carlyle Depo., at 105:16-106:03, 113:25-114:04]. Ms. Carlson and Ms. Ketchum admitted that Plaintiff complied with this written company policy. [Exhibit 5, Carlson Depo., at 79:13-16; Exhibit 1, Ketchum Depo., at 162:05-13]. Ms. Carlson admitted that Plaintiff complied with the Missouri mandatory reporter statute as well. [Exhibit 5, Carlson Depo., at 79:17-19]. Despite having only one constructive coaching form issued to her, with marked improvement on the issue, Plaintiff was issued three PAFs and a PIP in a two-day period two weeks after her DHSS report. [Exhibit 4, Depo. Ex. 17; Exhibit 26, Depo. Ex. 19; Exhibit 33, Depo. Ex. 22; Exhibit 27, Depo. Ex. 16].

84. Other than her personal, subjective belief, Plaintiff has no information or knowledge that her reporting alleged abuse to DHSS was factor of any kind in TruHealth's decision to issue her the PAF on August 4, 2020, for referring to the managers of a customer's facility as "butt buddies."

Q. Do you have any information or knowledge that your complaint to the State DHSS on July 14th of 2020 was a factor of any kind in the company's decision to issue you Exhibit Number 22?

A. I feel it was, yes.

Q. Other than your subjective feelings that it was, do you have any other information or knowledge that your complaint to the State on July 14, 2020, was a factor of any kind in the company's decision to issue you the PAF shown in Exhibit 22?

A. No.

(Plt. Dep., p. 161:8-161:20, Exhibit 1)

**RESPONSE:** Controverted. [*See* Response to SOF 83].

85. Other than her personal, subjective belief, Plaintiff has no information or knowledge that her reporting alleged abuse to DHSS was factor of any kind in TruHealth's decision to issue her the PIP.

Q. Okay. Do you have any information or knowledge that your complaint to the State DHSS on July 14th of 2020 was a factor of any kind in the company's decision to issue you the Performance Improvement Plan shown here in Exhibit 16?

A. It's my opinion that yes, they did.

Q. All right. Other than your personal, subjective opinion, do you have any other information or knowledge that your complaint to the DHSS on July 16th of 2020 was a factor of any kind in the company's decision to issue you the Performance Improvement Plan shown here in Exhibit 16?A. No.

(Plt. Dep., p. 169:2-169:16, Exhibit 1)

**RESPONSE:** Controverted. [*See* Response to SOF 83].

86. Plaintiff has no information or knowledge that her complaint to DHSS was a factor of any kind in TruHealth's decision to issue her the revised PIP.

Q. Do you have any information or knowledge that your complaint to the State DHSS on July 14th of 2020 was a factor of any kind in the company's decision to issue you the revised Performance Improvement Plan shown in Exhibit 24?

A. No. Not at this time, no.

(Plt. Dep., p. 172:8-172:13, Exhibit 1)

**RESPONSE:** Controverted. [*See* Response to SOF 83].

87. Other than her personal, subjective belief, Plaintiff has no information or knowledge that her reporting the alleged abuse to DHSS was factor of any kind in TruHealth's decision to issue her the PAF on August 5, 2020, for providing treatment to a non-TruHealth member.

Q. Do you have any information or knowledge that your complaint to the State on July 14th of 2020 was a factor of any kind in the company's decision to issue you Exhibit Number 19?

A. I believe it was, yes.

Q. Other than your subjective belief that it was, do you have any facts or evidence that you can point me to that would support your belief that your complaint to the State on July 14th of 2020 was a factor of any kind in the company's decision to issue you Exhibit Number 19?

A. I don't have anything in front of me, no.

Q. Well, I'm not asking if you have anything in front of you.

A. I don't -- nothing right off the top of my head. I don't remember anything right off the top of my head, no.

(Plt. Dep., p. 149:15-150:8, Exhibit 1)

**RESPONSE:** Controverted. [*See* Response to SOF 83].

88. Other than the fact that she was terminated approximately one month after she made a report to DHSS, Plaintiff has no information or knowledge that her complaint to DHSS was factor of any kind in TruHealth's decision to terminate her employment.

Q. So outside of the fact that you were terminated approximately one month after you reported abuse and neglect to the State, do you have any other information or knowledge of any kind that your complaint to the State was a factor in the company's decision to terminate your employment on August 19th of 2020?

A. I don’t have any, no.

(Plt. Dep., p. 248:9-248:16, Exhibit 1)

**RESPONSE:** Controverted. [*See* Response to SOF 83].

89. Other than her personal subjective belief, Plaintiff has no information or knowledge that her internal complaint to the Company was a factor of any kind in TruHealth’s decision to terminate her employment.

Q. All right. Other than your subjective belief that you think it was a part of it, what other information or knowledge do you have that your August 9, 2020, complaint to TruHealth was a factor of any kind in the company’s decision to terminate your employment on August 19th of 2020?

A. I don’t have anything else. (Plt. Dep., p. 251:15-251:21, Exhibit 1)

**RESPONSE:** Controverted. [*See* Response to SOF 83].

## III. PLAINTIFF’S STATEMENT OF ADDITIONAL MATERIAL FACTS

90. Plaintiff Lynda Carlyle has twenty-six years of experience in nursing, including twelve years as a Nurse Practitioner. [Exhibit 2, Carlyle Depo., at 146:11-12; Ex. 19, Depo. Ex. 1].

91. Plaintiff holds an Associate’s and a Bachelor’s degree in Nursing and a Master’s degree in Rural Family Nurse Practitioner. [Exhibit 19, Depo. Ex. 1].

92. Plaintiff is a certified nurse practitioner by the American Academy of Nurse Practitioners, and she is a licensed nurse practitioner by the Missouri State Board of Nursing. [Exhibit 19, Depo. Ex. 1].

93. Plaintiff began her employment with Defendants on December 2, 2019, and her

supervisor was Dawn Ketchum throughout her employment. [Exhibit 20, Depo. Ex. 2; Exhibit 2, Carlyle Depo., at 18:17-22].

94. Ms. Ketchum gave Plaintiff a favorable 2019-20 performance review which was completed on March 12, 2020. [Exhibit 1, Ketchum Depo., at 70:23-71:22; Exhibit 10, Depo. Ex. 78].

95. In the review, Ms. Ketchum rated Plaintiff "exceeds expectations" in Professionalism and noted that Plaintiff "[p]lans, organizes, and completes task in an acceptable time frame." She also rated Plaintiff "exceeds expectations" in "Compassion" and Ketchum noted that Plaintiff "[h]as compassion for our members. Acknowledges others points of view." [Exhibit 1, Ketchum Depo., at 73:11-25; Exhibit 10, at TruHealth 105-06].

96. Plaintiff was not rated "below expectations" in any category, and as of March 12, 2020, Ms. Ketchum had no concerns with Plaintiff's job performance. [Exhibit 1, Ketchum Depo., at 75:17-21; Exhibit 10, Depo. Ex. 78].

97. A few weeks earlier on February 21, Ms. Ketchum sent an email to all of the Missouri nurse practitioners ("NPs") that the LEGO numbers were not good and a few NPs were behind. LEGOS keep track of "who has patients to see, when they're supposed to see them, and if their charts are done." [Exhibit 1, Ketchum Depo., at 77:07-16; Exhibit 21, Depo. Ex. 79].

98. Plaintiff was not one of the NPs whose numbers were below expectations, but Ms. Ketchum had concerns about other NPs. [Exhibit 1, Ketchum Depo., at 79:10-19].

99. Ms. Ketchum testified that "everybody was a little bit behind [because] we were rolling all these new facilities out and adding continued patients and was trying to get to those facilities and [] getting patients seen. It was a lot for some of them." [*Id.* at 82:10-16].

100. One such NP was Jamela Love who had issues with keeping up with the number

of patients, getting charts completed, verbalizing treatment plans, and not showing up to facilities. [Exhibit 1, Ketchum Depo., at 79:23-80:03, 80:13-81:06, 81:16-18].

101. Ms. Love received coaching, but Ms. Ketchum did not issue her any PAFs or a PIP. [*Id.* at 81:11-16].

102. Nevertheless, Ms. Ketchum did not want to fire Ms. Love, and in fact, Ms. Love was given the choice to resign or be terminated. Ms. Love resigned. [*Id.* at 80:06-08].

103. Ms. Ketchum testified that Ms. Love was given a choice to resign because Ms. Ketchum thought not having a termination on her record would be better for her. [Exhibit 1, Ketchum Depo., at 81:25-82:05.

104. Ms. Love was in her 30s, and there is no evidence that she had any diagnosed disabilities. [79:23-82:09].

105. In the same February 21 email, despite most NPs being behind in work, Ms. Ketchum noted that Defendants were effectively doubling the workload of the NPs, including Plaintiff. [Exhibit 21, Depo. Ex. 79; Exhibit 1, Ketchum Depo., at 82:17-23, 83:22-24].

106. Ms. Ketchum was not in favor of the workload doubling because having worked "in the field" before, she knew how hard it is to see all the patients then try to get the charts completed. [Exhibit 1, Ketchum Depo., at 83:22-84:04].

107. About three months after her workload doubled, Plaintiff began falling behind in her charting. [Exhibit 3, Carlyle Affidavit, at ¶ 7]. As of June 1, 2020, Plaintiff had 40 charts to complete. [Exhibit 22, Depo. Ex. 80].

108. Plaintiff was not alone being late with charting. Ms. Ketchum testified that everybody was a little bit behind because Defendants were rolling new facilities out and adding patients. "It was a lot for some of them." [*Id.* at 82:10-16].

109. Ms. Ketchum informed Plaintiff of this and connected Plaintiff with the team lead, Mandie DeVincentis, to work on skills and strategies to improve charting and time management. [Exhibit 22, Depo. Ex. 80; Exhibit 23, Depo. Ex. 6, 7; Exhibit 1 Ketchum Depo., at 91:12-15]. And Plaintiff was receptive to this coaching. [*Id.* at 91:18].

110. On June 23, 2020, Ms. Ketchum issued Plaintiff an Employee Coaching Form consisting of constructive feedback. [Exhibit 24, Depo. Ex. 11].

111. Plaintiff believed that several of the items were not appropriate for a coaching session or any pre-disciplinary action, but she acknowledged that charting and time management were areas she was working on. [*Id.* at TruHealth 487].

112. Over the course of the next several weeks, Plaintiff worked on her time management and significantly improved her charting by the end of July. [Exhibit 1, Ketchum Depo., at 103:02-20].

113. Ms. Ketchum acknowledged that even without a PIP and missing a week due to Covid-19 exposure, Plaintiff was improving her performance using the coaching she received from Ms. Ketchum and Ms. DeVincetis. [Exhibit 1, 103:06-20].

**Plaintiff Helps Administer Emergency Aid and Gets Written-Up**

114. Defendants do not have any “brick and mortar” buildings in Missouri; rather they contract with various long-term care facilities to provide nursing services. [Exhibit 4, Depo. Ex. 17; SOF 4, 6-7].

115. Defendants’ Adult Protection policies purported to cover not only its employees, but also “residents, patients, contractors, and visitors of health care delivery sites.” [Exhibit 34, at TruHealth 176-77, Depo. Ex. 4].

116. This policy also required Plaintiff to report suspected abuse and neglect or face

dismissal. [*Id.*].

117. Defendants' employees did not treat every patient at the facilities, only the patients who signed up for one of their health care plans. [Exhibit 1, Ketchum Depo., at 165:18-20].

118. On July 8, 2020, Plaintiff was working in Highland tending to a patient when the Assistant Director of Nursing, Marvine Fluker, frantically asked Plaintiff for emergency help with a patient who had fallen. [Exhibit 2, Carlyle Depo., at 137:136:25-137:09]. Ms. Fluker had ordered x-rays and believed the patient had broken her hip. [*Id.*].

119. Ms. Fluker had paged the on-call provider, Dr. Epperson, numerous times but had not received a call-back, and she did not know what to do. [*Id.* at 137:10-14].

120. Plaintiff had the cell phone number of the facility's nurse practitioner, Tammy Minshall, and offered to text her for a call-back. Ms. Fluker asked Plaintiff to do so, and she did. [*Id.* at 137:15-20; Exhibit 25, Minshall text].

121. Ms. Fluker also asked Plaintiff to perform an emergency check on the patient, so Plaintiff performed Basic Life Support protocol by checking to ensure she had an open airway, that she was breathing, and that she had adequate circulation in her affected foot. [Exhibit 2, Carlyle Depo., at 137:21-138:06; Exhibit 3, Carlyle Affidavit at ¶¶ 20-22]. Further, Plaintiff checked to ensure she had no life-threatening head injury from her fall. [Exhibit 3, Carlyle Affidavit at ¶ 23].

122. At that time, NP Minshall called Plaintiff's cell phone, and Plaintiff handed her phone to Ms. Fluker. They walked to Ms. Fluker's office where they put the phone on speaker. Ms. Fluker told Minshall that she had been trying like crazy to reach someone, but the facility phones were not working properly. Additionally, after Ms. Minshall requested, Plaintiff

informed Ms. Minshall of the results of her airway, breathing, and pulse checks. [*Id.* at 138:10-20].

123. Ms. Minshall then told Ms. Fluker to call an ambulance and send her to the hospital. Thereafter, Plaintiff called 911 while Ms. Fluker tended to the patient. [*Id.* at 138:20-139:08; Exhibit 3, Carlyle Affidavit at ¶ 25].

124. Either that evening or the next day, Plaintiff called Ms. Ketchum and told her exactly what happened – that she checked for an airway, that she was breathing, and had circulation. [*Id.* at 143:21-144:05].

125. Plaintiff was not disciplined for her actions in this incident until a month later, after she had called the DHSS to report abuse and neglect at the same facility. [Exhibit 26, Depo. Ex. 19].

126. Ms. Carlson acknowledged that, even if it was not TruHealth's patient, it would be appropriate for a nurse practitioner in Plaintiff's position to perform emergency aid on the patient, such as checking for breathing, circulation, and calling 911. [Exhibit 5, Carlson Depo., at 93:15-19].

127. Plaintiff had a duty as a licensed healthcare provider to perform such actions. [Exhibit 2, Carlyle Depo., at 144:01-03].

**Plaintiff's Report of Resident Abuse and Neglect to the DHSS**

128. On or about July 7, 2020, a certified nursing aid at Highland walked into a room and witnessed two residents in a sexual situation. A male resident was standing in front of a wheelchair-bound female patient with his penis exposed in front of her face. [Exhibit 2, Carlyle Depo., at 94:25-95:12]. Both residents were TruHealth patients. [*Id.* at 96:13-16].

129. The female resident was mentally disabled and had a significant history of abuse

and neglect and suffered from PTSD. [*Id.* at 95:22-25; Exhibit 3, Carlyle Affidavit at ¶ 32]. The male resident had a "long history" of similar sexual misconduct in the facility, including sexually harassing Ms. Ketchum herself. [Exhibit 2, Carlyle Depo., at 99:10-15; Exhibit 2, Ketchum Depo., at 110:14-112:04].

130. The certified nursing aid who witnessed the incident reported it to Highland's Director of Nursing, Tamara Broom. [Exhibit 2, Carlyle Depo., at 98:24-99:05; Exhibit 1, Ketchum Depo., at 31:18-32:01].

131. The sexual misconduct by the male resident was brought up in Highland's Monday morning meeting which was attended by Highland's social worker, rehab coordinator, MDS coordinator, two or three assistant directors of nursing, the floor director of nursing, Ms. Broom, Plaintiff, and Defendant's case manager Heather Crouch. [Exhibit 2, Carlyle Depo., at 97:16-98:04].

132. Ms. Broom informed the group of the incident, the recurring problems with the male resident, and brainstormed interventions including removing him from the facility. [*Id.* at 99:06-17, 100:20-101:04].

133. The group decided to revisit the issue at the next day's STRIDES meeting which would be attended by the same group in addition to Dr. Epperson, Ms. Minshall, and mental health NP Carol Flattery, the primary care providers for Highland. [*Id.* at 100:02-07, 101:21-102:06].

134. In the STRIDES meeting on Tuesday, the group agreed that the male resident needed to be issued a notice of discharge to remove him from the facility because of his recurring problems. [*Id.* at 102:23-103:09].

135. In the week following this meeting, Plaintiff called Ms. Ketchum and let her

know what had happened. [Exhibit 1, Ketchum Depo., at 109:21-110:17; Exhibit 2, Carlyle Depo., at 105:16-106:03]. Plaintiff also informed Chris Burkhart, the regional director of operations for Tuterra, the company that owned Highland. [Exhibit 2, Carlyle Depo., at 106:03-10].

136. Plaintiff attended the next week's STRIDES meeting virtually because she had been exposed to Covid-19, but again all of the health care providers agreed the male resident should be removed from the facility. [Exhibit 2, Carlyle Depo., at 107:24-108:06].

137. Plaintiff felt that no one was doing anything about his continued sexually abusive behavior. [*Id.* at 107:21-23, 108:08-09.

138. Missouri law obligates nurse practitioners, among other healthcare providers, to immediately call the Department of Health and Senior Services if they have reasonable cause to believe a resident has been abused or neglected. [Exhibit 60, Depo. Ex. 50; RSMo. § 198.070]. If a nurse practitioner fails to do so within a reasonable time, they are guilty of a class A misdemeanor. [*Id.*]. Furthermore, any reports to the DHSS "shall be confidential." [Exhibit 6, Depo. Ex. 75; Exhibit 60 at ¶ 8, Depo. Ex. 50].

139. On Tuesday, July 14, 2020, Plaintiff called the DHSS and reported her reasonable suspicion of abuse and neglect regarding the male patient as required by Missouri law. [*Id.* at 108:16-109:08; SOF 138].

140. On July 15, 2020, Plaintiff again called Ms. Ketchum and informed her of Plaintiff's suspicion of abuse and neglect involving the male's repeated abuse and the neglect of female residents. [*Id.* at 113:25-114:04].

141. Plaintiff further informed Ms. Ketchum that no one was going to do anything to stop it. [*Id.* at 114:14-22].

142. Ms. Ketchum then called her supervisor Ms. Carlson and they decided that the entire incident was "hearsay" and there was nothing to report to the DHSS. [*Id.* at 120:21-25; Exhibit 1, Ketchum Depo., at 118:08-13; Exhibit 4, Depo. Ex. 17].

143. Ms. Ketchum called Plaintiff back and told her not to call the DHSS. [Exhibit 1, Ketchum Depo., at 118:13-14].

144. Plaintiff informed Ms. that she had already called the DHSS. [Exhibit 2, Carlyle Depo., at 129:25-130:08; Exhibit 8, Depo. Ex. 18].

145. Neither Ms. Ketchum nor Ms. Carlson ever spoke to anyone about the incident who was present in any of the meetings, other than Plaintiff. They did not speak to Ms. Crouch, their employee, any of the health care providers who agreed with Plaintiff, or the certified nursing assistant who eye-witnessed the incident. And they never spoke with the administration of Tuterra or Highland about the incident. [*Id.* at 116:08-15, Exhibit 5, Carlson Depo., at 36:13-24].

**Ms. Ketchum Issues Plaintiff a Retaliatory PIP**

146. Twelve days later, on July 27, 2020, Ms. Ketchum began drafting a PIP that included five "areas of concern." [Exhibit 27, Depo. Ex. 16].

147. On July 31 Ms. Ketchum sent her draft to Mr. Boguski for his review. She remarked in the email, "Another problem child." [Exhibit 38, at TruHealth 362, Depo. Ex. 55].

148. In the draft, Ketchum stated, "Lynda called me again the next day or so and told me that she called the state about the male patient and they were at the facility. She said the state "dinged them." I asked her why she did that after I told her not to[]. She was directly insubordinate." [*Id.* at TruHealth 363].

149. The first "areas of concern" was "Charts not being completed within the 5-day

requirement. Ms. Ketchum referenced the June 23rd Coaching Form and stated, "Already received coaching form and still no improvement." [*Id.* at TruHealth 666].

150. Yet, Ms. Ketchum admitted that by this time, Plaintiff had made substantial improvements to her charting. [Ex. 1, Ketchum Depo., at 102:24-103:20, 108:22-109:10].

151. The second "area of concern" was "Insubordination" and references a Personnel Action form ("PAF") from 8/4/2020. [*Id.*].

152. The PAF references related to Plaintiff's report of abuse and neglect to the DHSS. [Exhibit 4, Depo., Ex. 17]. The PAF states:

> I called Kami [Carlson] right after I hung up the phone with Lynda. Kami and I agreed that this was hearsay and nothing we can report. I told her I was still waiting for Kelly Hilmes to call me back. The next day or so Lynda called me to tell me that the state was at the facility and that she had called and turned them in. I asked her why she did that after I told her not to and that it was hearsay and we had nothing to report. She said, "I am a mandated reporter." I said, "But what you are reporting if it's hearsay and the female patient denied anything happened?" I told her this was our partner and we work together with them. We are also patient advocates, however if there is no proof and the female patient denies anything happened then this is only causing problems for the facility. I told Kami Carlson, ED/Truhealth what had happened. This was direct insubordination.
>
> [Exhibit 4, Depo. Ex. 17].

153. The PAF provided a "corrective action" which states, "Lynda will follow directives from her supervisor/managers in the company." [*Id.* at TruHealth 664].

154. During the drafting of this PAF (and others discussed below), Ms. Ketchum sent drafts to Mr. Boguski for his input. In that draft for this PAF, the "corrective action" stated:

> Lynda will follow instruction from supervisor/managers in company. Will not take it upon herself to do what she wants after having discussed with leadership. Lynda will not tell any staff members at any of the facilities that she turned a home into the state as this could jeopardize her ability to do her job. She could be asked not to return to the facilities due to burden now placed on facility financially or otherwise.
>
> [Exhibit 28, at TruHealth 386, Depo. Ex. 51].

155. Mr. Boguski sent the PAF drafts to an HR colleague, Toni Brush, for her input. She responded, "I'm not so sure about the one for insubordination. Lynda could see that as retaliation because she reported to the state something she thought no one was doing anything about." [Exhibit 29, at TruHealth 398, Depo. Exs. 58 & 59].

156. Mr. Boguski responds, "I was thinking of cutting out the entire section that I highlighted in red, for that reason. Does that make sense?" [*Id.*]. The entire section highlighted in red states:

> Will not take it upon herself to do what she wants after having discussed with leadership. Lynda will not tell any staff members at any of the facilities that she turned a home into the state as this could jeopardize her ability to do her job. She could be asked not to return to the facilities due to burden now placed on facility financially or otherwise.
>
> [*Id.* at TruHealth 395].

157. Mr. Boguski willfully deleted the text that he and Ms. Brush thought Plaintiff could view as retaliatory. [Exhibit 12, Boguski Depo., at 45:14-20].

158. Two HR professionals saw Ms. Ketchum's language in the PAF and thought that Plaintiff could view it as retaliation. [Exhibit 29 at TruHealth 398, Depo. Exs. 58 & 59; Exhibit 12, Boguski Depo., at 42:17-43:07].

159. Ms. Ketchum admitted that this language was referring to Ms. Carlyle's report to the DHSS. [Exhibit 1, Ketchum Depo., at 140:01-04].

160. Ms. Ketchum admitted that she wrote-up Plaintiff for insubordination for calling the DHSS after Ms. Ketchum told her not to.

> Q: And then you say, "I asked why she [called the State] after I told her not to. She was directly insubordinate" Did I read that correctly?
> A: Yes.
> Q Was it your position here that she was insubordinate because she called the State after you told her not to?
> A: I guess that's where I was going with it.

[*Id.* at 121:25-122:04-07].

161. Ms. Ketchum, Ms. Carlson, and Mr. Boguski all understood that Plaintiff had a legal right and obligation to call the DHSS if she suspected abuse and neglect of patients. [Exhibit 1, Ketchum Depo., at 28:14-21, 56:01-11; Exhibit 5, Carlson Depo., at 16:04-15, 47:11-23; Exhibit 12, Boguski Depo., at 18:06-13].

162. Following the delivery of the PIP and the Insubordination PAF, Ms. Carlson and Ms. Ketchum attempted to devise new policies to prevent Plaintiff from reporting to the DHSS in the future. Ms. Carlson "[did]n't want to leave her any loophole to do her own reporting." [Exhibit 5, Carlson Depo. 77:24-78:12; Exhibit 14, Depo. Ex. 63].

163. Ms. Carlson and Ms. Ketchum also attempted to set the expectation that "[Plaintiff] need[s] to notify the facility and [her] manager/supervisors before reporting to the state. [Exhibit 14, Depo. Ex. 63]. "Even if [Plaintiff is] positive that something needs to be reported [she] needs to notify [her] supervisor first." [Exhibit 30, Depo. Ex. 64]. Ms. Ketchum admitted that she did not agree with this expectation. [Exhibit 1, Ketchum Depo., at 171:02-07].

164. Defendants have no written policies requiring a health care provider to inform her supervisor before making a mandated call to the DHSS. [Exhibit 5, Carlson Depo., at 76:09-14].

165. These were Ms. Carlson's new expectations that had not been communicated to Plaintiff prior to being written up and placed on a PIP. [*Id.* at 76:15-21].

166. Plaintiff had a legal right to confidentiality in her report to the DHSS. [Exhibit 6, Depo. Ex. 75; Exhibit 1, Ketchum Depo., at 28:22-29:07, 58:08-14; Exhibit 5, Carlson Depo., at 16:12-23, 49:07-18]. And Ms. Carlson knew that: "She absolutely did not have to tell us." [Exhibit 5, Carlson Depo., at 110:16-19].

167. Defendants have a policy requiring an employee to inform her supervisor of any

suspected abuse and neglect. [Exhibit 31, at TruHealth 176, Depo. Ex. 4; Exhibit 5, Carlson Depo., at 38:22-39:13].

168. Plaintiff had reported the male resident's conduct to Ms. Ketchum even prior to this incident, and she reported the specific incident to Ms. Ketchum on July 15, 2020. [Exhibit 1, Ketchum Depo., at 109:21-110:17; Exhibit 2, Carlyle Depo., at 105:16-106:03, 113:25-114:04].

169. Ms. Carlson and Ms. Ketchum admitted that Plaintiff complied with this written company policy. [Exhibit 5, Carlson Depo., at 79:13-16; Exhibit 1, Ketchum Depo., at 162:05-13].

170. Ms. Carlson admitted that Plaintiff complied with the Missouri mandatory reporter statute as well. [Exhibit 5, Carlson Depo., at 79:17-19].

171. Plaintiff responded to the Insubordination PAF giving her account of the events and further informing Ms. Ketchum that nothing was documented at the facility, and the healthcare providers were instructed not to document anything relating to the incident. [Exhibit 8, Depo. Ex. 18]. And Plaintiff reiterated that she was a mandatory reporter under RSMo. 198.070 which requires her to report suspected abuse and neglect. [*Id.*].

172. The third item on the PIP was "Liability Concerns" relating to Plaintiff's conduct regarding a patient who had fallen at Highland. [Exhibit 27, Depo. Ex. 16].

173. As discussed above in SOFs 111-120, Plaintiff was asked to help with a patient and Plaintiff checked her breathing, circulation, and called 911. [SOF 118-127].

174. Ms. Ketchum included this item on the PIP prior to speaking to Plaintiff about it. [Exhibit 1, Ketchum Depo., at 131:10-17].

175. Moreover, the incident at issue occurred nearly one month earlier on July 8, and Plaintiff had informed Ms. Ketchum about the incident at the time. [Exhibit 2, Carlyle Depo., at

143:21-144:05].

176. Plaintiff was not disciplined for her actions in this incident until after she had called the DHSS to report abuse and neglect at the same facility. [Exhibit 26, Depo. Ex. 19].

177. Furthermore, Plaintiff contested the accuracy of Ketchum's account in the PIP, and the item was subsequently removed. [Exhibit 31, Depo. Ex. 60].

178. Ms. Ketchum acknowledged that the removed PIP items should not have been considered in any further discipline. [Exhibit 1, Ketchum Depo., at 146:07-10].

179. Nevertheless, on August 5, 2020, the day after the PIP was delivered, Ms. Ketchum issued Plaintiff another PAF for the incident. [Exhibit 26, Depo. Ex. 19].

180. Ms. Ketchum cited two Handbook violations in the PAF: 1.53 is failure to deliver services as documented; and 1.54 is unsatisfactory job performance. [Exhibit 26, Depo. Ex. 19; Exhibit 1, Ketchum Depo., at 157:14-19].

181. Ms. Ketchum did not know how 1.53 applied to the situation and said Mr. Boguski added the citations. [Exhibit 1, Ketchum Depo., at 157:19-25]. Mr. Boguski did not know either. [Exhibit 12, Boguski Depo., at 55:15-56:15].

182. Ms. Ketchum continued to accuse Plaintiff of giving orders on a non-TruHealth patient even though Plaintiff unequivocally denied that accusation. [Exhibit 32, Depo. Ex. 20; Exhibit 2, Carlyle Depo., at 143:21-144:05].

183. Plaintiff merely performed her duties as a licensed nurse practitioner in an emergency situation. [Exhibit 2, Carlyle Depo., at 144:01-03].

184. The fourth item on the PIP relates to Plaintiff's use of the term "butt buddies" referring to a facility's employees.

185. Plaintiff acknowledged that she used the term to mean that one followed the other

very closely. [Exhibit 2, Carlyle Depo., at 154:08-11]. Once Plaintiff was informed that her use of the term offended someone, she never used it again. [*Id.* at 158:04-06, 160:12-17].

186. The fifth item on the PIP involved another employee, case manager Heather Crouch, not getting her work done on time. [Exhibit 27, Depo. Ex. 16].

187. Ms. Ketchum admitted that "it is Heather's job to do Heather's job." [Exhibit 1, Ketchum Depo., at 145:01-06]. She removed this item from the PIP as well. [*Id.* at 144:20-25].

188. Ms. Ketchum issued Plaintiff a revised PIP with only three areas of concern, but included the Insubordination for calling the DHSS to report concerns of abuse and neglect at Highland. [Exhibit 31, Depo. Ex. 60].

189. Despite having only one constructive coaching form issued to her, with marked improvement on the issue, Plaintiff was issued three PAFs and a PIP in a two-day period two weeks after her DHSS report. [Exhibit 4, Depo. Ex. 17; Exhibit 26, Depo. Ex. 19; Exhibit 33, Depo. Ex. 22; Exhibit 27, Depo. Ex. 16].

**Plaintiff's Complaints of Retaliation to the Proper Authorities**

190. On August 9, 2020, Plaintiff sent a complaint to Mr. Boguski complaining about differential treatment, unethical behavior, and retaliation for her report to the DHSS. This complaint referenced her responses to the PAFs issued to her. [Exhibit 7, Depo. Ex. 27; *see also* Exhibit 8, Depo. Ex. 18 (response to Insubordination PAF citing RSMo. 198.070)].

191. On August 13, 2020, Plaintiff sent a more detailed complaint to Mr. Boguski complaining that her treatment "was done in blatant retaliation of the call made to the State of Missouri. [Exhibit 16, Depo. Ex. 30].

192. On August 14, Plaintiff complained about retaliation to Ms. Carlson. [Exhibit 59, Depo. Ex. 31]. Again, she reported that her PIP and PAFs were in retaliation for the call to the

DHSS. [*Id.*].

193. Plaintiff acknowledged the improvement needed on the charting issues and her use of offensive language, but she requested the remaining items be removed from her employee file and the PIP.

194. Defendants' policies provide that any complaints of discrimination or retaliation will be immediately and thoroughly investigated. [Exhibit 34, at TruHealth 126-27, 130-31, Depo. Ex. 4].

195. Mr. Boguski testified that either himself or Ms. Brush would investigate all complaints pursuant to company policy. [Exhibit 12, Boguski Depo., at 21:08-16; Exhibit 34 at TruHealth 126-27].

196. Human Resources never investigated any of Plaintiff's complaints. [Exhibit 12, Boguski Depo., at 85:24-86:21].

197. Mr. Boguski testified that he recused himself and "would have handed it over to Toni [Brush]" because he had involvement in Plaintiff's PIP and PAFs, but he suggested Plaintiff send her complaints to Ms. Carlson instead – who also had involvement in Plaintiff's PIP and PAFs. [*Id.* at 86:20-87:15; Exhibit 9, Depo. Ex. 28].

198. Instead, Ms. Carlson conducted a "review" of Plaintiff's PAFs by looking back at the timeline. [Exhibit 5, Carlson Depo., at 105:15-24]. In fact, she stated, "I don't think I was investigating it as such" and she expected Human Resources to investigate these types of complaints. [Ex. 5, Carlson Depo., at 19:12-22, 99:11-14, 100:09-12].

199. Mr. Boguski and Mr. Cooper (both HR professionals) also expect Human Resources to investigate such complaints. [Ex. 12, Boguski Depo., at 21:08-19; Ex. 13, Cooper Depo., at 27:04-14]. Furthermore, Mr. Cooper stated that HR would conduct the investigation in

coordination with the business leader unless the complaint involved the business leader, and Ms. Carlson was the business leader in this circumstance. [Ex. 13, Cooper Depo., at 27:11-15].

200. Mr. Boguski testified that Ms. Carlson would be an inappropriate person to conduct the investigation. [Ex. 12, Boguski Depo., at 87:18-88:01, 99:15-22].

201. Ms. Carlson provided a summary of her review to Mr. Boguski (Ms. Brush was not copied) even though he indicated he recused himself from the matter. [Exhibit 35, Depo. Ex. 32; SOF 197].

202. Nevertheless, Ms. Carlson's review indicated that Plaintiff was not insubordinate by calling the DHSS and that it could be dismissed, but she refused to remove the PAF from her file. [Exhibit 35, Depo. Ex. 32 at TruHealth 777; Exhibit 5, Carlson Depo., at 113:03-12]. Plaintiff was terminated two days later. [Exhibit 18, Depo. Ex. 34].

**Plaintiff's Termination**

203. On August 18, 2020, Ms. Ketchum was in Plaintiff's locked office (Plaintiff had given her the lock code) and found Plaintiff's bottle of prescribed hydrocodone allegedly left out on her desk. [Exhibit 17, Depo. Ex. 33; Exhibit 2, Carlyle Depo., at 223:17-20; Exhibit 36, text message]. Ms. Ketchum acknowledged that she moved a lot of items around on Plaintiff's desk. [Exhibit 1, Ketchum Depo., at 201:19-202:24].

204. Plaintiff had given Ms. Ketchum the code on August 18 at Ms. Ketchum's request so Ketchum could access needed PPE supplies. [Exhibit 3, Carlyle Affidavit at ¶ 12; Exhibit 36].

205. Other than Plaintiff, only two people knew the code to the office she shared with the case manager, Heather Crouch. [Exhibit 2, Carlyle Depo., at 223:17-20, 224:21-24, 226:02-18].

206. Ms. Ketchum admitted that it was likely an accident that Plaintiff left her medication on her desk, but she did not ask Ms. Crouch if Plaintiff routinely left it out. [Exhibit 1, Ketchum Depo., at 200:25-201:05].

207. Ms. Ketchum drafted another PAF for this incident. In it, she wrote, "There is cause for working under the influence of opioids." [Exhibit 17, Depo. Ex. 33].

208. Ms. Ketchum and Ms. Carlson were both aware that Plaintiff had diagnosed disabilities, underwent physical therapy for them, and was taking medication for these conditions. [Exhibit 15, Depo. Ex. 77; Exhibit 1, Ketchum Depo., at 206:10-22; Exhibit 5, Carlson Depo., at 119:19-120:15].

209. No one asked Plaintiff if she took her medication while working. [Ex. 18, Depo. Ex. 34; Ex. 5, Carlson Depo., at 123:04-11; Ex. 1, Ketchum Depo., at 210:05-10; Ex. 13, Cooper Depo., at 99:11-14].

210. The termination PAF continued to say, "Also negligence in securing a controlled substance properly, which is concerning. The Admin, DON, and maintenance have access to this room. It would be a concern that patients could break into the room and take this medication or distribute it to other patients and cause injury or harm. There has been a history of rooms in the facility being broken into. This would be considered Gross Misconduct." [Exhibit 17, Depo. Ex. 33].

211. As discussed above, the DON and Admin did not have access to the room. [SOF 205]. Furthermore, despite seeking such evidence, Defendants provided no evidence supporting any history of rooms or offices being broken into at Highland. [Exhibit 73, RFPs at ¶ 25].

212. Defendants terminated Plaintiff's employment on August 19, 2020. [Exhibit 18, Depo. Ex. 34]. In the termination phone call, Ms. Carlson stated that "based on the

understanding of the performance improvement plan as it was written and delivered to you on August 4th, we are choosing to terminate your employment with TruHealth effective immediately." [*Id.*].

213. Ms. Carlson admitted that lesser discipline was considered and that the PIP factored-into the decision to terminate Plaintiff; it was the final straw. [Exhibit 5, Carlson Depo., at 130:18-131:12].

214. Neither Ms. Carlson nor Ms. Ketchum had ever terminated someone for accidentally leaving her own prescribed medication exposed in some way. [*Id.* at 128:06-09; Exhibit 1, Ketchum Depo., at 211:19-24].

215. Mr. Boguski sent two emails to colleagues to finalize Plaintiff's termination. In both, he referred to Plaintiff's termination as "contentious." [Exhibit 39, Depo. Exs. 72 & 73].

216. Mr. Boguski testified that "I knew Ms. Carlyle, if she was going to make – if anyone was going to make a stink about their termination, it would have been her." [Exhibit 12, Boguski Depo., at 115:22-25].

**Other employees were terminated shortly after making reports of non-compliance**

217. As discussed above in SOF 147, Ms. Ketchum referred to Plaintiff as "another problem child" when she sent Mr. Boguski a draft of the PIP. [SOF 147]. The other "problem child" was Deborah Asberry. [Exhibit 12, Boguski Depo., at 27:15-28:03; Exhibit 1, Ketchum Depo., at 108:08-17].

218. Ms. Asberry was a nurse practitioner in the same position as Ms. Carlyle and was likewise supervised by Ms. Ketchum. [Exhibit 40, Asberry Declaration at ¶ 4; Exhibit 1, Ketchum Depo., at 17:19-20. She was employed by Defendants from August 19, 2019 to February 28, 2020. [Exhibit 40, Asberry Declaration at ¶ 3]. Ms. Carlson was Ms. Ketchum's

supervisor at the time Ms. Asberry was terminated. [*Id.* at ¶ 5].

219. Ms. Asberry has more than 30 years of experience as a Nurse Practitioner. [*Id.* at ¶ 1].

220. Early in her employment with Defendants, Ms. Asberry expressed compliance concerns to Ms. Ketchum about performing certain duties with a Collobarative Practice Agreement executed. [*Id.* at ¶ 6]. Also early in her employment, Ms. Asberry verbally expressed compliance concerns about their incapacitated patients did not have durable powers of attorney in place as required by Missouri law. [*Id.* at ¶ 7]. She provided Ms. Ketchum a list of such incapacitated patients. [*Id.* at ¶ 8].

221. After expressing these compliance concerns, Ms. Ketchum began lodging unwarranted criticisms against Ms. Asberry regarding her alleged behavior in the facilities. [*Id.* at ¶ 9].

222. About two months after her verbal reports of non-compliance, Ms. Asberry sent Ms. Ketchum a written report of non-compliance on December 17, 2019. [Exhibit 41, at TruHealth 1378-79].

223. Ms. Ketchum sent Ms. Asberry's complaint to Shiloh Kukuljan, executive director on the plan side. [*Id.* at TruHealth 1378; Exhibit 1, Ketchum Depo., at 11:24-12:03]. Ms. Ketchum remarked, "This is a constant for her." [Exhibit 41, at 1378].

224. Ms. Kukuljan responded, "She needs to stay in her lane. We'll talk about her behavior tomorrow." [*Id.*].

225. The next day on December 19, Ms. Ketchum emailed Ms. Carlson and said, "I think we need to have a back up because I am probably going to need to let Deborah go soon." [Exhibit 42, at TruHealth 1381]. Ms. Carlson responded to put her on a PIP "ASAP." [*Id.* at

1382].

226. Ms. Ketchum began attempting to collect complaints about Ms. Asberry's alleged behavior to give to HR to paper her file. [Exhibit 43, TruHealth 1385-86].

227. Ms. Ketchum placed Ms. Asberry on a PIP on December 30, 2019. [Exhibit 44, TruHealth 1387-92].

228. Ms. Ketchum had issued only two employees PIPs: Ms. Asberry and Plaintiff. [Exhibit 1, Ketchum Depo., at 128:23-129:15]. Both PIPs were issued less than two weeks after reports of non-compliance and/or abuse or neglect. [SOF 139, 246, 222, 227].

229. On January 7, 2020, frustrated with Ketchum's inaction, Ms. Asberry sent a compliance complaint to Defendants' Chief Compliance & Privacy Officer, Laura Carrico, and Ms. Carrico emailed Mr. Cooper and Ms. Carlson to inform them. [Exhibit 40, Asberry Declaration, at ¶ 13; Exhibit 45, at TruHealth 1419]. Ms. Carlson forwarded the email to Ms. Ketchum. [*Id.*].

230. Ms. Ketchum then forwarded those emails to Ms. Kukuljan and said, "I knew we should have terminated her. You are right she is a liability." [*Id.*]. Kukuljan asks if Ms. Ketchum knew what Ms. Asberry said. [*Id.*].

231. Ketchum responded, "No that's the problem. I bet its about our CPA agreement and the fact that we signed on people she feels aren't competent and don't have a DPOA in place. I don't know what else. She is a mess. She has a superiority complex and very defensive. She waited until her 90 days passed to pull this crap. She only reacted when she was put on a PIP." [*Id.* at 1418].

232. However, both Ketchum and Kukuljan knew Ms. Asberry had reported her concerns prior to being placed on a PIP. [SOF 223-24].

233. Ms. Ketchum also responded to Ms. Carlson to say, "I honestly feel like Deborah is a liability to the company. I have discussed this with Shiloh [Kululjan] in the past and she agreed that she isn't for the company and I'm not sure why. <u>How long do we need to wait to term her?</u> [Exhibit 46, TruHealth 1420-21 (emphasis added)].

234. Ms. Carlson then advised, "We need to give her at least 30 days to correct her behavior with the clients and get better reports from them. Ultimately our stance is to seek to help her be successful so be sure you document all the great coaching and feedback you are providing and receiving." [*Id.* at 1420].

235. Ms. Ketchum then forwards Ms. Carlson's response to Kukuljan who responds, "We just have to work the process." [Exhibit 47, at TruHealth 1422-23].

236. Ms. Ketchum emailed Ms. Carrico (Chief Compliance Officer) and acknowledges that Ms. Asberry had brought up compliance concerns in the past and said, "To be honest I wanted to term her in December. I put her on the PIP to see if things would improve but it sounds like it isn't." [Exhibit 48, at TruHealth 1428-29].

237. Ms. Ketchum also opined that "[Ms. Asberry is probably retaliating because she got put on a performance improvement plan" while acknowledging the very issues Ms. Asberry was complaining about. [*Id.* at 1428]. Furthermore, Ketchum stated, "It just seems funny to me that she sent complaints after she got put on a PIP." [*Id.*]. Again, Ms. Asberry sent complaints prior to being placed on a PIP. [SOF 223-24].

238. Ms. Asberry also reported her concerns about resident abuse and neglect to the DHSS on or about January 7, 2020. [Exhibit 40, Asberry Declaration at ¶ 15].

239. On or about January 9, 2020, Ms. Asberry complained about retaliation regarding her PIP to Mr. Boguski and Anita Moore. [*Id.* at ¶ 18; Exhibit 49, TruHealth 1434-35; Exhibit 1,

Ketchum Depo., at 18:10-22, 19:10-16].

240. On January 10, Ms. Asberry sent Ms. Ketchum an update of the facilities and outlined the patient care issues she was witnessing at the facilities. [Exhibit 50, at TruHealth 1444-46]. She concludes her summary: "I will continue to advocate for the patients, and will be thorough and ethical. I realized I am a guest in the facilities, but professionally we are ethically bound to do the right thing as well." [*Id.* at 1446]. Ms. Asberry also forwarded Ketchum the concerns she outlined to her collaborative physician, Dr. Sears. [Exhibit 50, at TruHealth 1450-52].

241. On January 15, 2020, Ms. Ketchum removed Ms. Asberry from her assignments at Highland and Hidden Lake. [Exhibit 52, at TruHealth 1468-69]. She emailed Clay Trillin, the DON at Hidden Lake, that Ms. Ketchum "will [not] be sending Deborah Asberry back to your facility. I had to reassign her." [*Id.* at 1470].

242. However, Ms. Ketchum testified that the facilities, Hidden Lake and Monterrey, asked that Ms. Asberry not come back to their facilities. [Exhibit 1, Ketchum Depo., at 43:05-19].

243. Ms. Asberry believes that she was "reassigned" in retaliation for her complaints of compliance and her report to the DHSS. [Exhibit 40, Asberry Declaration, at ¶ 17].

244. Ms. Ketchum did not know for sure, but she suspected Ms. Asberry had made a report to the DHSS. [Exhibit 1, Ketchum Depo., at 31:09-17].

245. In late January 2020, Ms. Asberry contacted IT about having issues printing at home, and the IT department informed Ms. Ketchum. [Exhibit 53, at TruHealth 1490]. Ms. Ketchum forwarded the email chain to Mr. Boguski and said, "With everything going on this concerns me. Is that something that she could be terminated on using the outside source?" [*Id.* at

1486].

246. Ms. Asberry was not disciplined for printing information at home, and Ms. Ketchum acknowledged that she did not know they could not print patient information at home either. [Exhibit 54, TruHealth 1491].

247. Nevertheless, Ms. Ketchum asked Mr. Boguski, "Even without the printer issue do we have enough to let her go or do we need to wait out the full 60 days?" [Exhibit 55, at TruHealth 1506]. Boguski cautioned against doing anything at 30 days unless it is something truly egregious. [*Id.*]. Ms. Ketchum forwarded the email to chain to Kukuljan with the comment "Ugg!!" And Kukuljan responded in kind "UGH." [*Id.* at 1506].

248. Ms. Asberry was terminated on February 28, 2020. [Exhibit 40, Asberry Declaration, at ¶ 20].

249. In addition to Ms. Asberry, Ms. Ketchum believes she was terminated for reporting DPOA compliance concerns, and she considered litigation for her wrongful termination. [Exhibit 1, Ketchum Depo., at 44:15-45:01; 69:07-20].

250. On November 16, 2020, Ms. Ketchum reported compliance concerns regarding DPOAs to Chris Burkhart of Tuterra. [Exhibit 56, TruHealth 1742].

251. On December 16, 2020, Ms. Ketchum followed-up on her DPOA concerns with Kelly Hilmes of Tuterra. [Exhibit 57, at TruHealth 1749-51].

252. On February 2, 2021, Ms. Ketchum was terminated allegedly due to her position being eliminated. [Exhibit 58, TruHealth 1765].

253. Ms. Ketchum hired an attorney and settled her claims prior to filing any litigation. [Exhibit 1, Ketchum Depo., at 49:14-50:01].

## IV. ARGUMENT

A moving party is not entitled to summary judgment unless it can show "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986)). A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Pro. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). The District Court does not balance the parties' competing evidence to determine the truth of a factual issue; but rather, it merely determines whether there is evidence creating a genuine issue for trial. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1102 (8th Cir. 1999). "A dispute about a material fact is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment." *Johnson v. Securitas Sec. Servs.*, 728 F.3d 754, 759 (8th Cir. 2013). "Because employment discrimination cases frequently turn on inferences rather than direct evidence, the court must be particularly deferential to the party opposing summary judgment." *Bell*, 186 F.3d at 1101.

### A. Summary Judgment Should Be Denied on Plaintiff's WPA Claim.

The Whistleblower's Protection Act ("WPA") provides a remedy for employees who have been terminated for blowing the whistle on unlawful conduct or refusing to engage in unlawful conduct. Summary judgment is not appropriate on Plaintiff's WPA claims. Defendants argue that (1) Plaintiff is not a "protected person" under the WPA; and (2) there is no causal connection between her report and the adverse actions taken against her. Defendants' argument fails for several reasons. First, Defendants employ a definition for "protected person"

that is far too narrow and undermines the legislative intent of the WPA. Second, even if this Court finds Defendants' definition appropriate, Plaintiff reported misconduct of her employer on three different occasions; and third, she refused to carry out an illegal directive issued by her supervisor.

To establish a claim under the WPA, Plaintiff must establish that (1) she is a protected person under the WPA; (2) she suffered an adverse employment action; and (3) her status as a protected person was the motivating factor in the adverse action. *Steak N Shake, Inc. v. White*, No. 4:18-cv-00072-SRC, 2020 U.S. Dist. LEXIS 3769 at *30 (E.D. Mo. Jan. 7, 2020).

**1. Plaintiff is a "Protected Person" under the WPA.**

**a. Plaintiff is a Protected Person as Defined in the WPA.**

Defendants argue that the definition of "protected person" under the WPA precludes Plaintiff from establishing her claims. Defendants ignore the remaining provisions of the Act and the other ways Plaintiff is a "protected person". Indeed, the WPA defines "protected person" as "[1] an employee of an employer who has reported to the proper authorities an unlawful act of his or her employer; [2] an employee of an employer who reports to his or her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation promulgated under statute; or [3] an employee of an employer who has refused to carry out a directive issued by his or her employer that if completed would be a violation of the law." RSMo. § 285.575.2(4). However, the WPA further provides that "[t]his section is intended to codify the existing common law exceptions to the at-will employment doctrine and to limit their future expansion by the courts." RSMo. § 285.575.3.

Defendants' argument ignores the express legislative intent that the WPA codified

existing common law. The common law public policy exception to the employment-at-will doctrine provided four exceptions, two of which are relevant to this case. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. banc 2010). The first is "where an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute. *Id.* The second is where the employee reported to her superiors or to public authorities serious misconduct that constitutes violations of the law or public policy. *Id.*

Here, Plaintiff reported abuse and neglect of a disabled resident at a long-term care facility to the Department of Health and Senior Services as well as to her supervisor. (SOF 139-40). Furthermore, Plaintiff was legally obligated to report suspected abuse and neglect immediately or be guilty of a misdemeanor. RSMo. § 198.070.1, 3. There is no question that Plaintiff's actions constitute reporting to public authorities and her superiors serious misconduct that constitutes violations of the law or public policy. Plaintiff's report would be protected from retaliation under the common law. And because the General Assembly expressed its intent to "codify the existing common law exceptions to the at-will employment doctrine, the WPA protects Plaintiff as well.

In *Yount v. Keller Motors, Inc.*, the Eastern District Court of Appeals addressed a similar issue relating to the definition of "employer" under the WPA. 639 S.W.3d 458 (Mo. App. 2021). In *Yount*, the plaintiff reported that two co-workers were stealing rear cameras off vehicles then selling them for cash. *Id.* at 461. Yount alleged that his supervisor began retaliating against him ultimately leading to his termination. *Id.* at 461-62. The plaintiff then filed suit alleging retaliation in violation of the WPA, and the circuit court dismissed the claim citing that Yount's

reporting of his co-employees' misconduct did not make him a "protected person" under the WPA because he did not report employer misconduct. *Id.* at 462. The Eastern District reversed the circuit court because "the WPA by its express language codified the existing public-policy exception for whistleblower protection under the WPA . . . ." *Id.* at 461.

The *Yount* court began its analysis by discussing the interplay between the definitions of "employer" and "protected person" in the WPA. *Id.* at 465. The court acknowledged that the definition of "employer" specifically *excluded* "an individual employed by an employer" which on its face would exclude reports about a co-worker from the definition of "protected person". *Id.* However, like here, the inquiry did not end with the definition of employer; "[t]o the contrary, [the court] is obligated to construe the statute as a whole and not in isolated parts." *Id.* (citing *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 658 S.W.3d 420, 429 (Mo. banc 2019)). Meaning must be given to the word "employer" that is in harmony with all provisions of the WPA and avoids an absurd result defeating the purpose of the Act. *Id.* The *Yount* court noted that the circuit court's judgment did not suggest that it considered any language of the WPA other than Section 285.575.2(2), and that is where the court erred. *Id.* at 466.

The practical reality is that employers must conduct their business through natural persons, including agents and employees. *Id.* As the court noted, "[m]ore simply stated, any misconduct or unlawful act of the employer necessarily would include the conduct of the employer's employees when the employer acts through its employees." *Id.* Strict, uniform application of the term "employer" led to an illogical result which would have eliminated a recognized common law public policy whistleblower protection for workers. *Id.* at 467. The legislature's intent in the WPA was to codify the existing common law protections and limit future expansion of those protections, not constrict them. *Id.* at 467-68.

Here, assuming for the sake of argument that Plaintiff did not report misconduct of her "employer," it is undisputed that she reported misconduct of Highland Rehabilitation. (SOF 15, RSOF 15). It is also undisputed that Plaintiff performed duties at skilled nursing facilities, such as Highland, at which Defendants directed the care and treatment of patients in partnership and in contract with the facilities. (SOF 4, 6-7, 152). Furthermore, Defendants' Adult Protection policies purported to cover not only its employees, but also "residents, patients, contractors, and visitors of health care delivery sites." (SOF 115). This policy also required Plaintiff to report suspected abuse and neglect or face dismissal. (SOF 116). And Missouri law required Plaintiff to report suspected abuse and neglect or face criminal liability. RSMo. § 198.070.3. Yet, Defendants argue that because Highland was not Plaintiff's "employer" they can retaliate against her at will even though their policies and Missouri law require her to do exactly what she did. As in *Yount*, this leads to an illogical and absurd result that undermines the stated intention of the General Assembly. Permitting Plaintiff's WPA claim in a joint venture relationship such as Defendants' would not further expand the protections of the WPA; rather, it would uphold the legislative intent that common law protections remain inviolate.

Defendants cite a single case to support its argument, and it is distinguishable. In *Ward*, the plaintiff was a security guard assigned by G4S to provider security services to its client, Mastercard. *Ward v. G4s Secure Solutions (USA), Inc.*, No. 4:20CV891 JCH, 2020 U.S. Dist. LEXIS 161894 at *1 (E.D. Mo. Sept. 4, 2020). The plaintiff learned that G4S hired a new security guard, Mauck, who had resigned from his previous employment as a police officer for the City of Jennings, Mo. *Id.* While employed with the City of Jennings, Mauck had shot at a fleeing car that had an eleven-month-old child inside. *Id.* at *1-2. The plaintiff reported this incident to his supervisor and questioned Mauck's fitness to be a security guard. *Id.* at *2. The

plaintiff alleged that his supervisors retaliated by suspending him and ultimately terminating his employment. *Id.*

The court found that the Plaintiff was not a "protected person" under the WPA because he reported misconduct of a person who was employed by a completely different entity and was not even the defendant's employee at the time of the misconduct. *Id.* at *5-6. The misconduct could not be imparted on the employer in any way.

Here, Defendants contract with their partner facilities to provide medical services. (SOF 4, 6-7, 152). Defendants have no "brick and mortar" buildings in Missouri, and their employees perform their services *only* at the partner facilities. (SOF 114). Plaintiff was completely reliant on the partner facilities to perform her work. Furthermore, Plaintiff was advocating for Defendants' patients and was required by Defendants and Missouri law to report instances of abuse and neglect. Plaintiff's circumstances are distinguished from those in *Ward* and much more analogous to *Yount*. Defendants must act through its own employees and its partners in the facilities to conduct its business and prevent abuse and neglect affecting their patients. Plaintiff is a "protected person".

**b. Plaintiff is a Protected Person Because She Reported Misconduct of Her Employer.**

Even if this Court finds that the WPA does not protect Plaintiff absent a report of misconduct of her "employer" as strictly defined in the statute, the analysis does not end there. Plaintiff is also protected because she also reported misconduct of her employer. Indeed, Plaintiff reported the repeated sexual abuse by the male resident and the repeated neglect of the female victim. (RSOF 15). The male resident's sexual misconduct predated Plaintiff's employment with Defendants. (SOF 129). Indeed, Ms. Ketchum testified that his conduct was "over the top" and he sexually harassed her as well. (*Id*). Ms. Ketchum had first-hand

knowledge of the long history of the male patient's behavior and justified her continued inaction because he was mentally incapable of understanding his actions. Then when this incident is brought to her attention – twice – she expressed no concern for the harassed victim and tells Plaintiff not to report it to the DHSS.

Plaintiff's report of abuse and neglect to the DHSS was a report of misconduct against not only the facility, but her supervisor who ignored repeated instances of sexual abuse for an extended period of time. Plaintiff is a "protected person" under the WPA.

**c. Plaintiff is a Protected Person Because She Refused a Directive That if Completed Would Have Been a Violation of Law.**

The WPA protects employees who "refused to carry out a directive issued by his or her employer that if completed would be a violation of law." RSMo. § 285.575.2(4); *see also Newsome v. Kan. City, Mo. Sch. Dist.*, 520 S.W.3d 769, 777 (Mo. banc 2017) (recognizing refusal to violate public policy to be protected conduct). As mentioned above, Defendants did not argue that Plaintiff is not a protected person under the WPA under this definition of "protected person" despite citing the definition in their opening brief. Plaintiff properly pleaded this theory in her Petition. [Doc. 1-1, at ECF 17, ¶ 78]. Defendants have waived any argument that Plaintiff is not a protected person under the refusal to violate public policy theory.

To be sure, Plaintiff is a "protected person" because she refused a directive that if completed would have been a violation of law. It is undisputed that Plaintiff is a mandatory reporter pursuant to RSMo. § 198.070. "When any . . . nurse practitioner . . . has reasonable cause to believe that a resident of a facility has been abused or neglected, he or she shall immediately report or cause a report to be made to the department." RSMo. § 198.070.1. "Any person required in subsection 1 of this section to report . . . to be made to the department who knowingly fails to make a report within a reasonable time after the act of abuse or neglect as

required in this subsection is guilty of a class A misdemeanor." RSMo. § 198.070.3. Plaintiff had reasonable cause to believe the male resident was sexually abusing the female resident and that the female victim was being neglected by her health care providers.

Ms. Ketchum admitted that she told Plaintiff not to call the DHSS to report abuse or neglect of the female resident. (SOF 152, 160). That was an illegal directive. Plaintiff had reasonable cause to believe abuse and neglect had occurred, and she was obligated under criminal liability to report it. *See also State v. Kaiser*, 139 S.W.3d 545, 554 (Mo. App. 2004) (affirming conviction where a non-mandated reporter "could properly be convicted as an accessory to Via in her failure to report elderly abuse."). Ms. Ketchum and Ms. Carlson both knew Plaintiff had an obligation to make such a report, and they knew Plaintiff had a right to confidentiality in her report to the DHSS. (SOF 161). The directive to Plaintiff to not call the DHSS would have been a violation of RSMo. § 198.070.1 if completed. Plaintiff is a protected person under the WPA.

Defendants may argue on Reply that Plaintiff had already called the DHSS at the time of the illegal directive, so Ms. Ketchum's mistake precludes Plaintiff from qualifying as a protected person. This argument fails. An employer's mistaken belief that an employee engaged in protected activity is no defense to the retaliatory discharge of that employee. *See Saffels v. Rice*, 40 F.3d 1546, 1549-50 (8th Cir. 1994) (analyzing FLSA and Missouri common law whistleblowing and ruling that "[w]hether the plaintiffs were discharged due to their employers' mistaken belief that they called the authorities . . . is properly a jury issue."); *see also Muhammad v. Wilkins Grp.*, No. 4:09-CV-247 CAS, 2010 U.S. Dist. LEXIS 18622 at *5-6 (E.D. Mo. Mar. 2, 2010) (denying summary judgment where defendant mistakenly believed plaintiffs had reported to the Department of Labor).

Here, Ms. Ketchum told Plaintiff not to call the DHSS, but Plaintiff had already done so. (SOF 143-44). Ketchum then retaliated by writing-up Plaintiff and placing her on a PIP for insubordination because she believed Plaintiff called the DHSS after Ketchum told her not to. (SOF 160). Ms. Ketchum attempted to prevent Plaintiff from exercising her legal obligation to report suspected abuse and neglect, and Defendants should not be shielded from potential liability because Ms. Ketchum was mistaken. And she was mistaken only on the timing, not the fact. Her admitted intent was to retaliate against Plaintiff for calling the DHSS. Plaintiff is a protected person under the WPA.

**d. Plaintiff is a Protected Person Under the WPA Because She Reported to the Proper Authorities Retaliation for Reporting to the DHSS.**

The WPA protects employees who report to her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation promulgated under statute. RSMO. § 285.575.2(4). Following her retaliatory PIP and PAFs, Plaintiff made three separate complaints of retaliation for calling the DHSS. (SOF 190-92). In these complaints, Plaintiff specifically referenced that the PIP and PAFs were "done in blatant retaliation of the call made to the State of Missouri." (SOF 191-92). While Defendants attempt to frame her complaints as a single complaint on August 13 (tacitly admitting that Plaintiff is a protected person), it is undisputed that she complained about retaliation for calling the DHSS. (SOF 38). Plaintiff was a mandatory reporter under RSMo. § 198.070, which is a clear mandate of public policy as articulated in the statute. Plaintiff is a protected person under the WPA.

**2. Plaintiff's Status as a Protected Person was the Motivating Factor in Her Termination.**

Defendants argue that Plaintiff cannot establish that her report to the DHSS was a

motivating factor for the PAFs, PIP, or her termination. "The motivating factor" means that "the employee's protected classification actually played a role in the adverse decision or action and had a determinative influence on the adverse decision or action." *Steak N Shake*, 2020 U.S. Dist. LEXIS 3769 at *29-30. First, Defendants' argument omits Plaintiff's three complaints about retaliation following the retaliatory discipline. Second, the temporal proximity between Plaintiff's complaints and resulting discipline support an inference of causation. And third, there is direct evidence linking Plaintiff's report to the DHSS to her termination.

As discussed above, Plaintiff reported abuse and neglect to the DHSS on July 14, 2020. (SOF 139). Following her report to the DHSS, Ketchum began drafting a PIP just two weeks later on July 27, then Ketchum issued Plaintiff the PIP and two PAFs on August 4 and another PAF on August 5. (SOF 146, 152, 179). Then Plaintiff made three separate complaints of retaliation on August 9, 13, and 14. (SOF 190-92). Her termination followed less than a week later. (SOF 212).

Temporal proximity alone can create a sufficient inference of causation if the proximity is very close as it is in this case. Where an adverse action occurs less than two weeks after the protected activity, the timing of the two events alone can support a finding of causation. *Peterson v. Scott Cnty.*, 406 F.3d 515, 524-25 (8th Cir. 2005); *see also Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002) (two weeks); *Sprenger v. S. Fed. Home Loan Bank*, 253 F.3d 1106, 1113-14 (8th Cir. 2001) ("a matter of weeks"). Furthermore, an unfavorable evaluation, write-up, or PIP can constitute an adverse action when it is subsequently used to alter the terms and conditions of employment. *Spears v. Mo. Dept. of Corr. & Human Resources*, 210 F.3d 850 (8th Cir. 2000).

Here, the decision to place Plaintiff on a PIP and the drafting of it occurred less than two

weeks after Ketchum learned about Plaintiff's report to the DHSS, and three PAFs followed a week later. Furthermore, the August 5 PAF was for emergency medical services that occurred almost a month earlier on July 8 – before Plaintiff made her report – and Ketchum was aware of the incident at the time. (SOF 175). Moreover, Plaintiff's termination came less than 10 days after her first complaint of retaliation and less than one week following her detailed complaints to Boguski and Carlson. The temporal proximity of these events supports an inference of causation.

In addition to the temporal proximity, Ms. Ketchum admitted giving Plaintiff the insubordination PAF for making the call to the DHSS, and she put the insubordination issue on Plaintiff's PIP. (SOF 151). Additionally, Ketchum threatened to remove Plaintiff from the facilities if she makes further reports or if she told any staff members. (SOF 154). Both Mr. Boguski and his HR peer Ms. Brush thought Plaintiff could view the PAF and its corrective actions as retaliatory, then Boguski deleted the retaliatory threat of removal from facilities. (SOF 155-57). Furthermore, Ms. Carlson attempted to set new unwritten policies preventing Plaintiff from reporting anything else to the DHSS; she did not want to "leave her any loophole to do her own reporting." (SOF 162). But both Ketchum and Carlson *knew* Plaintiff had a legal obligation to report suspected abuse or neglect and that Plaintiff had a legal right to confidentiality in her report. (SOF 161, 166).

When Carlson conducted her "review" of the PAFs, she admitted Plaintiff was not insubordinate as Ketchum had written. (SOF 202). Moreover, Carlson also admitted that Plaintiff complied with both company policy and Missouri law in informing her supervisor and the DHSS about suspected abuse or neglect. (SOF 169-70). However, Carlson did not remove the PAF or PIP as Plaintiff requested even though Carlson acknowledged that Plaintiff did

nothing wrong. (SOF 202).

Defendants argue that Plaintiff leaving her prescription on her desk in a locked office is the sole reason for her termination. But Ms. Carlson's words undermine the argument. Indeed, in the termination phone call, Carlson relied on the retaliatory PIP to justify terminating Plaintiff over a one-time accident of leaving her medication on her desk. (SOF 207, 212). Furthermore, Carlson acknowledged that lesser discipline was considered but because Plaintiff was on a PIP, it was the final straw. (SOF 213). A reasonable jury could find that Plaintiff's status as a protected person actually played a role in her termination and had a determinative influence on the decision. Plaintiff had no formal discipline prior to her report to the DHSS, then she received a flurry of PAFs and a PIP in a two-day period for conduct that mostly occurred prior to her report – combined with direct evidence of retaliatory PAF and PIP – explicitly linked to the termination. Defendants' Motion for Summary Judgment as to Plaintiff's WPA claim should be denied.

**3. Defendants Demonstrate a Pattern or Practice of Retaliating Against Employees Who Make Whistleblower Complaints.**

"Pattern or practice" is a legal term that refers to an employer regularly engaging in prohibited discriminatory or retaliatory conduct. *Cox. v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 116 (Mo. banc 2015). Both the Missouri Supreme Court and United States Supreme Court have explicitly ruled that "me too" evidence is relevant and admissible to support discrimination claims. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008) (holding that testimony by nonparty employees about discrimination can be relevant in a single-act discrimination case and any *per se* exclusion of such evidence constitutes an abuse of discretion); *Cox*, 473 S.W.3d at 125 (finding that this type of evidence "is highly logically relevant because it makes the existence of a fact – the firing of [Plaintiff] due to her [gender or

race] – much more probable than it would be without the evidence.”).

Here, in addition to Plaintiff, Defendants terminated two other individuals shortly after they made whistleblower complaints. First, Deborah Asberry was a nurse practitioner who preceded Plaintiff in the role, and she was supervised by Ms. Ketchum. (SOF 218). Early in her employment, she expressed concerns about performing her Nurse Practitioner duties without a collaborative practice agreement, as required by law. (SOF 220). She also reported that many incapacitated patients at the facilities did not have durable powers of attorney (“DPOA”) in place, as required by law. (SOF 220). After expressing these concerns, Ketchum began lodging unwarranted criticisms about her behavior. (SOF 221). Eventually, Ms. Asberry provided a written complaint to Ms. Ketchum about the DPOA issues on December 17, 2019. (SOF 222). Ketchum sent that complaint to Defendants’ executive director, Shiloh Kukuljan, who remarked “she needs to stay in her lane.” (SOF 224). The next day, Ketchum told Ms. Carlson “I am probably going to need to let Deborah go soon.” (SOF 225). Like Plaintiff, Ketchum put Asberry on a PIP less than two weeks after the written report of non-compliance. (SOF 227).

Asberry persisted with her concerns and sent another complaint to Defendants’ Chief Compliance Officer on January 7, 2019. (SOF 229). When Ketchum learned of this report, she sent an email to Kukuljan and said, “I knew we should have terminated her. You are right she is a liability.” (SOF 230). Then Ketchum falsely tells Kukuljan and the Compliance Officer that Asberry “only reacted when she was put on a PIP” omitting that Ketchum put her on a PIP immediately after her first complaint. (SOF 231, 237). Ketchum also told Ms. Carlson that she thinks Asberry is a liability to the company and asks, “How long do we need to wait to term her?” (SOF 233). Then, on January 15, Ketchum removed Asberry from two of her assignments – the same threat she issued to Plaintiff. (SOF 241). Ms. Asberry was terminated on February

28, 2020, and she believes her PIP and termination were in retaliation for making whistleblower reports. (SOF 248).

Ironically, Ms. Ketchum was also terminated shortly after raising the same compliance concerns that Ms. Asberry raised. (SOF 249). Ketchum reported DPOA non-compliance on two occasions, November 16 and December 16 of 2020. (SOF 250-51). Ketchum was terminated on February 2, 2021. (SOF 252). Ms. Ketchum believed her termination was in retaliation for her reports of non-compliance, and she hired an attorney to pursue litigation before settling her claims prior to any litigation. (SOF 253). In less than one year, Defendants terminated three employees who raised whistleblower complaints shortly after they blew the whistle. Plaintiff's WPA claim should proceed to trial.

**B. Summary Judgment Should Be Denied On Plaintiff's Disability Discrimination Claim.**

Missouri courts use the burden-shifting analysis under *McDonnell Douglas* to evaluate proof in employment discrimination cases at the summary judgment state. *Eivins v. Mo. Dep't of Corr.*, 636 S.W.3d 155, 166 (Mo. App. 2021). Employment discrimination cases often depend on inferences rather than direct evidence; therefore, individual plaintiffs generally must rely on circumstantial evidence of discrimination. *Cox*, 473 S.W.3d at 116. To establish a claim for disability discrimination under the Missouri Human Rights Act, Plaintiff must prove the following elements: (1) disability protected by the statute; (2) an adverse employment action; and (3) evidence from which to infer the employee's disability was a factor in the adverse employment action. *Mobley v. St. Luke's Health Sys.*, No. 4:19-CV-00764-BCW, 2021 U.S. Dist. LEXIS 124718 at *12 (W.D. Mo. June 1, 2021). Once Plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a non-discriminatory reason for the adverse action. *Eivins*, 636 S.W.3d at 167. If the employer meets its burden, then Plaintiff must prove

the articulated justification is pretext for discrimination. *Id.*

**1. Plaintiff Can Establish a Prima Facie Case of Disability Discrimination.**

Defendants concede the first two elements of Plaintiff's prima facie case – that she has a qualified disability, and she suffered an adverse action. However, Defendants argue that Coaching, PAFs, and the PIP are considered adverse actions. Generally, this may be true, but an unfavorable evaluation, write-up, or PIP can constitute an adverse action when it is subsequently used to alter the terms and conditions of employment. *Spears*, 210 F.3d at 854. As discussed above, Ms. Carlson specifically relied on the PAFs and PIP when she made the decision to terminate Plaintiff. (SOF 213). Additionally, Plaintiff can establish the third element.

Plaintiff suffered a non-work injury in early June, and Ketchum and Carlson were both aware that she was in physical therapy three days a week to treat the injury. (RSOF 45). Ketchum and Plaintiff had a friendly relationship prior to the injury, then everything changed. (*Id.*). Furthermore, Defendants primary stated reason for termination is suspicion of Plaintiff taking her prescribed medication for her disabilities, but as discussed below, that reason has shifted. Furthermore, Plaintiff did not receive any discipline until after her injury and Ketchum's awareness of it. This evidence gives rise to an inference of discrimination.

**2. Defendants' Proffered Reasons Are Pretextual.**

Pretext means that the true reason behind a challenged employment decision is in fact an unlawful reason. *Bibbs v. Block*, 749 F.2d 508, 511 n.1 (8th Cir. 1984). "[I]mplausible explanations and false or shifting reasons support a finding of illegal motivation." *Id.*

Here, Defendants' reasons have shifted. In her termination notice and phone call, Defendants stated the primary reason for termination was "suspicion of working under the influence of opioids." (SOF 58). Now, there is no mention of it anywhere in Defendants' brief.

In fact, Ms. Carlson testified that Plaintiff taking the medication merely "crossed [her] mind" but Plaintiff was never asked if she actually took the medication while working. [Exhibit 5, Carlson Depo., at 124:13-15]. Now, Defendants have tried to walk back a stated reason for termination. That is evidence of pretext.

Additionally, an employer's failure to follow its own investigation policies can be a sufficient basis for finding pretext. *Kopman v. City of Centerville*, 871 F. Supp. 2d 875, 896 (D.S.D. 2021) (citing *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 871 (8th Cir. 2009)). Defendants' policies require an investigation when an employee makes protected complaints. (SOF 194). As discussed above, Plaintiff made several complaints of retaliation, and no one conducted any investigation. (SOF 195-200). Plaintiff has established sufficient pretext to present a genuine issue of fact for the jury to decide. Defendants' Motion for Summary Judgment should be denied. Plaintiff's disability claim should proceed to trial.

## V. CONCLUSION

For the reasons outlined above, Defendants' Motion should be denied, and Plaintiff's WPA and MHRA disability discrimination claims should proceed to trial.

Respectfully submitted,

**SIRO SMITH DICKSON PC**

By /s/ Ryan P. McEnaney
Rik N. Siro MO #33908
Eric W. Smith MO #47108
Athena M. Dickson MO #55104
Raymond A. Dake MO #62829
Ryan P. McEnaney MO #70235
1621 Baltimore Avenue
Kansas City, Missouri 64108
816.471.4881 (Tel)
816.471.4883 (Fax)
rsiro@sirosmithdickson.com (email)

esmith@sirosmithdickson.com (email)
adickson@sirosmithdickson.com (email)
rdake@sirosmithdickson.com (email)
rmcenaney@sirosmithdickson.com (email)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF filing system on December 7, 2022, which system sent notification of such filing electronically to the following counsel of record:

James R. Holland, II
Samantha J. Monsees
Jessica Barranco
FISHER & PHILLIPS LLP
4622 Pennsylvania Avenue, Suite 910
Kansas City, MO 64112
Email: jholland@fisherphillips.com
Email: smonsees@fisherphillips.com
Email: jbarranco@fisherphillips.com
**ATTORNEYS FOR DEFENDANTS**

/s/ Ryan P. McEnaney
ATTORNEY FOR PLAINTIFF