EXHIBIT
12
exhibitsticker.com





IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

LYNDA G. CARLYLE,

Plaintiff,

vs. Case No. 4:21-CV-00920-RK

AMERICAN HEALTH PARTNERS,
LLC, et al.,

Defendants.

Videotaped Deposition of:

PETER BOGUSKI

Taken on behalf of the Plaintiff
June 9, 2022
Commencing at 1:01 p.m. CST

Reported by: Jenny Checuga, LCR, RPR



A P P E A R A N C E S

For the Plaintiff:
MR. RYAN P. MCENANEY
Attorney at Law
Siro Smith Dickson, PC
1621 Baltimore Avenue
Kansas City, MO 64108
(816a)471-4881
rmcenaney@sirosmithdickson.com

For the Defendants:
MR. JAMES R. HOLLAND, II
Attorney at Law
Fisher & Phillips, LLP
4622 Pennsylvania Avenue, Suite 910
Kansas City, MO 64112
(816)842-8770
jholland@fisherphillips.com

Also present:
MS. AUGUSTA SMITH - Videographer
MR. ANDREW AMONETTE



I N D E X


| | Page |
|---|---|
| Examination By Mr. McEnaney | 7 |


E X H I B I T S


| | Page |
|---|---|
| Exhibit No. 55 E-mail 7/31 Ms. Ketchum to Mr. Boguski | 26 |
| Exhibit No. 56 E-mail 11:22 a.m. Mr. Boguski to Ms. Ketchum | 33 |
| Exhibit No. 57 E-mail from Mr. Boguski to Mr. Brush | 40 |
| Exhibit No. 58 E-mail between Ms. Brush and Mr. Boguski about Write-ups | 41 |
| Exhibit No. 59 E-mail 8/4 Mr. Boguski to Ms. Ketchum | 44 |
| Exhibit No. 60 E-mail Ms Ketchum to Mr. Boguski | 45 |
| Exhibit No. 61 E-mail 8/5 Ms. Ketchum to Mr. Boguski | 47 |
| Exhibit No. 62 E-mail 9:26 a.m. Ms. Ketchum to Mr. Boguski | 51 |
| Exhibit No. 63 E-mail Ms. Ketchum to Ms. Carlson | 69 |





| | Page |
|---|---|
| Exhibit No. 64 E-mail 8/5 Ms. Ketchum to Mr. Boguski | 74 |
| Exhibit No. 65 E-mail between Ms. Ketchum and Mr. Boguski | 78 |
| Exhibit No. 66 E-mail 8/5-8/6 Ms. Ketchum and Mr. Boguski | 82 |
| Exhibit No. 67 Grievance | 85 |
| Exhibit No. 68 E-mail Chain with Ms. Carlyle's Complaint | 88 |
| Exhibit No. 69 E-mail 8/10 Ms. Ketchum to Ms. Carlson | 91 |
| Exhibit No. 70 E-mail 8/13 Complaint | 94 |
| Exhibit No. 71 Response to E-mail Exhibit No. 70 | 102 |
| Exhibit No. 72 E-mail between Mr. Boguski and Ms. Trinkler | 109 |
| Exhibit No. 73 E-mail between Mr. Boguski and Ms. Thompson | 114 |


(Original exhibits attached to original transcript.)

Page 5

S T I P U L A T I O N S

The videotaped deposition of PETER BOGUSKI was taken by counsel for the Plaintiff, at the offices of Fisher & Phillips LLC, 3310 West End Avenue, Nashville, Tennessee, on June 9, 2022, by Notice for all purposes under the Federal Rules of Civil Procedure.

All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

It is agreed that JENNIFER CHECUGA, LCR, RPR, and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness were not discussed.

Page 6

* * *

THE VIDEOGRAPHER: We are now on the record. Today's date is June 9th, 2022, and the time is 1:01 p.m. This is the video-recorded deposition of Peter Boguski in the matter of Lynda G. Carlyle versus American Health Partners, LLC, et al., Case Number 4:21-CV-00920 RK in the United States District Court for the Western District of Missouri, Western Division.

This deposition is being held today at 3310 West End Avenue in Nashville, Tennessee. The reporter's name is Jenny Checuga. My name is Augusta Smith, I am the legal videographer. We are with Lexitas Legal.

Would the attorneys present please intro -- excuse me, introduce themselves and the parties that they represent.

MR. MCENANEY: Ryan McEnaney on behalf of Plaintiff, Lynda Carlyle.

MR. HOLLAND: Jim Holland with Fisher Phillips on behalf of Defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

Page 7

* * *

PETER BOGUSKI,

was called as a witness, and having first been duly sworn, testified as follows:

THE VIDEOGRAPHER: You may proceed.

EXAMINATION

QUESTIONS BY MR. MCENANEY:

Q. Good afternoon, Mr. Boguski. I'm Ryan McEnaney. We -- we just met briefly. I represent Lynda Carlyle. You understand she has sued American Health Companies and TruHealth for her wrongful termination, alleging age and disability discrimination and retaliation and also retaliation for reporting abuse and neglect in a long-term care facility.

Please state your --

A. Sorry.

Q. Please state your full name for the record.

A. Peter Stanley Boguski.

Q. And what is your address?

A. 1167 Cranford Hollow Road, Columbia, Tennessee 38401.

Page 8

Q. And what's your phone number, Mr. Boguski?

A. (408)921-0936.

Q. Have you ever had your deposition taken before?

A. No.

Q. Since this is your first, I'll go over a couple ground rules, really just to help the deposition go a little smoothly and get a clear transcript. This is a relatively informal setting, but you're -- you're under oath and your testimony has the same force and effect as if we're in court; you understand that?

A. Yes, I do.

Q. And we want a clear record, so try to refrain from nodding or saying "uh-huh" or "nuh-uh." Even though I'll understand what you mean, the court reporter may not. The transcript will --

A. Fair enough.

Q. If I -- if I remind you of that, please don't think I'm being rude.

A. I will not take it personally.

Q. If you don't understand a question or if it's confusing, please ask me to repeat it or

Page 9

rephrase it.
A. Okay.
Q. And if I've asked a question and you've answered it, I'll assume you understood the question; is that fair?
A. Yes, that is fair.
Q. And finally, let's speak one at a time. Let me finish my question before you answer; and likewise, I'll let you finish your answer before asking you a question.
A. Understood.
Q. And if you need a break, please say so. Not a marathon, so if you need to get up for any reason, just speak up.
A. I will. I think you can hear my voice is a bit low on the register. I've been fighting something for the last week, so I might need to.
Q. Okay. My only request is if there's a question pending, please answer that question, then we can take a break.
A. Fair enough.
Q. Did you review any documents to prepare for today's deposition?
A. Yes.

Page 10

Q. What did you review?
A. Some of the prior e-mails from that time and some of the disciplinary documents.
Q. The personnel action forms?
A. Correct.
Q. Did you review the -- the PIPs?
A. Yes.
Q. Did you review Ms. Carlyle's complaint that she filed in court?
A. I don't recall.
Q. Have you provided any documents to Mr. Holland --
A. No.
Q. -- regarding this case?
A. I have not.
Q. Do you possess any that might be relevant?
A. No, I do not.
Q. Do you have any text messages relating to Ms. Carlyle and her employment?
A. None that I know of, no.
Q. Did you ever text with Ms. Ketchum while you were working?
A. I think I did. Whether it was on this particular subject or not, I don't recall.

Page 11

Q. What about with Kami Carlson, did you ever text with her about work?
A. Maybe. The incidence or possibilities of that happening, possibility of that happening is much less than with Dawn.
Q. And besides your attorney, have you spoken with anyone to prepare for today's deposition?
A. I have not.
Q. I understand you're no longer employed with American Health; is that true?
A. That is correct.
Q. When did you stop working there?
A. At the end of August last year, I want to say the 26th or 7th, August.
Q. Was that a voluntary ending or was it involuntary?
A. I resigned.
Q. Why did you resign?
A. I got a new opportunity.
Q. Did American Health issue you a work phone while you were working there?
A. No, they did not.
Q. Just used your personal?
A. Correct.

Page 12

Q. Did you ever exchange any text messages with Jonathan Cooper regarding work?
A. On occasion. Over this particular matter, I don't recall.
Q. So where do you work now?
A. I'm a contractor for Medtronic.
Q. What are you doing for Medtronic?
A. Employee relations specialist.
Q. Is that an HR role?
A. Correct.
Q. How long have you been employed?
A. Since September of last year.
Q. Do you supervise any employees in your current role?
A. I do not.
Q. When you were employed with American Health, who was your supervisor?
A. At the time of this incident, to the best of my recollection, it was Crystal Creach.
Q. How do you spell Crystal's last name?
A. C-R-E-A-C-H.
What was the -- please refresh my memory, what was the date of the termination?
Q. August 19th, 2020.
A. That would have been Crystal Creach.

Page 13

Q. Who was it prior to Ms. Creach?
A. Nominally, Anita, and her last name is escaping me, but that was only for a very short time when I was first hired before they hired Crystal.
Q. Was Crystal your supervisor at the time you resigned?
A. No.
Q. Who was that?
A. Jonathan Cooper.
Q. When did he start supervising you?
A. Mid March of '21. Crystal was laid off in a RIF.
Q. What was your position with American Health?
A. Employee relations specialist, I guess they called it.
Q. And did you have any direct reports?
A. No.
Q. Was there a reporting relationship between Ms. Creach and Jonathan Cooper?
A. She reported to him, to the best of my knowledge.
Q. And after she got RIF'd, you just kind of skipped and reported to Mr. Cooper?

Page 14

A. Correct.
Q. Okay. Were you the HR rep for certain regions of the country? Like, how was that divvied out?
A. There was myself and another person. For Tennessee, she took the western part of the state to mid Tennessee and I took mid Tennessee to eastern.
I tended to handle most of the issues that went out of state in the -- the business divisions that they were starting to develop. Maybe not exclusively, but it just seemed to be that people just reached out to me because I would -- they would refer -- say, call this guy, because I worked with them prior. So it just kind of by natural osmosis.
Q. Okay. And who was the other person you just referred to?
A. Toni, T-O-N-I, Brush.
Q. So she essentially had the same position as you, just a different territory?
A. Correct. At that time, correct.
Q. Did you have the ability to hire and fire employees with American Health?
A. Did not hire. I did not directly fire

Page 15

that I -- but I would make recommendations.
Q. Have you ever met Lynda Carlyle in person?
A. No, have not.
Q. You've spoken to her on the phone, though?
A. I don't recall.
Q. Have you ever met Dawn Ketchum in person?
A. No.
Q. But you have spoken with her on the phone?
A. Yes.
Q. And exchanged text messages?
A. Correct.
Q. And when you worked for American Health, did you work in the same location as Kami Carlson?
A. I believe so.
Q. So you met her in person?
A. I have.
It's all kind of a blur vis-à-vis pre and post arrival of COVID.
Q. I think that makes sense.
A. Yeah.
Q. What's your educational background, just

Page 16

starting with college?
A. Bachelor's degree from the University of California Santa Cruz. Currently working on my masters at Middle Tennessee State.
Q. And do you have any HR certifications?
A. PHR.
Q. Do you have continuing education to -- to keep that up?
A. Uh-huh, I do.
Q. So as an HR professional, you -- you understand it's illegal to discriminate based on age or disability; is that right?
A. Correct.
Q. And it's illegal to retaliate against someone because they made complaints of discrimination --
A. Correct.
Q. -- whether those -- whether those complaints ended up being valid or not?
A. Correct.
Q. You agree with that?
And you knew that back in August 2020 just as you do today?
A. Correct.
Q. Did American Health offer EEO training

Page 17

while you were there?
A. They offered a variety of training through the Relias program.
Q. What kind of trainings were on Relias?
A. You name it, actually.
Q. Okay. So there was discrimination training?
A. Yes.
Q. And retaliation training?
A. Yep.
Q. Was there training --
A. There was.
Q. Sorry.
A. There was.
Q. Was there training involving mandatory reporter statutes?
A. I don't recall. I think so, but I'm not a hundred percent sure.
Q. Have you ever taken training on mandatory reporter statutes?
A. Yes. Whether I did at American Health Partners or not, I don't recall.
Q. So you said you were the HR rep for a portion of Tennessee and also out of state, including Missouri, right?

Page 18

A. Uh-huh.
Q. Did you familiarize yourself with the mandatory reporter statutes in Tennessee and Missouri?
A. No.
Q. What is your understanding of the mandatory reporter statutes?
A. In a sense, if you observe something, you are obligated to report it.
Q. Do you know if there's any kind of legal repercussions if you fail to report something you've seen?
A. Yes.
Q. Is it your understanding the statutes also include provision to making it illegal to retaliate against somebody for reporting abuse and neglect?
A. Yes.
Q. Is it fair to say that you would agree that it's illegal to retaliate against an employee for making a good faith report of abuse and neglect in a long-term care facility?
A. I think it's fair to say.
Q. Besides Ms. Carlyle's complaints, while you were working at American Health, were you

Page 19

involved in any other complaints of discrimination?
A. Yes. I couldn't give you specifics. I really don't recall individual cases.
Q. About how many would you say?
A. I don't recall.
Q. More than five?
A. I honestly don't recall.
Q. More than ten?
A. I don't know.
Q. Were you aware of any other complaints of retaliation for reporting a facility to the State?
A. I was not.
Q. In front of you is a binder with already marked exhibits. Some of them are loose because they occurred today. But if you first flip to Tab 4, which is Exhibit 4, looks like the American Health Partners employee handbook. Do you recognize this cover page?
A. Yes.
Q. Were you familiar with this handbook while you worked at American Health?
A. Reasonably.
Q. I'll just point out the bottom right of

Page 20

the page, there's something called Bates numbers. It says TruHealth 000118; do you see that?
A. Yes.
Q. That's how we mark these documents. The pagination -- and, of course, this handbook also includes its own pagination, but I'll -- I'll refer to these for the most part --
A. Oh.
Q. -- to direct you to certain pages.
A. Okay.
Q. So please flip to Page 126. It's also Page 9 of that.
A. Uh-huh.
Q. Section 104, the complaint procedure for sexual and other workplace harassment and discrimination; do you see where I am?
A. Mm-hmm.
Q. "Complaint procedure: Any employee who has a workplace sexual harassment complaint or a complaint of any discrimination or harassment against a supervisor, coworker, visitor or other person must bring the problem to the attention of their supervisor, members of management or human resources." Did I read

Page 21

that correctly?
A. Mm-hmm. Yes.
Q. It says, "If you believe you've been harassed or discriminated against, you must immediately report the incident." Do you see that, too?
A. I do.
Q. And the last sentence is, "The complaint will be immediately and thoroughly investigated in a professional manner." Did I read that correctly?
A. Yes.
Q. When a -- when a complaint is made, who conducts the investigation?
A. Typically, it would be either myself or Toni.
Q. And is the reason for that because you're looking for an impartial investigator?
A. Yes.
Q. Would you consider it improper if someone who was not impartial was doing an investigation into the complaint?
A. I think that's reasonable.
Q. Is that because you -- impartiality helps a fair investigation to figure out what

Page 22

happened?
A. That's the concept.
Q. Flip to the next page, please.
A. (Complies.)
Q. Start at the top paragraph but the second sentence. "American Health Partners' investigation will likely include interviews with" --
A. I'm sorry.
Q. It's Page -- it'll be Page 10 of the handbook, Page TruHealth 127.
A. Okay, where are you starting?
Q. The very top but the second sentence.
A. Oh, thank you.
Q. The paragraph begins "actions taken internally."
A. Yeah.
Q. And then the second sentence begins, "American Health Partners' investigation will likely include interviews with the parties involved in the incident and, if necessary, with individuals who may have observed the incident or conduct or have relevant knowledge." Did I read that correctly?
A. Mm-hmm, yes.

Page 23

Q. Would you agree that a -- an interview with the person making the complaint would be necessary in an investigation?
A. If a complaint was made, yes.
Q. Then the next paragraph begins, "Any employee who protects another employee who is charged with harassment or discrimination by failing to promptly and properly investigate and respond to a complaint is subject to disciplinary action up to and including termination." Do you see where I read that?
A. I do.
Q. How do you interpret that sentence?
A. I interpret that as if an employee basically gets in the way of an investigation or even the thought of a proposed investigation.
Q. What do you mean by "gets in the way"?
A. Tries to squelch.
Q. By "tries to squelch," would you agree that that would encompass destroying evidence of discrimination or retaliation?
A. Depends on your definition of destroy.
Q. To shred, to burn, to delete.
A. Are you implying willful intent?

Page 24

Q. Sure.
A. I suppose if willful intent was involved, that's reasonable.
Q. Let's look at the bottom of that page, Section 105. It's the ADA accomodation process policy. Are you with me there?
A. Yes.
Q. The last sentence of that first paragraph under 105 says, "American Health Partners will provide a reasonable accomodation to disabled, qualified applicants and employees unless doing so would create an undue hardship." Did I read that correctly?
A. You did.
Q. And then it goes on to say, "A qualified individual with a disability is an applicant or employee who can perform the essential functions of the job in question with or without reasonable accommodations. An employer's duty is to reasonably accommodate known disabilities." Did I read that correctly?
A. Yes.
Q. Flip the page, please, to TruHealth 130, which is Page 13 in the handbook.

A. (Complies.)
Q. And Section 108 is the anti-retaliation policy. Are you tracking with me there?
A. Yes.
Q. It says, "American Health Partners' policy specifically prohibit retaliation against any individual engaged in a protected activity. Protected activities include, but are not limited to, making a good faith complaint of discrimination, sexual or other form of harassment, participating as a witness or otherwise in a harassment investigation or investigation into other illegal activity, or requesting accommodations based on religion or disability." Did I read that correctly?
A. Yes.
Q. And then skipping to the next paragraph, "Retaliation conduct is seen as an adverse action that could dissuade a reasonable employee from making or suggesting an allegation of discrimination or harassment and includes actions such as termination, demotion, refusal to promote, threats, unjustified negative evaluations, unjustified negative references, increased surveillance or



unreasonable work" -- pardon me, "work assignments. Retaliation will not be tolerated and will be cause for discipline up to and including termination." Did I read that correctly?
A. Yes.
Q. And everything we just went over was review for you, right, in the training you've had over the course of your career?
A. Yes.
Q. Would you agree with that?
When did you first become involved with issues relating to Ms. Carlyle?
A. I don't recall.
Q. I'm going to hand you what will be marked as Exhibit 55.
(WHEREUPON, a document was marked as Exhibit Number 55.)
BY MR. MCENANEY:
Q. Mr. Boguski, this is an e-mail from July 31st from Ms. Ketchum to yourself. It looks like there was an attachment, Performance Improvement Plan, Lynda Carlyle. Do you recognize this document?
A. Yes.



Q. And the -- the text of the e-mail says, "I am not done with this, but can you look it over and tell me what you think? I know it's late, so you probably won't see this until Monday." Did I read that correctly?
A. You did.
Q. Had you and Ms. Ketchum spoken about Ms. Carlyle before this?
A. I don't recall.
Q. Judging by the -- her e-mail, does it sound like you may have?
A. No, sounds like we haven't.
Q. This is out of the -- this was out of the blue?
A. Another problem child.
Q. What problem child?
A. To me, sounds like she's introducing it to me.
Q. Do you know what she's referring to, "another problem child"?
A. Just a difficult employee.
Q. Had you and her worked with difficult employees before?
A. Yes.
Q. Do you remember any names?



A. One.
Q. Who was that?
A. Debra Asbury.
Q. What was difficult about Debra Asbury?
A. Performance issues.
Q. What were her issues?
A. I couldn't give you specifics at this point.
Q. It looks like she sent this kind of late on a Friday and she says, "I will talk to you" -- "talk to her Monday" -- "I will need to talk to her Monday if you're available." But the attachment looks like the PIP follows this, and this is her -- looks like her first draft of the PIP or -- at least my assumption, it's the first draft since it's the first time you saw it. Do you recognize Page 2 of this exhibit?
A. I certainly recognize the form. Yeah, the basic content --
Q. Okay.
A. -- seems familiar.
Q. Areas of concern, Number 1, are charts not being completed within the five-day requirement. Do you recall that?

Page 29

A. Specifically?
Q. Generally.
A. Generally, yes.
Q. And the second area of concern is insubordination. Are you with me there?
A. I am.
Q. It says, "On July 15th, Lynda called me and told me she had a concern at Highland. She said one of those concerns was a male patient she thought might be sexually harassing two other female patients." Did I read that correctly?
A. Yes.
Q. It goes on to say, "She stated that one of the employees walked in on the male patient with his penis out and was standing in front of a female patient in a W/C." Do you understand W/C to mean wheelchair?
A. Yes.
Q. "She said this was reported to the facility and they did their investigation, and that the DON, admin, regional nurse, PCP, psych NP were all aware of this. The female patient was questioned by three people and denied anything happened." Did I read that correctly?

Page 30

A. Yes.
Q. Do you see back on the first sentence where she thought he might be sexually harassing two other female patients? See that first sentence under insubordination?
A. Yes.
Q. Then Ms. Ketchum, what I just read was she said the female patient was questioned by three people. She's only referring to one patient there, right?
A. It appears that way.
Q. It says, "Lynda said the male patient needed to be kicked out of the facility and reported to the State. I told Lynda to write up everything she had just told me in an e-mail and I was going to talk to Kami Carlson, ED, and Kelly Hilmes, VP for Tutera/Highland, so they can work on this together and see if they have any advice and we can come up with a plan." Did I read that correctly?
A. Uh-huh.
Q. And Ms. Ketchum says, "I told her not to do anything until I spoke to Kami Carlson and Kelly Hilmes. I spoke to Kami, and we both agreed that this was hearsay." Did I read that

Page 31

correctly?
A. You did.
Q. "And that there was nothing for Lynda to report since she didn't see anything and the female patient denied anything happened and that the facility had done their investigation. I called Lynda back and told her that Kami and I agree this was hearsay and the facility investigated this. I told Lynda I was waiting for Kelly to return my call. Lynda called me the next day or so and told me that she called the State about the male patient and they were at the facility. She said the State dinged them." Did I read that correctly?
A. Yes.
Q. And then she says, "I asked her why she did that after I told her not to. She was directly insubordinate." Did I read that correctly?
A. Yes.
Q. Did you understand that to mean that she was insubordinate for calling the State after Ms. Ketchum told her not to?
A. That's my read on it.
Q. And then Ms. Ketchum says, "I told her

Page 32

this can cause issues at the facility with the relationship between our company and our partners." Did I read that right?
A. You did.
Q. And then she says, "She still has not sent the e-mail with the information I requested."
And then area of concern Number 3 involves giving orders on a patient that wasn't American Health's. Do you recall that at all?
A. Vaguely, yes.
Q. And then Number 4, there's a heading Professionalism, and there was a complaint that Ms. Carlyle had used some words that were offensive. Do you remember that?
A. I do.
Q. And if you flip to the next page, it's area of concern Number 5.
A. (Complies.)
Q. "Heather hasn't been getting her work done on time because she didn't want to overwhelm you because she said you knew you were behind in your work." Did I read that correctly?
A. Uh-huh.

Page 33

Q. Do you know who Heather is?
A. I do not.
Q. And then on observations, previous discussions or, it says, "We have had discussions on numerous occasions regarding time management and getting charts completed on time. I have given Lynda time management material and requested her to send me a tentative weekly schedule, has been given a coaching form in the past."
That seems to connect to area of concern Number 1; would you agree with that, charts not being completed within the five-day requirement?
A. I think that's reasonable.
Q. And then apparently there are no other previous discussions about any of the other four points on the PIP; would you agree with that?
A. It would appear that way.
Q. I'm going to hand you what will be marked Exhibit 56.
(WHEREUPON, a document was marked as Exhibit Number 56.)
///

Page 34

BY MR. MCENANEY:
Q. This looks like an e-mail from you to Ms. Ketchum that following Monday at 11:22 a.m. Looks like you had edited it and sent it back. Do you recall this document, this e-mail?
A. I'm sure I did.
Q. If you flip to the next page, under Number 2, the insubordination area of concern has been greatly reduced and it just says, "Insubordination/following through with directives from supervisor and/or management." And then it says, "See personnel action form from 8/4/2020." Did I read that correctly?
A. You did.
Q. Now, this -- these edits were on 8/3/2020, correct?
A. Yes.
Q. Is it fair to say that the personnel action form had not been written yet?
A. Or had not been delivered.
Q. And then down on Number 4, it's professionalism and it's about the -- the offensive language.
A. Correct.
Q. In front of you, loose, will be

Page 35

Exhibit 51.
So Exhibit 51 looks like an e-mail from Ms. Ketchum to you, this time with three attachments on August 3rd. And Ms. Ketchum says, "Peter, let me know what you think. Fix as you wish. Do you have time tomorrow for the call? Thank you." Did I read that correctly?
A. Uh-huh, you did.
Q. Do you recognize this e-mail exchange?
A. I recognize the personnel action forms.
Q. Flip to the very next page, it's TruHealth 384.
A. Uh-huh, yes.
Q. This is a personnel action form for the offensive language where she used the term "butt buddies" and -- in meeting or meetings; is that correct?
A. Correct.
Q. And above at the top where it's got handbook infractions in boxes, Number 11 is checked, violation of company rules; is that correct?
A. That is correct.
Q. And then flip to the next page, please. It would be the personnel action form for

Page 36

insubordination?
A. Yes.
Q. It says, "On July 15th, Lynda called me to tell me about a male member that she suspected was possibly sexually harassing other female members." Did I read that correctly?
A. You did.
Q. And here's the -- the previous version we saw of this, right?
A. Yes.
Q. And Ms. Carlyle called Ms. Ketchum and reported that she was concerned about possible harassment at Highland; is that right?
A. Yes.
Q. "She stated that she thought this member should be kicked out of the facility. Lynda said that one of the nursing staff walked in a room and said the male member was standing with his penis hanging out of his pants in front of one of the female members that was in a W/C," a wheelchair. "The incident was reported to the DON administrator. Lynda stated that she [sic] should be reported to the State and the facility wasn't doing anything about it."
So you understood here that Ms. Carlyle's

Page 37

concerns seemed to be that the facility investigated but wasn't doing anything to stop this alleged harassment; is that what your understanding was at this point?
A. That her opinion of the matter was such, yes.
Q. I'm going to skip a couple lines. There's kind of that gap, I'm going to start there.
A. Okay.
Q. Starts with "there was anything," do you see where I am?
A. How many lines down are you? This is 385?
Q. Yes. It's kind of that gap in the middle of the page.
A. Yeah, I see it. I see it.
Q. Right above it, "I told her I didn't think there was anything we could do since she denied anything happened and Lynda didn't witness anything herself." And then she repeats, "She felt like the facility should have done more." Did I read that correctly?
A. You did.
Q. Then I'm going to skip a line, "I asked

Page 38

Lynda to write everything up in an e-mail and send it to me so I would have specific details. She has never done what I requested."
Then I'll skip a couple lines. I'm going to start where it says, "The next day or so, Lynda called me." Do you see that?
A. I see it.
Q. "To tell me that State was at the facility and that she had called and turned them in. I asked her why she did that after I told her not to and that it was hearsay and we had nothing to report. She said, I am a mandatory reporter." Did I read that correctly?
A. You did.
Q. Then she says, "I said that you are reporting" -- sorry, let me start over there.
"I said, but what you are reporting is if it's hearsay and the female patient denied anything happened. I told her this was our partner and we work together with them. We are also patient advocates; however, there's no proof and the female patient denies anything happened. This is only causing problems for the facility. I told Kami Carlson what had

Page 39

happened. This was direct insubordination." Do you see where it says that?
A. I do.
Q. So again she says, "I asked why she did that after I told her not to and that it was direct insubordination."
And then flip to the next page, please.
A. (Complies.)
Q. Ms. Ketchum's draft has a corrective action section that says, "Lynda will follow instruction from supervisor, managers and company. Will not take it upon herself to do what she wants after having discussed with leadership. Lynda will not tell any staff members at any of the facilities that she turned a home in to the State as this could jeopardize her ability to do her job. She could be asked not to return to the facilities due to burden now placed on facility financially and otherwise." Did I read that correctly?
A. Yes.
Q. Did Ms. Ketchum's proposed corrective action cause you any concerns?
A. No.

Page 40

Q. Would you agree with me that there's nothing in here about failure to document her report, right, in the corrective action?
A. No, I disagree.
Q. In the corrective action?
A. She -- it's in there that she didn't provide the report that she was asked to provide.
Q. On the -- on the previous page, I agree.
A. Oh.
Q. But in here?
A. Oh, on the corrective action, okay.
Q. I'm going to hand you what's going to be marked Exhibit Number 57.
(WHEREUPON, a document was marked as Exhibit Number 57.)
BY MR. MCENANEY:
Q. This is an e-mail from you to Toni Brush, who we discussed earlier was your peer in HR, right?
A. Correct.
Q. And you say, "Could you look these over for me? I'd like to get your opinion. They were sent to me by a manager in Missouri." Did I read that correctly?

Page 41

A. You did.
Q. And if you flip the page to 394.
A. (Complies.)
Q. I believe there are no edits on this page, other than -- do you see where it's bolded and underlined, "She has never done what I requested"? Do you see that?
A. I do, I see it.
Q. Did you bold and underline that?
A. I don't recall.
Q. And then flip to the next page.
A. (Complies.)
Q. Page 395. It's the same language as the exhibit we just looked at; however, the -- the last three sentences are highlighted in red. Do you see that?
A. I do.
Q. Did you highlight those in red?
A. I don't recall.
Q. I'm going to hand you what's going to be marked Exhibit 58.
(WHEREUPON, a document was marked as Exhibit Number 58.)
BY MR. MCENANEY:
Q. This is an e-mail chain between you and

Page 42

Ms. Brush about the write-ups. If you'll start from the bottom, which would have been the earliest, she says, "I'm not so sure about the one for insubordination. Lynda could see that as retaliation because she reported to the State something she thought no one was doing anything about." Did I read that correctly?
A. Yes.
Q. And then you respond three minutes later, "I was thinking of cutting out the entire section that I highlighted in red for that reason." Did I read that correctly?
A. Yes.
Q. Does that refresh your recollection on whether you highlighted that language in red?
A. Yes.
Q. And she said, I'm going to repeat what she said, "Lynda could see that as retaliation because she reported to the State something she thought no one was doing anything about." And you said you wanted to cut out that entire section for that reason. Am I -- am I tracking that correctly?
A. Yes.
Q. So earlier you testified that when you

Page 43

first saw those three sentences, you did not have any concerns about them, but here you said -- you agreed that Lynda could see that as retaliation; is -- is that true?
A. Okay.
Q. Is that a yes?
A. I guess. I don't really have a firm opinion on it.
Q. Well, Mr. Boguski, these are your words. I'm just asking --
A. Those are my words from how many years ago?
Q. Two.
A. Okay.
Q. And when you say, "Does that make sense," Ms. Brush says, "Yes, it does." You say, "Thanks." Did I read that correctly?
A. Yes.
Q. So your colleague looks at the write-up for insubordination and she sees that it -- it looks like retaliation could be afoot?
A. Okay.
Q. Is that a fair interpretation?
MR. HOLLAND: Object to the form, misstates the document.

Page 44

BY MR. MCENANEY:
Q. So you send Ms. Brush the PAF for insubordination, and Ms. Brush says, "Lynda could see that as retaliation." And you said, "I was thinking of cutting out the entire section that I highlighted in red for that reason." There are no other reasons in here, right?
A. For cutting out the section in red?
Q. Yes.
A. Yes, there are no other reasons.
Q. When I first asked you if you highlighted that in red, you did not recall. Does this help reflesh your -- pardon me, refresh your recollection on whether you bolded and underlined --
A. It does not.
Q. I'm going to hand you what will be marked as Exhibit Number 59.
(WHEREUPON, a document was marked as Exhibit Number 59.)
BY MR. MCENANEY:
Q. This is an e-mail from you to Ms. Ketchum on the same day, August 4th, where you attach three documents, looks like the performance

Page 45

improvement plan and then the two PAFs. Do you see where I am with that? It's on the front page.
A. Yes.
Q. And then behind are the attachments, the first one is the PIP. We've already gone through that. And the second attachment begins on TruHealth 406, personnel action form --
A. Yes.
Q. -- for insubordination. The bolded portion in the middle, "She has never done what I requested," that's still there, correct?
A. It is.
Q. And then if you flip the page, all the language that you had highlighted in red was deleted, right?
A. It appears so.
Q. Fair to say that it was willfully deleted?
A. Yes.
Q. Hand you what will be marked Exhibit 60.
(WHEREUPON, a document was marked as Exhibit Number 60.)
BY MR. MCENANEY:
Q. This is an e-mail from Ms. Ketchum to

Page 46

you. The subject is Changes to PIP. There's an attachment, Performance Improvement Plan, Lynda Carlyle, Revised. And in the text, she says, "I removed the two things she denied happened, but getting orders on a patient that wasn't hers and the fact that her work was impeding Heather's." Did I read that correctly?
A. You did.
Q. If you flip the page.
A. (Complies.)
Q. Under areas of concern, two things were removed from here; is that correct?
A. What exhibit should I cross- --
Q. That's fair.
A. -- reference it to?
Q. Really any of the previous ones.
MR. HOLLAND: If you take a look at the second page of Exhibit 59, Peter.
THE WITNESS: Thank you.
Yes, okay.
BY MR. MCENANEY:
Q. So the charts are still on there, the insubordination's still on there, the professionalism for using the language is still

Page 47

there, but removed was liability concerns and Heather not getting her work done on time; is that correct?
A. Yes.
Q. And if you're still comparing them, at the bottom under observations, previous discussions or, Exhibit 60 has a Number 2 now and it says, "Peter Boguski with HR on call during PIP review and personnel action forms review, 8/4/2020." Did I read that correctly?
A. You did.
Q. Fair to say that you spoke with Ms. Carlyle on the phone on this day or around this day?
A. I guess. I don't recall.
Q. Why were those items removed?
A. I do not know.
Q. But they were, right?
A. It appears so.
Q. I'm going to hand you what will be marked Exhibit 61.
(WHEREUPON, a document was marked as Exhibit Number 61.)
BY MR. MCENANEY:
Q. This is August 5th, the next day.

Page 48

Ms. Ketchum is sending you the "first coaching form I had her sign." Do you recognize this document?
A. Yes.
Q. Do you know why she was sending you the first coaching form?
A. Specifically, no.
Q. Generally?
A. Probably for reference.
Q. But the PIP had already been written; is that correct?
A. Apparently, yes.
Q. And edited?
A. Seems that way, yes.
Q. And the PAFs had already been written and edited?
A. Yes.
Q. And the next day, you're receiving the first coaching form.
And do you see on the second page, which is the form itself, there's a box checked right in the middle, it says constructive feedback?
A. Uh-huh.
Q. As an HR professional, isn't this something you would want before talking about a

Page 49

PIP and personnel action forms?
A. It's possible it had been provided to me prior and I just needed it resent. I just don't recall.
Q. Fair to say that if -- if it had been provided before, it would have been provided via e-mail just like this one?
A. It is fair to say.
Q. So if there is no e-mail prior to this one, would it be fair to say this was the first time you received this?
A. Yes.
Q. Now, on that second page, on Page 426, Point Number 2, it says, "If you need to eat, please do not speak with your mouth full of food and/or, if needed, turn your camera off and mute your phone. I had a few comments with regards to our Missouri meeting last week that we had an assure source in speaking with your mouth full of food." Did I read that correctly?
A. Yes.
Q. Do you think it's fair to assume she's talking about Teams meetings, like online video meetings?

Page 50

A. I don't know specifically.
Q. "But if needed, turn your camera off and mute your phone"?
A. That style of meeting, sure.
Q. Do you think that's an appropriate constructive feedback?
A. Do I think it's appropriate?
Q. Uh-huh.
A. Yes.
Q. If Ms. Ketchum did the exact same thing, would it be appropriate to give Ms. Carlyle a coaching form for it, when she does it herself?
MR. HOLLAND: Object to the form. Go ahead and answer.
THE WITNESS: It's really not my purview. Nobody ever filed a complaint against Ms. Ketchum for eating during meetings, so I wouldn't know.
THE VIDEOGRAPHER: We've been going about an hour. Are we going to --
MR. MCENANEY: We can do it now.
THE VIDEOGRAPHER: One moment, please. Going off the record at 2:05 p.m.
(Short break.)
THE VIDEOGRAPHER: Back on the record

Page 51

at 2:14 p.m.
BY MR. MCENANEY:
Q. Mr. Boguski, we're back on the record after a short break. You understand you're still there are oath --
A. I do.
Q. -- is that correct?
Before the break, we were talking about Exhibit 61. It was an e-mail you got from Ms. Ketchum where she was sending you the -- the first coaching form to Ms. Carlyle. You said she may have given that to you earlier, you don't remember. Regardless, this is Wednesday, August 5th at 9:11 a.m.; is that correct?
A. Yes.
Q. I'm going to hand you what will be marked as Exhibit 62.
(WHEREUPON, a document was marked as Exhibit Number 62.)
BY MR. MCENANEY:
Q. This is an e-mail from Ms. Ketchum to you on Wednesday, August 5th at 9:26, about 15 minutes after she sent you the -- the coaching form; do you see that?

Page 52

A. I do.
Q. In the text it says, "Peter, attached is a rough draft, the warning for calling on a patient that wasn't a member. Let me know if it looks okay, please." Did I read that correctly?
A. You did.
Q. And then if you flip to the next page, for the personnel action form, Box 15 is checked for other.
A. Yes.
Q. And the remarks say, "During a PIP review with you on August 4th, 2020, I told you I had two team members state that you had said on one of the meetings that you gave orders on a patient that fell that wasn't one of our members. You stated that is not what happened, that you called the PCP, and the PCP said to send the patient to the hospital. The issue is that you shouldn't have involved yourself with a patient that wasn't one of our members. You shouldn't have called the PCP, the staff should have called the provider. This could become a liability issue with our company since that patient wasn't our member. You had to pass the

order to the staff to initiate ambulance pickup. This also creates an issue with regards to the facility having documentation on who spoke to the doctor and what was said and discussed." Did I read that correctly?
A. You did.
Q. Corrective action is, "In the future, not involve yourself on any patients that aren't an active member on our plan." Did I read that correctly?
A. Yes.
Q. Would you agree with me that this is very similar to the item that was removed from the first PIP?
A. Yes.
Q. So Ms. Carlyle's given a PIP, that PIP is revised, removing this item plus one more, and the next day she's issued a PAF for that item?
A. Okay.
Q. Is that right?
Why did that happen like that?
A. I don't recall.
Q. Is that typical procedure for American Health?
A. There's no one typical procedural method.



Q. Was a new PIP ever issued including this?
A. I don't know.
Q. And if you look at the next page, you respond to this and you said, "I added a couple handbooks" -- "handbook statutes that apply" --
A. Correct.
Q. -- "attached." And the back page looks like it's all the same language except you put in some handbook infractions, 1.53 and 1.54; is that correct?
A. Yes.
Q. If you flip to the binder under Tab 20, and look at Exhibit 20.
A. PAF agreement exchange, Counsel?
Q. Yes.
Do you recognize this document?
A. Yeah.
Q. Ms. Carlyle responds to this PAF, says, "Reason, will not sign this document. I decline to sign as follows: I did nothing wrong in regards to this incident. There was no liability involved. I gave no orders on the patient in question. My name's not cited in the patient charts as seeing this patient, either. I have spoken with the PCP, NP or



medical director, my collaborative physician, and he agrees there were no ethical or legal issues either with my actions. In review of the handbook policies that were cited, 1.53, which states failure to deliver services as documented, I delivered no services, none were documented, this makes no sense. Regarding 1.54, unsatisfactory job performance, I am unsure how this was determined to be applicable in this situation." Did I read that correctly?
A. Yes.
Q. Any reason to believe that her two citations are incorrect?
A. No.
Q. So how does 1.53 apply here, failure to deliver services as documented?
A. I don't recall.
Q. In front of you, you have the language of the personnel action form.
A. Uh-huh.
Q. You reviewed it, you added the citations. Also in front of you is what the citations say. So sitting here today, looking at it with fresh eyes, how does 1.53 apply?
A. I really don't recall. It's been two



years? I don't recall -- relive the Halcyon days of American Health Partners every day.
Q. I'm not asking you to recall, Mr. Boguski. I'm asking you to read it now and tell me how it applies to this action.
A. And I tell you I don't know, I don't recall.
Q. How does unsatisfactory job performance apply?
A. That she gave orders on a patient that wasn't one of our -- wasn't one of our patients.
Q. So you recall how 1.54 applies but not 1.53?
A. Correct.
Q. The corrective action states, "In the future, do not involve yourself in any patients that aren't an active member in our plan."
So if she's -- if a nurse practitioner is at a facility and a patient falls, she can't help?
A. I'm not a nurse. Why are you asking me?
Q. Because you cited these rules.
A. Based upon the information that was provided me.

Page 57

Q. Would you flip to Exhibit 42, sorry, in that binder.
MR. HOLLAND: What number, Ryan?
MR. MCENANEY: 42.
MR. HOLLAND: 42.
MR. MCENANEY: The charge of discrimination.
THE WITNESS: (Complies.)
BY MR. MCENANEY:
Q. This is Ms. Carlyle's charge of discrimination she filed with the Missouri Commission on Human Rights and EEOC. Do you see that?
A. I do.
Q. Do you recognize this document?
A. I do not.
Q. Do you believe you've ever seen it?
A. I don't recall it.
Q. Do you recall providing information to local attorneys to respond to it?
A. It's possible.
Q. Direct your attention to Exhibit 48, should be loose in front of you somewhere. It'll say Thompson Burton on the top.
A. Is it in this?

Page 58

Okay, yes.
Q. This is what we or at least I colloquially call a position statement, and it was American Health's response to Ms. Carlyle's charge of discrimination. Have you ever seen this document?
A. Not that I recall.
Q. Earlier today, Mr. Cooper testified that you gave information for this response. Any reason to disbelieve what he said?
A. No. That doesn't mean, though, that I've seen this document.
Q. But you may have given information --
A. Yes.
Q. -- for this document to be drafted?
A. Oh yeah, that's entirely possible.
Q. If you would flip to the third page, which is TruHealth 1001.
A. (Complies.)
Q. I'm going to start at the very last paragraph that begins with "second, the insubordination PAF."
A. Uh-huh, yes.
Q. It says, "Second, the insubordination PAF was prompted by Ms. Carlyle's failure to report

Page 59

suspected abuse in accordance with company policy." Did I read that correctly?
A. You did.
Q. "Per TruHealth's employee handbook, employees who suspect or become aware of abuse in the workplace to immediately report such information to their supervisor." Did I read that correctly?
A. You did.
Q. The next sentence, "On July 15th, 2020, Ms. Carlyle did so, reporting to her supervisor suspected sexual harassment by a male patient to a female patient in the same facility." Did I read that correctly?
A. Yes.
Q. So she complied with TruHealth's -- or American Health's policy on informing supervisor about suspected sexual harassment; is that correct?
A. Correct.
Q. I'd like to direct you to Exhibit 50, it'll be similarly loose. Probably have a paperclip on top. It's that one.
A. Yes.
Q. This is Missouri Statute 198.070; do you

Page 60

see that, in the up -- upper left in bold?
A. Yes. Yes, I do.
Q. And it looks like it's a lot of topics, but it generally covers abuse and neglect of residents, reports, when and by whom, the contents, the failure to report, the confidentiality of report, immunity and prohibition against retaliation. Do you see all those --
(Reporter clarification.)
BY MR. MCENANEY:
Q. Immunity and prohibition against retaliation, do you see all those headings?
A. Yes.
Q. Excuse me.
You can set that to the side just for a moment. And then flip to Exhibit 17, please, in the binder.
A. (Complies.)
Q. And this is, we've looked at it before, the PAF for insubordination?
A. Uh-huh. Yes.
Q. 1.10 is checked on Number 4; is that correct?
A. It is.

Page 61

Q. If you flip to the very next exhibit, 18.
A. (Complies.)
Q. This looks like Ms. Carlyle's response to this PAF. Do you recognize this?
A. Yes.
Q. And here she gives her account of what happened?
A. And her opinion, yes.
Q. It says, I'm going to start on the third line, "On Monday, July 6th, 2020, the DON presented in the ISNP meeting that the occurrences had taken place between these two members. On July 7th, we as a team discussed these issues in the Strides meeting." She lists several people and positions that were present; do you see that?
A. I do.
Q. And then she continues, "It was a very long discussion, but all providers were agreed that the male should be removed from the community over the next couple of days." Do you see that?
A. I do.
Q. Did you ever speak to any of these people?

Page 62

A. I did not.
Q. Then it says, "Over the next couple days, the DON, administrator and SW spoke with the female and the psych NP spoke with the male." Did I read that correctly?
A. Yes.
Q. And she says, "None of this is documented in the patient's records. Everyone was instructed not to do so. And I had not discussed the issue with the female yet as on July 8th, I was exposed to COVID and was in quarantine at home until July 18th." Did I read that correctly?
A. You did.
Q. Did that cause any concern that she said everyone's instructed not to document this?
A. Did it cause any concern to me, personally?
Q. In your position as an HR professional with the company.
A. Simply because I have no idea when I -- if I read this in a timely manner that was germane to this action or not, I really don't recall.
Q. We've gone through several e-mails

Page 63

between you and Ms. Ketchum back and forth --
A. Okay.
Q. -- editing PIPs, editing PAFs. A lot of these e-mails were minutes apart. You're suggesting that you did not read this in a timely manner?
A. Yeah.
MR. HOLLAND: Objection.
THE WITNESS: I am.
MR. HOLLAND: Misstates the testimony, but go ahead.
BY MR. MCENANEY:
Q. If you flip back to Exhibit 17.
A. (Complies.)
Q. There is no mention of the male being spoken to, is there?
MR. HOLLAND: Object to the form, document speaks for itself.
Go ahead and answer.
THE WITNESS: What's the question?
MR. HOLLAND: He's asking you if there's anything in Exhibit 17 that says something about the male being spoken to.
THE WITNESS: I don't see anything that says he -- the male had been spoken to.

Page 64

BY MR. MCENANEY:
Q. At the bottom of Exhibit 18, about five or six lines up, it says Missouri statute; do you see that?
A. Five -- yes.
Q. And before it says, "As for me not reporting it, Missouri Statute 198.070 states that if any mandatory reporter," paraphrasing, quote, "has reasonable cause to believe that a resident of a facility has been abused or neglected, shall report it to the department." Did I read that correctly?
A. You did.
Q. You do remember reading this at some point; is that --
A. Last week.
Q. Did you read this at some point in August of 2020?
A. No recollection.
Q. Well, she provided you notice that she was relying on this statute.
MR. HOLLAND: Objection, it's not what the document says. Document's not something that was sent to Mr. Boguski.

Page 65

BY MR. MCENANEY:
Q. Mr. Boguski, who gets these Adobe signed e-mails?
A. Those would have probably gone to Dawn. And it was not uncommon for those not to make it to me in a timely fashion.
Q. Take a look at Exhibit 50.
A. (Complies.)
Q. This is that statute she cited, 198.070; do you see that?
A. I do.
Q. I'm going to read Subsection 1, but I'm going to skip a bunch of the -- I'm not sure what to call them. Says, "When any adult daycare worker, chiropractor," has a whole bunch of occupations and positions, do you see that?
A. I do.
Q. On the eighth line down on the far right it says nurse, nurse practitioner; do you see that?
A. Yes, I do.
Q. And then it continues to list more occupations?
A. Uh-huh, yes.

Page 66

Q. So it says, "When any nurse, nurse practitioner," then it skips more occupations, "has reasonable cause to believe that a resident of a facility has been abused or neglected, he or she shall immediately report or cause a report to be made to the department." Do you see that?
A. I do.
Q. Would you agree that's unambiguous language?
MR. HOLLAND: Object to the form.
THE WITNESS: To the Department of Public Health and Welfare, or to a supervisor?
BY MR. MCENANEY:
Q. It says to the department.
A. It appears, according to this document, it would be to the department -- to the department, yes.
Q. Earlier, at the beginning of your deposition, I asked you what your general understanding of these statutes was, and you said if you observe something, you're obligated to report it.
A. Okay.
Q. Is that correct?

Page 67

A. And she did, to her supervisor.
Q. And to the Department of Public Health and Welfare, correct?
A. Apparently.
Q. She called the State?
A. Apparently.
Q. Were you unaware that she called the State?
A. I learned later, yes.
Q. Later when?
A. As they told me. I mean, all this was happening -- being informed to me after the fact.
Q. So during the -- the PAF and the PIP edits --
A. Okay, yes.
Q. -- generally around that time was when you learned about it?
A. Fair enough.
Q. And if you go down to Section 3, it says, "Any person required in Subsection 1 of this section to report or cause a report to be made to the department who knowingly fails to make a report within a reasonable time after the act of abuse or neglect as required in this

Page 68

subsection is guilty of a Class A misdemeanor." Do you see that?
A. I do.
Q. You earlier testified that your general understanding of these statutes was that -- was that there are legal repercussions if you fail to make such a report --
A. Correct.
Q. -- correct?
So this comports with your general understanding from earlier?
A. Yes.
Q. Flip the page to Subsection 8. Are you with me on that one?
A. I am.
Q. It says, "Reports shall be confidential as provided pursuant to Section 192.2500." Did I read that correctly?
A. Yes.
Q. And then Number 11, "No person who directs or exercises any authority in a facility shall," I'm going to skip a few words that apply, "retaliate against an employee because such employee has made a report of any violation or suspected violations of laws." Do

Page 69

you see where I read that from?
A. I do.
Q. And does that comport with your earlier testimony about your general knowledge of these statutes, that it's illegal to retaliate against someone who made such a report?
A. Seems reasonable.
Q. I'm going to hand you what we marked as Exhibit 63.
(WHEREUPON, a document was marked as Exhibit Number 63.)
BY MR. MCENANEY:
Q. This is an e-mail string, you were not copied on it, between Ms. Ketchum and Ms. Carlson. In the middle, I guess the second e-mail from Ms. Carlson to Ms. Ketchum, she states, "Can you add the expectation that if a facility is reported, it will be done so by the program manager?" Did I read that correctly?
A. Uh-huh, yes.
Q. And then she says, "She should report any concerns to the CPM and discuss with the NHA/DON." Did I read that correctly?
A. Yes.
Q. You would agree that Ms. Carlyle did

Page 70

report her concerns to Ms. Ketchum, right?
A. Apparently, as well as the administrator and the DON.
Q. And then it says, "We never hotline a home unless we are unable to resolve quality issues with the partner. She is there to help them to prevent them from getting hotlined, not to hotline them." Did I read that correctly?
A. You did.
Q. It says, "I really don't want to leave her any loophole to do her own reporting." Did I read that correctly?
A. Yeah.
Q. Would you agree that that statute we just went over allows her to do her own reporting?
A. Could you finish out that sentence?
Q. Sure, but can you answer my question first?
A. No, because I think that adds to the context.
Q. We'll do both. I'm not going to not read it, so go ahead and answer my question, please.
A. Rephrase your question, please, or restate it.
Q. Ms. Carlson says, "I really don't want to

Page 71

leave her any loophole to do her own reporting."
A. Okay.
Q. Would you agree that the statute we just went over mandates that she do her own reporting?
A. At face value, yes.
Q. Then she goes on to say, "Because I don't trust her judgement in discerning what is reportable and what is not." Do you see that?
A. I do.
Q. I know you weren't copied on that e-mail, but does that cause any concerns with you?
A. Not particularly, no.
Q. If you go to Exhibit 4, it's the employee handbook.
A. In the binder?
Q. Yes.
A. (Complies.)
Q. Page 59 of the handbook, it's TruHealth 176. At the bottom, it's Section 702, Adult Protection Policy?
A. Yes.
Q. Have you seen this policy before?
A. Yes.

Page 72

Q. Do you see where it says scope?
A. I do.
Q. Go ahead and flip to the next page, we will get back to scope.
A. (Complies.)
Q. But the bottom of this page, Section E says "protection from job discrimination." Do you see where it says that?
A. I do.
Q. It says, "Any person making a report or causing any investigation shall be presumed to be acting in good faith, shall thereby be immune from any liabilities, civil or criminal, that might otherwise be incurred or imposed."
And the next section says, "Any person making a report relative to suspected abuse, neglect or misappropriation of patient/resident property of an adult receiving service from the company may not be retaliated against in any form."
Did I read that correctly?
A. Yep.
Q. "If the employee is subjected to retaliation, the employee should immediately notify human resources and the chief compliance

Page 73

officer." Did I read that right?
A. You did.
Q. So when Ms. -- in Exhibit 673 where Ms. Carlson says, "Because I do not trust her judgement in discerning what is reportable," is she -- she's not presumably acting in good faith, she's not -- would you agree that she's not presuming Ms. Carlyle would be acting in good faith?
MR. HOLLAND: Object to the form.
THE WITNESS: I can't presume that because you're using a term that I don't agree with. Good faith or good judgement? I don't think those are the same thing, necessarily.
BY MR. MCENANEY:
Q. So if somebody, say Ms. Carlson, believed that somebody has poor judgement, she doesn't have to comply with Missouri law?
MR. HOLLAND: Object to the form.
THE WITNESS: Doesn't have to comply with Missouri law? I don't think that was her intention.
BY MR. MCENANEY:
Q. "I really don't want to leave her any loophole to do her own reporting."

Page 74

I'm going to hand you what's going to be marked Exhibit 64.
(WHEREUPON, a document was marked as Exhibit Number 64.)
BY MR. MCENANEY:
Q. This is an e-mail from Ms. Ketchum to you on August 5th where she seems to be trying to -- to run some -- by some language to -- by -- by you; do you -- excuse me, do you see that?
A. I do.
Q. Her proposed language says, "I did follow up on your question about are we required to notify our company with anything that we think that might be a concern that could potentially be something that could be reported to the State, the answer is yes." Did I read that correctly?
A. Yes.
Q. "The expectation is that if you think there might be something that is reportable, you would notify me." Did I read that correctly?
A. Yes.
Q. And we can agree that that -- that

Page 75

Ms. Carlyle did that, right?
A. That she notified Dawn and Kami, presumably, or a hierarchy, yeah.
Q. But definitely Ms. Ketchum, right?
A. Yes, we can -- yeah.
Q. I'm going to skip a couple lines. Do you see where it says, "We also need to make sure what is being reported," about halfway down on the right side?
A. Yes.
Q. "We also need to make sure what is being reported is" -- "if that is what is agreed needs to happen with your CP and supervisors is actually valid and not hearsay."
Then the next line says, "Even if you are positive that something needs to be reported, you need to notify your supervisors first." Did I read that correctly?
A. Yes.
Q. So here she's saying, even if you're positive, no question about judgement, you have to notify your supervisors first?
A. Okay.
Q. Is that how you interpret that?
A. Yes.

Page 76

Q. And the very last two sentences, it says, "We do not report hearsay and we do not report something that a patient denies happened to four different professionals. This can cause unnecessary harm to the facilities if this isn't true." Did I read that correctly?
A. Yes.
Q. Do you have any issues with those two lines?
A. No.
Q. Do you have any -- any concern that if it is true, the un -- the harm to the facilities is taking precedence over harm to a patient?
MR. HOLLAND: Objection, misstates the document.
THE WITNESS: Can only base it upon what I've been told at that time, that it had been reported to various persons of management in charge at the facility and it was found to be unsubstantiated.
BY MR. MCENANEY:
Q. What was unsubstantiated?
A. The allegations.
Q. How do you know this?
A. Because it's in the documentation.

Page 77

Q. In these e-mails or documentation that you have not seen today?
A. I was told that it had been -- it's in what we've gone over, that the administrator, the DON and whatnot, it had been reported to them that the person that it supposedly happened to denied -- or did not actually report anything. Yeah, that's in this documentation.
Q. Would you agree that also in this documentation is evidence that someone spoke to the male involved, but that never came up in Ms. Ketchum's summaries to you?
A. That's not --
MR. HOLLAND: I'm going to object to the form, misstates the -- misstates the -- the record. The only mention of that is in Ms. Carlyle's denial PAF, I believe, but...
MR. MCENANEY: Which is part of the record.
BY MR. MCENANEY:
Q. So you remember seeing the PAF where she said, "The psych NP spoke to the male, but none of it was documented because we were instructed not to document anything." Do you recall going

Page 78

over that?
A. I don't recall that. Could we find that?
Q. Sure.
MR. HOLLAND: Exhibit 18.
THE WITNESS: 18, thank you.
Oh, Carlyle's opinion. Okay.
BY MR. MCENANEY:
Q. And then when we went over that, we went through the previous document where Ms. Ketchum had no mention of the male being spoken to; do you recall that?
A. Okay.
Q. Am I correct that you did not do any independent investigation?
A. Correct.
Q. Are you aware of anyone at American Health that did any independent investigation?
A. I'm not aware of one.
Q. I'm going to hand you what's going to be marked Exhibit 65.
(WHEREUPON, a document was marked as Exhibit Number 65.)
BY MR. MCENANEY:
Q. This is an e-mail chain between you and Ms. Ketchum. It begins in the bottom section,

Page 79

"Peter, did you get a chance to read what Kami wants me to say to Lynda? I found this in the employee handbook. So she has to let her supervisor know of any concerns for suspected abuse, neglect, mistreatment, et cetera, to her immediate supervisor." Did I read that correctly?
A. Yes.
Q. "She can't just keep it a secret and just hotline for anything and everything she deems reportable. Kami's concern is that Lynda has poor judgement and is going to report everything, even if not reportable." Did I read that right?
A. Yes.
Q. And then it looks like she's copied and pasted --
A. From the handbook?
Q. -- from the handbook, Section 702. If you want to review the handbook, you may, but it certainly looks to be the same.
And it says, "A scope, this policy is applicable to all employees, residents, patients and contractors and visitors of healthcare delivery sites. Failure to report

Page 80

any suspected abuse, neglect, mistreatment or misappropriation of resident/patient property could result in immediate dismissal of the employee." Did I read that correctly?
A. Yes.
Q. And again, we agree that Ms. Carlyle did that; is that correct?
A. We agree that she did what exactly?
Q. She reported her suspected abuse, neglect --
A. Okay, yes.
Q. -- to Ms. Ketchum.
And you respond, "Yes, this is excellent."
A. Correct.
Q. Going back to her note to you, the second sentence says, "I found this in the employee handbook." The PIP had already been issued, right, by this time on August 6th?
A. Presumably.
Q. Well, it was issued on August 4th.
A. Well, it's dated August 4th. I don't recall if the conversation took place on August 4th or not.
Q. Do you recall going through two versions

Page 81

of the PIP, and then the second one had it in bold on the bottom, "HR call with Peter Boguski on August 4th," and all those dates were August 4th --
A. Is that what it says?
Q. More or less, I believe, yes.
A. If that's what it says, okay.
I'm not being combative. I'm just -- oftentimes these things will have a date, but sometimes the actual conversation doesn't happen for several days later, but if you say it is, so be it.
Q. Any concern that she was digging for a policy to justify after the fact?
MR. HOLLAND: Objection, argumentative.
THE WITNESS: To answer your question, no.
BY MR. MCENANEY:
Q. Why not?
A. I don't feel she was.
Q. But it's, "I found this in the employee handbook." I read that correctly, right?
A. You did.
Q. Hand you what's going to be marked

Page 82

Exhibit 66.
(WHEREUPON, a document was marked as Exhibit Number 66.)
BY MR. MCENANEY:
Q. It's an e-mail exchange between you and Ms. Ketchum from August 5th and August 6th, it looks like. It's initiated by Ms. Carlyle at the bottom of that page, and then her e-mail's on the back. And she says --
A. Oh, okay.
Q. So she sends an e-mail to Ms. Ketchum and copies you. Looks like there's policy numbers. She says, "I'm trying to review the handbook policy numbers that have been referenced in those write-ups that I was sent the last two days. However, I have reviewed the policy manual on our website, and the policy manual that I reviewed in Relias in December 2019 after I was hired, there are no policy handbook numbers of 1.34, 1.10, 1.53 or 1.54. I'd like to see these and be able to review them, please." Did I read that correctly?
A. You did.
Q. We've already gone over most of those, so we know that they're -- they're there; is that

Page 83

right?
A. Correct.
Q. So then Ms. Ketchum e-mails you and she says, "See below. Is she kidding? I don't care if there are numbers or not. The previous e-mail I sent you was mixed with some of Kami's comments. It was a bit jumbled." Did I read that correctly?
A. Yes.
Q. And then she said, "I think Kami's main point is that she works for this company and that any communication regarding our members is an internal thing and we need to know everything she is doing with regards to our patients. Hotlining our partners is not something she should take upon herself as one of our employees." Did I read that correctly?
A. You did.
Q. And you've responded pretty simply, "She just wants to see the handbook infractions. I can send her a copy."
A. Correct.
Q. "Again, hotlining our partners is not something she should take upon herself as one of our employees." The mandatory -- pardon me,

Page 84

the mandatory reporter statutes provide her that ability, correct?
MR. HOLLAND: Object to the form, misstates the statute, calls for a legal conclusion.
You can answer, if you can.
THE WITNESS: I don't have an answer. That's really not an HR function.
BY MR. MCENANEY:
Q. Earlier you testified that if you observe something, you're obligated to report it; is that correct?
A. You asked my understanding of what mandated reporting is, yes.
Q. And then we went over the statute --
A. You didn't ask how the functions worked in the company.
Q. And then we went over the statute, and you agreed that the statute comported with your understanding that we had talked about earlier; do you remember that?
A. Correct.
Q. I'm going to hand you what will be marked Exhibit 67.
///

(WHEREUPON, a document was marked as Exhibit Number 67.)

BY MR. MCENANEY:

Q. This is a grievance that Ms. Carlyle sent to you on August 9th, 2020; do you recognize that?

A. I do.

Q. Behind it are the e-mails associated with sending it to you. On the very last page, which was 542, Ms. Carlyle says to you, "I've drafted a letter as an official complaint/grievance. I cannot send this to my supervisors, it's about my supervisor, and I am uncomfortable" -- "I am not comfortable sending it to her boss at this time. However, I have no problem doing that if it's what you would like me to do. I can draft one and send it to Kami." Do you see where it says that?

A. I do.

Q. And you responded, "Good morning, Lynda. With your permission, I will forward this to Kami."

A. I see that.

Q. When you received this complaint, what did you do to investigate it?



A. I'm not sure if I did at that point.

Q. Why wouldn't you have?

A. When was she terminated?

Q. Ten days later.

A. Okay. So it's possible the investigation, if there was one, hadn't started in that time.

Q. Yeah, I think that makes sense considering this is when she first complained. So I'm asking, when you received this on August 9th, did you do anything to investigate it?

A. At that point in time, probably not. Well, I know -- actually, let me rephrase that.

So I see she responded on August 10th that it would be fine to send it to Kami. I presume I did that and I presume you have that e-mail. I certainly don't recall doing any investigation or if there was -- and if there was an investigation, I would have handed it over to Toni.

Q. Why would you have handed it over to Toni?

A. To recuse myself.

Q. Why would you need to recuse yourself?



A. Because I had involvement with her personnel action forms and PIPs and whatnot. I think at that point, I had enough background that it probably would have been good to hand it over.

And Toni and I did that for each other on occasion. Hey, I've worked with this person on various things in the past, would you do this investigation for me. Every now and then, that would happen.

I really don't recall it ever getting to the point of an investigation in this case, judging from the timeline between when she said it would be okay to send it to Kami and from when she got terminated.

Q. You've reviewed many e-mails. Kami Carlson's been in some. Others, Ms. Ketchum referred to what Kami Carlson had said. Did you feel Kami Carlson was an appropriate person to send this complaint to?

A. Well, she would be the one over.

Q. What do you mean, "the one over"?

A. Dawn's supervisor.

Q. But she seems to be involved in this, as well, right?



A. True.

Q. So when she says, "I'm not comfortable sending it to her boss at this time. However, I have no problem doing so if that's what you would like for me to do," and then you said, "With your permission, I will forward this to Kami." Is that correct?

A. That is.

Q. Why didn't you forward it to -- to Ms. Brush instead?

A. Because I wanted it to go to Dawn's supervisor first.

Q. Why?

A. I -- I don't recall at this point.

Q. After you forwarded it to Ms. Carlson, did you and Ms. Carlson discuss it?

A. I don't recall.

Q. I'll hand you what is going to be marked Exhibit 68.

(WHEREUPON, a document was marked as Exhibit Number 68.)

BY MR. MCENANEY:

Q. Here's an e-mail chain, it looks like it begins at the bottom with Ms. Carlyle's e-mail to you with her complaint. And then one step

Page 89

up, you send it to Ms. Carlson and you say, "Good morning, Kami. Please see below."

And then Ms. Carlson responds, "Shall we discuss sometime today? When are good times for you?"

And then you responded, "I just accepted your 2:30 p.m. call, but if you can do it later in the afternoon, that would be better."

Did I read all that correctly?

A. Yes.

Q. Does this reflect -- refresh your recollection on whether you had a conversation with Ms. Carlson about the complaint?

A. Well, tells me a conversation was had. I don't recall what the conversation -- the text of it was.

Q. Again, you -- you thought it was appropriate for you to recuse yourself because you were involved, correct?

A. That would have been my thinking.

Q. And you -- you just testified that Ms. Carlson was involved, as well, correct?

A. Involved in what?

Q. All the PAFs and PIP and everything that was going on with Ms. Carlyle, what she was

Page 90

complaining about.

A. She was aware of them.

Q. But you just testified that she was involved, right?

A. She was aware of them, yes.

Q. She should have also recused herself; is that correct?

A. I'm not saying that.

Q. Would you agree with me that Ms. Brush would have been perhaps the most appropriate person to investigate this complaint?

A. Well, first of all, we haven't established if an investigation actually was launched, so that would be a major point for me right there. I'm pretty sure Kami didn't launch an investigation.

Now, I can't recall what the text of the supposed 2:30 or later meeting was. I don't know, don't recall.

Q. If Ms. Carlson did launch an investigation, would you agree that she would have not been an appropriate person to do so?

A. I don't think Ms. Carlson would have launched an investigation.

Q. I appreciate that, but would you agree

Page 91

with me that she would have been an inappropriate person to do it?

A. If she was going to do it, yes, I agree.

Q. I'll hand you what's going to be marked Exhibit 69.

(WHEREUPON, a document was marked as Exhibit Number 69.)

BY MR. MCENANEY:

Q. This is an e-mail from Ms. Ketchum to Ms. Carlson. You're copied. If you look back at Exhibit 68, which was -- which is the same day, August 10th, this being at 1:30 p.m., Ms. Ketchum has forwarded several attachments, personnel action form, looks like three of them, and the performance improvement plan. Do you see that?

A. Uh-huh, yes.

Q. And if you flip the page, the first one, the first PAF is the offensive language PAF; do you see that?

A. Yes.

Q. And the second one is the insubordination PAF?

A. Correct.

Q. And the third one appears to be the

Page 92

offensive language one again. Do you see that?

A. Yeah, I do.

Q. And then the last one is the PIP. Do you see the PIP?

A. Yes.

Q. And this is the -- the five-point PIP that had been revised, correct? This is not the three-point PIP.

A. Uh-huh, correct.

Q. When you saw this e-mail, did you alert Ms. Carlson or Ms. Ketchum that this was not the -- the operative PIP?

A. I don't recall.

Q. If -- we have not established it, but if Ms. Carlson was getting these documents to conduct an investigation, wouldn't the revised PIP be the PIP to base it on?

A. In theory, but that's assuming she was getting it to launch an investigation.

Q. Hand you what's going to be marked Exhibit 70.

MR. HOLLAND: Ryan, this one's already been marked. Do you want to mark it again?

MR. MCENANEY: That's a good point.

Page 93

I felt like I had a reason for it, but I don't.
What exhibit is that?
MR. HOLLAND: 30.
MR. MCENANEY: Yeah, works for me.
BY MR. MCENANEY:
Q. Take a look at Exhibit 30 in the binder.
It's the same thing.
Are you there?
A. I am.
Q. This is an e-mail from Ms. Carlyle to
you. Looks like she copies her personal e-mail
on it, as well. And it looks like another
complaint, right? Second paragraph, see the
first sentence?
A. Uh-huh.
Q. "I feel that the personnel action form
regarding handbook infraction 1.10,
insubordination, was done in blatant
retaliation of the call made to the State of
Missouri." Did I read that correctly?
A. You did.
Q. What did you do after receiving this
complaint?
A. I don't recall.
Q. I'm going to hand you what will be marked

Page 94

Exhibit 70.
(WHEREUPON, a document was marked as
Exhibit Number 70.)
BY MR. MCENANEY:
Q. So the previous exhibit we looked at,
Exhibit 30, she had sent you that complaint on
August 13th at 10:30 p.m. And then Exhibit 70,
looks like she follows up the next morning in
an e-mail to you, and she says, "I only sent
that e-mail to you last evening. I didn't
think it was something I was supposed to send
to Dawn, too. However, if I'm supposed to
include her or anyone else, let me know and I
can do so." Did I read that correctly?
A. Uh-huh, yes.
Q. And you respond, "Ultimately, the
decision one way or the other is going to come
down from the management structure of your
division. HR acts in an advisory role. If you
don't feel comfortable sending this to Dawn, I
would recommend sending it to Kami." Did I
read that correctly?
A. You did.
Q. Why did you recommend sending it to Kami?
A. Because she's Dawn's supervisor.

Page 95

Q. Earlier you testified that complaints
should be investigated by HR, either you or
Ms. Brush; is that correct?
MR. HOLLAND: Objection, misstates
the testimony.
Go ahead and answer.
THE WITNESS: Yes.
BY MR. MCENANEY:
Q. If anyone was involved, they should
recuse themselves, which you testified you did,
correct?
A. Essentially.
Q. What do you mean by "essentially"?
A. Up until that point, there really hadn't
been a request for an investigation on her
part. So you were asking me -- you know, up
until the 10th, she hadn't asked for that.
Q. Is it your testimony that an employee has
to ask for an investigation into a complaint of
retaliation for an investigation to occur?
A. Well, somebody's got to ask for an
investigation for an investigation to be
launched. That is logical. Otherwise, I'd be
conjuring up retaliation out of thin air,
theoretically.

Page 96

Q. Would you take a look at Exhibit 4,
please.
A. (Complies.)
Q. Bates labeled TruHealth 126 or Page 9 of
the handbook. Do you see Section 104?
A. I do.
Q. The last two sentences, we went over
these earlier, but perhaps we should do it
again. It says, "If you believe that you have
been harassed or discriminated against, you --
(Reporter clarification.)
BY MR. MCENANEY:
Q. Yes. I'm sorry. "If you believe that
you have been harassed or discriminated
against, you must immediately report the
incident. The complaint will be immediately
and thoroughly investigated in a professional
manner." Did I read that correctly?
A. Yes.
Q. It doesn't say anything about requesting
an investigation, does it?
A. Or reporting?
Q. I'm sorry?
A. So here, you're -- you're basically
intimating that if you believe, and therefore

Page 97

an investigation should be launched -- launched.
Q. I'm sorry, I'm not following you. What do you mean?
A. How do I know she believes it until she tells me?
Q. Because -- well, she told you.
A. She told me on the 10th.
Q. Okay. And then it says the complaint --
A. And we started the ball in motion.
Q. You said you weren't going to investigate anything until you were asked to, and she --
A. She asked on the 10th, did she not?
Q. I feel like we're talking past each other a bit.
So on the 10th, when you got the first complaint grievance from her, you forwarded that to Ms. Carlson, correct?
A. With her permission.
Q. But you knew Ms. Carlson was involved at that point, right?
A. Yes.
Q. So just to clarify, if an HR professional at American Health gets a complaint of discrimination or retaliation or any other

Page 98

protected complaint, the complaint will be immediately and thoroughly investigated in a professional manner; is that correct?
A. It will be investigated, yes.
Q. There's nothing about they have to request an investigation, right?
A. Well, we have to know that somebody wants an investigation. Just to believe it doesn't mean we know it.
Q. How long have you been working in HR?
A. For a while.
Q. So is it your testimony that if you receive a complaint of discrimination or retaliation, you can just sit on it unless they specifically ask for an investigation?
MR. HOLLAND: Objection, misstates his testimony.
THE WITNESS: I think that's a ridiculous question. She asked for -- for it to be investigated on August 10th.
BY MR. MCENANEY:
Q. Am I incorrect that you said you did not do an investigation until the 14th, after the second complaint?
A. I didn't say that.

Page 99

Q. Okay.
A. On the 10th.
Q. All right. So what did you do to investigate when you received the complaint on the 10th?
A. I don't know if anything was done.
Q. Okay. But --
A. Given -- because we had other cases we were working on, and so it takes time.
Q. Okay, so something should have been done, right?
A. That doesn't mean something wasn't done, but were we going to drop everything just for Ms. Carlyle? No.
Q. Do you believe that discrimination and retaliation is pretty serious?
A. Yes, I do.
Q. So you agree with the policy that a complaint should be immediately and thoroughly investigated in a professional manner, right?
A. There are two people in a company of 45 -- approximately 4500 people doing this work. Becomes a simple matter of caseload. I think you can understand that and respect that as a legal counselor.

Page 100

So are you telling me I should have -- me or actually Ms. Brush should have dropped everything for Ms. Carlyle?
Q. No, I was just asking what was done.
A. Well, and I can't tell you because it was two years ago.
Q. Okay.
A. What I can tell you is in that relatively short amount of time, other events came about that led to her termination that had nothing to do with that.
Q. I'm going to hand you what's going to be marked Exhibit 71.
MR. HOLLAND: This has already been marked. Do you just want to use the -- are you going to mark it again or you want to use the old -- the version that's already marked?
MR. MCENANEY: I want the e-mail on top.
MR. HOLLAND: It's already been marked.
MR. MCENANEY: It is? What exhibit?
MR. HOLLAND: Exhibit 32.
MR. MCENANEY: That works for me, thanks again.

Page 101

BY MR. MCENANEY:
Q. So Exhibit 32, please.
A. Okay.
Q. So this is an e-mail from Ms. Carlson to you. Nobody else is copied. It says Director's Review of PAF, Lynda Carlyle, sent to you on August 17th at 11:00 a.m.
A. Uh-huh. Yes.
Q. Her review is attached. This appears to be her response to Ms. Carlyle's complaints; would you agree with that?
A. It appears to be.
Q. And she sent it to you to review?
A. It appears that way.
Q. So earlier you testified that if Ms. Carlson did do an investigation into this complaint, that she would be the -- she would be an inappropriate person to do that?
MR. HOLLAND: Objection, mischaracterizes his testimony.
THE WITNESS: So to answer your question, yes.
BY MR. MCENANEY:
Q. I'm going to hand you what's going to be marked Exhibit 71.

Page 102

(WHEREUPON, a document was marked as Exhibit Number 71.)
BY MR. MCENANEY:
Q. You respond to her with edits on her review, what looks to be about 37 minutes after she sent it to you. Do you see that?
A. I do.
Q. And you said, "I would consider" -- or, sorry, "I would suggest considering striking the part I outlined in red. Otherwise, I think it looks good." Is that correct?
A. Yes.
Q. And then flip the page, if you would. The part outlined in red says, "Documentation from additional leaders who can attest to the insubordination involving Lynda using offensive language in violation of a realtime directive not to from her manager are pending receipt but have been requested." Did I read the -- the red font correctly?
A. You did.
Q. Why did you think she should strike that?
A. Probably because of poor grammar.
Q. Why not just correct the grammar?
A. I don't know if it was necessary to have

Page 103

this, but I don't really recall.
Q. Okay, let's go the top of this. This is the review, this section is the review of the insubordination PAF. Ms. Carlson writes, "The timeline presented by the manager reflects that the report to the State resulted after the initial conversation about the incident with Lynda. Based on company policy of reporting issues to supervisor prior to excalating reports to the State, Lynda would have been insubordinate to report the incident after that conversation on 7/15." Did I read that correctly?
A. Yes.
Q. Do you believe that that's insubordination?
A. I believe she was in -- insubordinate.
Q. I'm just asking about that sentence alone.
MR. HOLLAND: He's just asking you if Ms. Carlyle would have been insubordinate in reporting it to the State after Dawn Ketchum told her, let me check with other people and find out if this is something that's reportable, and --

Page 104

THE WITNESS: Yeah.
MR. HOLLAND: -- Ms. Carlyle went ahead and did it anyway.
THE WITNESS: Yes, I do. She didn't follow a directive from her supervisor.
BY MR. MCENANEY:
Q. Keep that exhibit out, please, but will you turn to Exhibit 4, the handbook, Page 57 of the handbook, Bates Label 174.
A. I'm sorry, what's the -- the number again?
Q. It's Page 57 of the handbook. It's Bates TruHealth 174.
A. 174, thanks.
Yes.
Q. Do you see Section -- or Subsection 1.10?
A. Yes.
Q. Insubordination?
A. Yep.
Q. "Which is a refusal or failure to perform work or follow instructions of supervisory personnel or management unless such instructions could reasonably be expected to endanger life or health." Did I read that correctly?

Page 105

A. You did.
Q. So if Ms. Carlyle reasonably believed someone's life or health was in danger, it may not be insubordination to not follow a directive; would you agree with that?
A. Okay.
Q. Is that a yes?
A. Depends on the context.
Q. We're living in the context right now.
A. I'll say yes.
Q. Going back to Exhibit 71, she continues, "Lynda now reports she called the" --
MR. HOLLAND: What's Exhibit 71?
MR. MCENANEY: The one I just -- that one.
MR. HOLLAND: That's Exhibit 32.
MR. MCENANEY: This is 32, with the red font?
MR. HOLLAND: Isn't it? No.
MR. MCENANEY: No, 32 did not have the red font.
MR. HOLLAND: Okay. Sorry about that, okay.
MR. MCENANEY: It's the e-mail dated 8/17.

Page 106

MR. HOLLAND: Yeah. Sorry about that.
MR. MCENANEY: No problem. There's a lot of very similar documents.
BY MR. MCENANEY:
Q. So picking up where we left off, "Lynda now reports she called the State on 7/14 prior to reporting the CPM. Had that been made clear to the manager on the initial call, then the conversation would have been counseling for Lynda about company policy going forward, and the approach to managing the incident reporting would have been altered." Did I read that correctly?
A. Yes.
Q. And then she says, "Because it appears in the documentation of the events that Lynda was not forthcoming during the 7/15 manager conversation that she had reported to the State prior to reporting to the manager, the appearance is that Lynda was insubordinate by her own omission from the timeline." Did I read that correctly?
A. You did.
Q. Again, employees have no duty to inform

Page 107

the manager that they've called the State; is that correct?
MR. HOLLAND: Objection, misstates the company policy that you've asked about ten times over, Ryan.
Go ahead and answer the question.
THE WITNESS: Restate the question again, please.
BY MR. MCENANEY:
Q. There is no policy that requires an employee to inform a manager that she has called the State; is that correct?
MR. HOLLAND: Objection, misstates the evidence. Misstates the handbook.
THE WITNESS: I don't recall at this point.
BY MR. MCENANEY:
Q. Because we've gone over probably ten times the policy that she must report suspected abuse and neglect to her supervisor, but would you agree there's no policy saying she must report that she called the State?
A. I think that's splitting hairs, but correct.
Q. And then she continues, "That count of

Page 108

insubordination could be dismissed had Lynda not additionally been insubordinate in another matter involving her language. It is reported that Lynda used offensive language on a team call with a manager directly tell her in the moment not to do so. This was after the manager had put out a blanket reminder to the team to avoid unprofessional language on such calls." Did I read that correctly?
A. Yes.
Q. We went through the PIP and the PAFs, and that particular incident was always marked under professionalism; do you recall that?
A. Okay.
Q. It had never been under insubordination; is that true?
A. Okay.
Q. Why is it now under insubordination?
MR. HOLLAND: Objection, mischaracterizes the document.
THE WITNESS: Don't know.
THE VIDEOGRAPHER: We've been going for almost close to about an hour and 30. Would we be coming to a good stopping point any time?

MR. MCENANEY: This is a good stopping point.
THE VIDEOGRAPHER: Okay. One moment, please. Going off the record at 3:40 p.m.
(Short break.)
THE VIDEOGRAPHER: Back on the record at 3:50 p.m.
BY MR. MCENANEY:
Q. Mr. Boguski, we're back on the record. You understand you're still under oath, correct?
A. Correct.
Q. I'm going to hand you what'll be marked Exhibit 72.
(WHEREUPON, a document was marked as Exhibit Number 72.)
BY MR. MCENANEY:
Q. This is a short e-mail exchange between you and Kimberly Trinkler.
A. Correct.
Q. Who's Kimberly Trinkler?
A. As it says there, the HRIS manager, which translates to she was the person that knew how to make UltiPro/UKG work if you needed something done.



Q. What does the "IS" stand for?
A. HR information system, database.
Q. I gotcha.
So you send her an e-mail on August 20th. This is after Ms. Carlyle's August 19th termination.
A. Uh-huh.
Q. You say, "Hi Kim, do you have time to generate a separation notice for Lynda Carlyle?" And then looks like her employee number. You said, "This is another contentious termination."
And she responds, "Sure, I'll do it now. Thanks."
A. Uh-huh.
Q. What did you mean by "this is another contentious termination"?
A. Exactly as it sounds. This is somebody that wasn't going quietly, and I was aware of the State -- the mandate that they had to get their separation notice, you know, within a certain time. I forget the actual hours involved at this point, but 48, 72 hours, something like that. And I wanted to get it in the mail to her as soon as possible, so just



not to have -- to stir up any possible hornets nests in that regard. Basically to do our proper -- you know, to do what's expected of us in that regard.
Q. You said, "This is another contentious termination." Are you referring to Debra Asbury?
A. No.
Q. Okay, who are you referring to?
A. Any number.
Q. So you have any number of terminations where they won't go quietly?
A. Sometimes.
Q. Do employees typically agree with their terminations?
A. Typical. Depends on what you define as typical. Also, what's the nature of the termination? Are you talking about for cause?
Q. What other kind of terminations are there other than for cause?
A. Terminating employment means you just don't work there.
Q. So when you terminate someone who no longer works there for cause --
A. I think of it in the sense of most of the



HRISs that I worked in, it's listed as termination date. It isn't how or the nature of termination, so it's more in a general sense.
I currently use Workday and it's termination. It doesn't mean whether a person was fired or they resigned or it was RIF'd or anything like that.
Q. So when you say this is another contentious termination, what are you signaling to Ms. Trinkler?
A. Probably should give you a little background.
So Toni and I, once again, we split our duties, and each of us got every morning, somewhere around 7:00 or 8:00 in the morning, we would get an e-mail that would have the previous day's terminations.
So the -- if somebody got terminated the previous day, theoretically, if they were -- if it was done by 5:00 p.m., it goes in the system. And over the course of the evening, it gets percolated, generated into PDF form, and a separation notice gets generated by the system, and then it spits it out into our respective

Page 113

inboxes.
That worked fairly efficiently for Tennessee with the skilled nursing facilities, which is where the bulk of the separation notices -- notices came from because there was a fairly decent amount of turnover.
In the other states, it was a bit more cloudy in terms of who would get what. And especially something like this that might be considered -- maybe would have been considered corporate, I just wasn't sure who would have got it.
And so, I was being proactive in asking Kim to expedite it for me, because I had had some times before where things had gotten gummed up in the works for whatever reason or maybe I just -- it got sent to somebody and they never received it or their dog ate it or whatever, and so I asked her, could you please generate a new one. So she was just my go-to person, and in this case, I was just being proactive to make sure it got generated and sent out to Ms. Carlyle in a timely manner.
Q. A few minutes ago, you -- you testified about a mandate of sending these out in 24,

Page 114

48 hours. Was that a Tennessee law, regulation --
A. It's --
Q. -- or Missouri?
A. It's a Tennessee law, and I honestly -- I forget what it is now, because I haven't had to do these in -- in sometimes -- in some time, but there is a law that says that somebody upon leaving employment is supposed to get it within a certain time frame.
I don't know if Missouri has a similar statute, honestly don't know, but I just kind of use that as my rule of thumb.
Q. So your general practice is to get these out right away?
A. Yeah.
Q. Okay. I'll hand you what will be marked Exhibit 73.
(WHEREUPON, a document was marked as Exhibit Number 73.)
BY MR. MCENANEY:
Q. Here's an e-mail chain from the next day between you and Stephanie Thompson. Who is Stephanie Thompson?
A. At the time -- oh, okay, yeah, she was an

Page 115

HRBP. Okay, and yeah, it looks like I was just giving her a heads-up that I had already done it.
Q. Then your last response to her on top, you say, "Glad I remembered to tell you in time. Given the contentious nature of the term, we thought it would be best to get a notice out to her right away." Did I read that correctly?
A. You did.
Q. If it was already your practice to get the notices out right away, why did "given the contentious nature of the term" matter?
A. As we just chatted about previously, timing.
Q. Well, you said you got them all out right away or you tried to.
A. If it arrived in my inbox, I got it out. I was pretty good about it, but I can't say that the system was perfect. And so, once again, I was being proactive to make sure because I knew Ms. Carlyle, if she was going to make -- if anyone was going to make a stink about their termination, it would have been her.

Page 116

MR. MCENANEY: I have nothing further.
MR. HOLLAND: No questions.
THE VIDEOGRAPHER: All right, then. If there are no further questions, this concludes the deposition. The time is 3:58 p.m. We are going off record.
THE REPORTER: Did you want to order this?
MR. MCENANEY: Yes.
MR. HOLLAND: Yeah.
FURTHER DEPONENT SAITH NOT
(At 3:58 p.m. CST)

Page 117

REPORTER'S CERTIFICATE

STATE OF TENNESSEE
COUNTY OF SUMNER

I, JENNY CHECUGA, Licensed Court Reporter, with offices in Nashville, Tennessee, and Registered Professional Reporter, hereby certify that I reported the foregoing videotaped deposition of PETER BOGUSKI by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.

I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

JENNY CHECUGA, LCR, RPR

Licensed Court Reporter (TN)
Notary Public State of Tennessee
My Notary Commission Expires: 5/22/2023

A
a.m 3:11,22 34:3 51:14 101:7
abilities 117:10
ability 14:23 39:17 84:2
able 82:21
abuse 7:17 18:16 18:22 59:1,5 60:4 67:25 72:16 79:5 80:1,9 107:20
abused 64:10 66:4
accepted 89:6
accommodate 24:20
accommodati... 24:19 25:14
accomodation 24:5,10
account 61:6
act 67:24
acting 72:12 73:6,8
action 5:15 10:4 23:10 25:19 34:12,19 35:10 35:14,25 39:10,24 40:3 40:5,12 45:8 47:9 49:1 52:9 53:7 55:19 56:5,16 62:23 87:2 91:14 93:16
actions 22:15 25:22 55:3
active 53:9 56:18
activities 25:8
activity 25:8,13
acts 94:19
actual 81:10 110:22
ADA 24:5
add 69:17
added 54:4 55:21
additional 102:15
additionally 108:2
address 7:23
adds 70:19
admin 29:22
administrator 36:22 62:3 70:2 77:4
Adobe 65:2
adult 65:14 71:21 72:18
adverse 25:18
advice 30:19
advisory 94:19
advocates 38:22
afoot 43:21
afternoon 7:10 89:8
age 7:15 16:12
ago 43:12 100:6 113:24
agree 16:21 18:19 23:1,20 26:11 31:8 33:12,18 40:1 40:9 53:12 66:9 69:25 70:14 71:4 73:7,12 74:25 77:10 80:6,8 90:9,21,25 91:3 99:18 101:11 105:5 107:21 111:14
agreed 5:17 30:25 43:3 61:19 75:12 84:19
agreement 54:14
agrees 55:2
ahead 50:14 63:11,19 70:22 72:3 95:6 104:3 107:6
air 95:24
al 1:7 6:7
alert 92:10
allegation 25:21
allegations 76:23
alleged 37:3
alleging 7:15
allows 70:15
altered 106:13
ambulance 53:1
American 1:6 6:6 7:13 11:11 11:21 12:16 13:14 14:24 15:15 16:25 17:21 18:25 19:19,23 22:6 22:19 24:9 25:5 32:10 53:23 56:2 58:4 59:17 78:16 97:24
AMONETTE 2:18
amount 100:9 113:6
and/or 34:11 49:16 117:17
ANDREW 2:18
Anita 13:2
Annotated 117:19
answer 9:8,9 9:20 50:14 63:19 70:17 70:22 74:17 81:17 84:6,7 95:6 101:21 107:6
answered 9:4
anti-retaliation 25:2
anyway 104:3
apart 63:4
apparently 33:16 48:12 67:4,6 70:2
appear 33:20
appearance 5:11 106:21
appears 30:11 45:17 47:19 66:16 91:25 101:9,12,14 106:16
applicable 55:9 79:23
applicant 24:16
applicants 24:11
applies 56:5,13
apply 54:5 55:15,24 56:9 68:23
appreciate 90:25
approach 106:12
appropriate 50:5,7,11 87:19 89:18 90:10,22
approximately 99:22
area 29:4 32:8 32:18 33:11 34:8
areas 28:23 46:12
argumentative 81:16
arrival 15:22
arrived 115:18
Asbury 28:3,4 111:7
asked 9:3 31:16 37:25 38:10 39:4,18 40:7 44:12 66:20 84:13 95:17 97:12,13 98:19 107:4 113:19
asking 9:10 43:10 56:3,4 56:22 63:21 86:10 95:16 100:4 103:18 103:20 113:13
assignments 26:2
associated 85:8
assume 9:4 49:23
assuming 92:18
assumption 28:15
assure 49:19
ate 113:18
attach 44:24
attached 4:22 52:2 54:7 101:9
attachment 26:22 28:13 45:7 46:2
attachments 35:4 45:5 91:13
attention 20:24 57:22
attest 102:15
attorney 2:4,11 11:6
attorneys 6:16 57:20
August 11:14,15 12:24 16:22 35:4 44:24 47:25 51:14 51:23 52:13 64:17 74:7 80:19,21,22 80:24 81:3,4 82:6,6 85:5 86:11,15 91:12 94:7 98:20

101:7 110:4,5
Augusta 2:18 6:14
authentic 117:18
authority 68:21
authorized 117:18
available 28:12
Avenue 2:5,12 5:7 6:12
avoid 108:8
aware 19:11 29:23 59:5 78:16,18 90:2 90:5 110:19

B

B 3:6
Bachelor's 16:2
back 16:22 30:2 31:7 34:4 50:25 51:3 54:7 63:1,13 72:4 80:16 82:9 91:10 105:11 109:6,9
background 15:25 87:3 112:13
ball 97:10
Baltimore 2:5
base 76:16 92:17
based 16:11 25:14 56:24 103:8
basic 28:20
basically 23:15 96:24 111:2
Bates 20:1 96:4 104:9,12
bear 117:17
beginning 66:19
begins 22:15,18 23:5 45:7 58:21 78:25
88:24
behalf 1:16 6:20 6:22
believe 15:18 21:3 41:4 55:12 57:17 64:9 66:3 77:18 81:6 96:9,13,25 98:8 99:15 103:15,17
believed 73:16 105:2
believes 97:5
best 12:18 13:22 115:7 117:9
better 89:8
binder 19:15 54:12 57:2 60:18 71:17 93:6
bit 9:16 83:7 97:15 113:7
blanket 108:7
blatant 93:18
blue 27:14
blur 15:21
Boguski 1:15 3:9 3:11,13,15,17,19 3:21,23 4:3,5 4:7,17,19 5:4 6:5 7:2,10,22 8:2 26:20 43:9 47:8 51:3 56:4 64:24 65:2 81:2 109:9 117:8
bold 41:9 60:1 81:2
bolded 41:6 44:15 45:10
boss 85:15 88:3
bottom 19:25 24:4 42:2 47:6 64:2 71:21 72:6 78:25 81:2
82:8 88:24
box 48:21 52:9
boxes 35:20
break 9:12,21 50:24 51:4,8 109:5
briefly 7:11
bring 20:23
Brush 3:13,15 14:19 40:18 42:1 43:16 44:2,3 88:10 90:9 95:3 100:2
buddies 35:16
bulk 113:4
bunch 65:13,16
burden 39:19
burn 23:24
Burton 57:24
business 14:10
butt 35:16

C

C 2:1
C-R-E-A-C-H 12:21
California 16:3
call 14:14 31:10 35:7 47:8 58:3 65:14 81:2 89:7 93:19 106:9 108:5
called 7:3 13:17 20:1 29:7 31:7 31:10,11 36:3,11 38:6,9 52:18 52:22,23 67:5 67:7 105:12 106:7 107:1,12 107:22
calling 31:22 52:3
calls 84:4 108:9
camera 49:16 50:2
caption 5:10
care 7:17 18:22 83:5
career 26:9
Carlson 3:24 4:12 11:1 15:17 30:16,23 38:25 69:15 69:16 70:25 73:4,16 87:18 87:19 88:15,16 89:1,3,13,22 90:20,23 91:10 92:11,15 97:18,20 101:4 101:16 103:4
Carlson's 87:17
Carlyle 1:3 6:6 6:20 7:12 10:20 15:2 26:13,23 27:8 32:14 36:11 46:3 47:13 50:11 51:11 54:18 59:11 69:25 73:8 75:1 80:6 82:7 85:4,10 89:25 93:10 99:14 100:3 101:6 103:21 104:2 105:2 110:10 113:23 115:22
Carlyle's 4:10 10:8 18:24 36:25 53:16 57:10 58:4,25 61:3 77:18 78:6 88:24 101:10 110:5
case 1:5 6:7 10:14 87:12 113:21
caseload 99:23
cases 19:4 99:8
cause 5:15 26:3 32:1 39:24
62:15,17 64:9 66:3,6 67:22 71:13 76:4 111:18,20,24
causing 38:24 72:11
certain 14:2 20:10 110:22 114:10
certainly 28:19 79:21 86:18
CERTIFICATE 117:1
certifications 16:5
certify 117:7,12 117:16
cetera 5:11 79:5
chain 4:10 41:25 78:24 88:23 114:22
chance 79:1
Changes 46:1
charge 57:6,10 58:5 76:19
charged 23:7
charts 28:23 33:6,12 46:23 54:24
chatted 115:14
check 103:23
checked 35:21 48:21 52:10 60:23
Checuga 1:25 5:17 6:14 117:5 117:22
chief 72:25
child 27:15,16 27:20
chiropractor 65:15
citations 55:13 55:21,22
cited 54:23 55:4 56:23 65:9

City 2:6,13
civil 5:9 72:13
clarification 60:10 96:11
clarify 97:23
Class 68:1
clear 8:9,15 106:8
close 108:23
cloudy 113:8
coaching 33:10 48:1,6,19 50:12 51:11,25
Code 117:19
collaborative 55:1
colleague 43:19
college 16:1
colloquially 58:3
Columbia 7:24
combative 81:8
come 30:19 94:17
comfortable 85:14 88:2 94:20
coming 108:24
Commencing 1:17
comments 49:17 83:7
Commission 57:12 117:25
communication 83:12
community 61:21
Companies 7:13
company 32:2 35:21 39:12 52:24 59:1 62:20 72:19 74:14 83:11 84:17 99:21 103:8 106:11 107:4
comparing 47:5
complained 86:9
complaining 90:1
complaint 4:10 4:14 10:8 20:15,19,20,21 21:8,13,22 23:2,4,9 25:10 32:13 50:16 85:24 87:20 88:25 89:13 90:11 93:13,23 94:6 95:19 96:16 97:9,17,24 98:1,1,13,24 99:4,19 101:17
complaint/gri... 85:12
complaints 16:15,19 18:24 19:1,11 95:1 101:10
completed 5:20 28:24 33:6,13
compliance 72:25
complied 59:16
Complies 22:4 25:1 32:19 39:8 41:3,12 46:11 57:8 58:19 60:19 61:2 63:14 65:8 71:19 72:5 96:3
comply 73:18 73:20
comport 69:3
comported 84:19
comports 68:10
concept 22:2
concern 28:23 29:4,8 32:8,18 33:11 34:8 46:12 62:15,17 74:15 76:11 79:11 81:13
concerned 36:12
concerns 29:9 37:1 39:24 43:2 47:1 69:22 70:1 71:13 79:4
concludes 116:6
conclusion 84:5
conduct 22:23 25:18 92:16
conducts 21:14
confidential 68:16
confidentiality 60:7
confusing 8:25
conjuring 95:24
connect 33:11
consider 21:20 102:8
considered 113:10,10 117:16,18
considering 86:9 102:9
constructive 48:22 50:6
content 28:20
contentious 110:11,17 111:5 112:10 115:6,13
contents 60:6
context 70:20 105:8,9
continues 61:18 65:23 105:11 107:25
continuing 16:7
contractor 12:6
contractors 79:24
conversation 80:23 81:10 89:12,14,15 103:7,12 106:10,19
Cooper 12:2 13:10,21,25 58:8
copied 69:14 71:12 79:16 91:10 101:5
copies 82:12 93:11
copy 83:21 117:16
corporate 113:11
correct 10:5 11:12,25 12:10 14:1,22,22 15:14 16:13,17 16:20,24 34:16,24 35:17 35:18,22,23 40:21 45:12 46:13 47:3 48:11 51:7,15 54:6,10 56:15 59:19,20 60:24 66:25 67:3 68:8,9 78:13,15 80:7 80:15 83:2,22 84:2,12,22 88:7 89:19,22 90:7 91:24 92:7,9 95:3,11 97:18 98:3 102:11,24 107:2,12,24 109:11,12,20 117:16
corrective 39:9 39:23 40:3,5 40:12 53:7 56:16
correctly 21:1,11 22:24 24:13 24:22 25:15 26:5 27:5 29:12,25 30:20 31:1,14 31:19 32:24 34:13 35:7 36:6 37:23 38:14 39:21 40:25 42:7,12 42:23 43:17 46:8 47:10 49:21 52:6 53:5,10 55:10 59:2,8,14 62:5,13 64:12 68:18 69:19 69:23 70:8,12 72:21 74:18,23 75:18 76:6 79:7 80:4 81:23 82:22 83:8,17 89:9 93:20 94:14 94:22 96:18 102:20 103:13 104:25 106:14 106:23 108:9 115:9
counsel 5:5 54:14 117:13
counseling 106:10
counselor 99:25
count 107:25
country 14:3
COUNTY 117:4
couple 8:8 37:7 38:4 54:4 61:21 62:2 75:6
course 20:6 26:9 112:22
court 1:1 5:18 6:9,23 8:13,18 10:9 117:5,23
cover 19:20

covers 60:4
COVID 15:22 62:11
coworker 20:22
CP 75:13
CPM 69:22 106:8
Cranford 7:24
Creach 12:19,25 13:1,21
create 24:12
creates 53:2
criminal 72:13
cross- 46:14
Cruz 16:3
Crystal 12:19,25 13:5,6,12
Crystal's 12:20
CST 1:17 116:13
current 12:14
currently 16:3 112:5
cut 42:21
cutting 42:10 44:5,9

D

D 3:1
danger 105:3
database 110:2
date 6:3 12:23 81:9 112:2
dated 80:22 105:24
dates 81:3
Dawn 11:5 15:8 65:4 75:2 94:12,20 103:22
Dawn's 87:23 88:11 94:25
day 31:11 38:5 44:24 47:13,14 47:25 48:18 53:18 56:2 91:12 112:20 114:22
day's 112:18
daycare 65:15
days 56:2 61:21 62:2 81:11 82:16 86:4
Debra 28:3,4 111:6
December 82:18
decent 113:6
decision 94:17
decline 54:20
deems 79:10
Defendants 1:8 2:10 6:22
define 111:16
definitely 75:4
definition 23:23
degree 16:2
delete 23:24
deleted 45:16 45:19
deliver 55:5,16
delivered 34:20 55:6
delivery 79:25
demotion 25:22
denial 77:18
denied 29:24 31:5 37:20 38:19 46:4 77:7
denies 38:23 76:3
department 64:11 66:7,12 66:15,17,18 67:2,23
Depends 23:23 105:8 111:16
DEPONENT 116:12
deposition 1:14 5:4,14,20 6:5 6:11 8:4,9 9:24 11:8 66:20 116:6 117:8
destroy 23:23
destroying 23:21
details 38:2
determined 55:9
develop 14:11
Dickson 2:5
different 14:21 76:4
difficult 27:21 27:22 28:4
digging 81:13
dinged 31:13
direct 13:18 20:10 39:1,6 57:22 59:21
directive 102:17 104:5 105:5
directives 34:11
directly 14:25 31:18 108:5
director 55:1
Director's 101:6
directs 68:21
disabilities 24:21
disability 7:15 16:12 24:16 25:15
disabled 24:10
disagree 40:4
disbelieve 58:10
discerning 71:9 73:5
disciplinary 10:3 23:10
discipline 26:3
discriminate 16:11
discriminated 21:4 96:10,14
discrimination 7:15 16:16 17:6 19:2 20:17,21 23:7,22 25:10 25:21 57:7,11 58:5 72:7 97:25 98:13 99:15
discuss 69:22 88:16 89:4
discussed 5:21 39:13 40:19 53:5 61:13 62:10
discussion 61:19
discussions 33:4,5,17 47:7
dismissal 80:3
dismissed 108:1
dissuade 25:19
District 1:1,1 6:8 6:9
division 1:2 6:10 94:19
divisions 14:11
divvied 14:4
doctor 53:4
document 26:17 26:24 33:23 34:5 40:2,15 41:22 43:25 44:20 45:22 47:22 48:3 51:19 54:16,19 57:15 58:6,12 58:15 62:16 63:18 64:23 66:16 69:10 74:3 76:15 77:25 78:9,21 82:2 85:1 88:20 91:6 94:2 102:1 108:20 109:15 114:19 117:16 117:18
Document's 64:23
documentation 53:3 76:25 77:1,9,11 102:14 106:17
documented 55:6,7,16 62:7 77:24
documents 9:23 10:3,11 20:5 44:25 92:15 106:4
dog 113:18
doing 12:7 21:21 24:11 36:24 37:2 42:6,20 83:14 85:16 86:18 88:4 99:22
DON 29:22 36:22 61:10 62:3 70:3 77:5
draft 28:14,16 39:9 52:3 85:17
drafted 58:15 85:11
drop 99:13
dropped 100:2
due 39:19
duly 7:4
duties 112:15
duty 24:20 106:25

E

E 2:1,1 3:1,6 72:6
e-mail 3:9,11,13 3:15,17,19,20 3:22,24 4:2,4 4:6,10,12,14,15 4:17,19 26:20 27:1,10 30:15 32:6 34:2,5 35:2,9 38:1 40:18 41:25

44:23 45:25 49:7,9 51:9,22 69:13,16 71:12 74:6 78:24 82:5,11 83:6 86:18 88:23 88:24 91:9 92:10 93:10,11 94:9,10 100:18 101:4 105:24 109:18 110:4 112:17 114:22
e-mail's 82:8
e-mails 10:2 62:25 63:4 65:3 77:1 83:3 85:8 87:16
earlier 40:19 42:25 51:12 58:8 66:19 68:4,11 69:3 84:10,20 95:1 96:8 101:15
earliest 42:3
eastern 14:8
eat 49:14
eating 50:17
ED 30:16
edited 34:4 48:13,16
editing 63:3,3
edits 34:15 41:4 67:15 102:4
education 16:7
educational 15:25
EEO 16:25
EEOC 57:12
effect 8:12
efficiently 113:2
eighth 65:19
either 21:15 54:25 55:3 95:2
employed 11:10 12:11,16
employee 12:8 13:16 18:21 19:19 20:19 23:6,6,14 24:17 25:20 27:21 59:4 68:23,24 71:15 72:23,24 79:3 80:4,17 81:22 95:18 107:11 110:10
employees 12:13 14:24 24:11 27:23 29:15 59:5 79:23 83:17 83:25 106:25 111:14
employer's 24:20
employment 10:20 111:21 114:9
encompass 23:21
endanger 104:24
ended 16:19
engaged 25:7
entire 42:10,21 44:5
entirely 58:16
escaping 13:3
especially 113:9
essential 24:17
essentially 14:20 95:12,13
established 90:13 92:14
et 1:7 5:11 6:7 79:5
ethical 55:2
evaluations 25:24
evening 94:10 112:22
events 100:9 106:17
everyone's 62:16
evidence 5:15 23:21 77:11 107:14
exact 50:10
exactly 80:8 110:18
Examination 3:2 7:8
excalating 103:9
excellent 80:14
exchange 12:1 35:9 54:14 82:5 109:18
exchanged 15:13
exclusively 14:12
excuse 6:17 60:15 74:9
exercises 68:21
exhibit 3:8,10,12 3:14,16,18,20 3:22,24 4:2,4 4:6,8,9,11,13 4:15,16,17,19 19:18 26:16,18 28:18 33:22 33:24 35:1,2 40:14,16 41:14 41:21,23 44:19 44:21 45:21 45:23 46:14 46:19 47:7,21 47:23 51:9,18 51:20 54:13 57:1,22 59:21 60:17 61:1 63:13,22 64:2 65:7 69:9,11 71:15 73:3 74:2,4 78:4 78:20,22 82:1 82:3 84:24 85:2 88:19,21 91:5,7,11 92:21 93:2,6 94:1,3 94:5,6,7 96:1 100:13,22,23 101:2,25 102:2 104:7,8 105:11 105:13,16 109:14,16 114:18,20
exhibits 4:22 19:16
expectation 69:17 74:20
expected 104:23 111:3
expedite 113:14
Expires 117:25
exposed 62:11
eyes 55:24

F

face 71:7
facilities 39:15 39:18 76:5,12 113:3
facility 7:17 18:22 19:12 29:21 30:13 31:6,8,13 32:1 36:16,24 37:1 37:22 38:9,25 39:19 53:3 56:20 59:13 64:10 66:4 68:22 69:18 76:19
fact 46:6 67:13 81:14
fail 18:11 68:6
failing 23:8
fails 67:23
failure 40:2 55:5,15 58:25 60:6 79:25 104:20
fair 8:20 9:5,6 9:22 18:19,23 21:25 34:18 43:23 45:18 46:15 47:12 49:5,8,10,23 67:19
fairly 113:2,6
faith 18:21 25:9 72:12 73:7,9 73:13
falls 56:20
familiar 19:22 28:22
familiarize 18:2
far 65:19
fashion 65:6
Federal 5:8
feedback 48:22 50:6
feel 81:21 87:19 93:16 94:20 97:14
fell 52:16
felt 37:22 93:1
female 29:11,17 29:23 30:4,8 31:5 36:6,20 38:19,23 59:13 62:4,10
fighting 9:16
figure 21:25
filed 10:9 50:16 57:11
finally 9:7
financial 117:14
financially 39:20
find 78:2 103:24
fine 86:16
finish 9:8,9 70:16
fire 14:23,25
fired 112:7
firm 43:7
first 7:3 8:7 13:4 19:17 24:8 26:12 28:14,16 28:16 30:2,5

43:1 44:12 45:6 48:1,6,19 49:10 51:11 53:14 70:18 75:17,22 86:9 88:12 90:12 91:18,19 93:14 97:16
Fisher 2:12 5:6 6:21
five 19:7 64:2,5
five-day 28:24 33:13
five-point 92:6
Fix 35:5
flip 19:18 20:12 22:3 24:24 32:17 34:7 35:11,24 39:7 41:2,11 45:14 46:10 52:8 54:12 57:1 58:17 60:17 61:1 63:13 68:13 72:3 91:18 102:13
follow 39:10 74:12 104:5,21 105:4
following 34:3 97:3
follows 7:4 28:13 54:20 94:8
font 102:20 105:18,21
food 49:16,20
force 8:12
foregoing 117:8
forget 110:22 114:6
form 5:12 25:11 28:19 33:10 34:12,19 35:14 35:25 43:24 45:8 48:2,6 48:19,21 50:12 50:13 51:11,25 52:9 55:19 63:17 66:11 72:20 73:10 73:19 77:16 84:3 91:14 93:16 112:23 117:11
formalities 5:10
forms 10:4 35:10 47:9 49:1 87:2
forth 63:1
forthcoming 106:18
forward 85:21 88:6,9 106:11
forwarded 88:15 91:13 97:17
found 76:19 79:2 80:17 81:22
four 33:18 76:4
frame 114:10
fresh 55:23
Friday 28:10
front 19:15 29:16 34:25 36:19 45:2 55:18,22 57:23
full 7:20 49:15 49:20
function 84:8
functions 24:18 84:16
further 116:2,5 116:12 117:12 117:16
future 53:7 56:17

G

G 1:3 6:6
gap 37:8,15
general 66:20 68:4,10 69:4 112:3 114:14
generally 29:2 29:3 48:8 60:4 67:17
generate 110:9 113:20
generated 112:23,24 113:22
germane 62:23
getting 32:20 33:6 46:5 47:2 70:7 87:11 92:15,19
give 19:3 28:7 50:11 112:12
given 33:7,9 51:12 53:16 58:13 99:8 115:6,12
gives 61:6
giving 32:9 115:2
Glad 115:5
go 8:7,9 50:14 63:11,19 67:20 70:22 71:15 72:3 88:11 95:6 103:2 107:6 111:12
go-to 113:20
goes 24:15 29:14 71:8 112:21
going 26:15 30:16 33:21 37:7,8,25 38:4 40:13,13 41:20,20 42:17 44:18 47:20 50:19 50:20,23 51:17 58:20 61:9 65:12,13 68:22 69:8 70:21 74:1,1 75:6 77:15,25 78:19,19 79:12 80:16,25 81:25 84:23 88:18 89:25 91:3,4 92:20 93:25 94:17 97:11 99:13 100:12,12,16 101:24,24 105:11 106:11 108:22 109:4 109:13 110:19 115:22,23 116:7
good 7:10 18:21 25:9 72:12 73:6,9,13,13 85:20 87:4 89:2,4 92:25 102:11 108:24 109:1 115:19
gotcha 110:3
gotten 113:15
grammar 102:23,24
greatly 34:9
grievance 4:8 85:4 97:17
ground 8:8
guess 13:16 43:7 47:15 69:15
guilty 68:1
gummed 113:16
guy 14:15

H

H 3:6
hairs 107:23
Halcyon 56:1
halfway 75:8
hand 26:15 33:21 40:13 41:20 44:18 45:21 47:20 51:17 69:8 74:1 78:19 81:25 84:23 87:4 88:18 91:4 92:20 93:25 100:12 101:24 109:13 114:17
handbook 19:19 19:22 20:6 22:11 24:25 35:20 54:5,9 55:4 59:4 71:16,20 79:3 79:18,19,20 80:18 81:23 82:13,19 83:20 93:17 96:5 104:8,9 104:12 107:14
handbooks 54:5
handed 86:20 86:22
handle 14:9
hanging 36:19
happen 53:21 75:13 81:11 87:10
happened 22:1 29:25 31:5 37:20 38:20 38:24 39:1 46:5 52:17 61:7 76:3 77:7
happening 11:4 11:4 67:12
harassed 21:4 96:10,14
harassing 29:10 30:4 36:5
harassment 20:16,20,21 23:7 25:11,12 25:21 36:13 37:3 59:12,18
hardship 24:12
harm 76:5,12,13

heading 32:12
headings 60:13
heads-up 115:2
health 1:6 6:7 7:13 11:11,21 12:17 13:15 14:24 15:15 16:25 17:21 18:25 19:19,23 22:6,19 24:9 25:5 53:24 56:2 66:13 67:2 78:17 97:24 104:24 105:3
Health's 32:10 58:4 59:17
healthcare 79:25
hear 9:15
hearing 5:13
hearsay 30:25 31:8 38:11,19 75:14 76:2
Heather 32:20 33:1 47:2
Heather's 46:7
held 6:11
help 8:8 44:14 56:21 70:6
helps 21:24
Hey 87:7
Hi 110:8
hierarchy 75:3
Highland 29:8 36:13
highlight 41:18
highlighted 41:15 42:11,15 44:6,12 45:15
Hilmes 30:17,24
hire 14:23,25
hired 13:4,4 82:19
Holland 2:11 6:21,21 10:12 43:24 46:18 50:13 57:3,5 63:8,10,17,21 64:22 66:11 73:10,19 76:14 77:15 78:4 81:15 84:3 92:22 93:3 95:4 98:16 100:14,20,23 101:19 103:20 104:2 105:13 105:16,19,22 106:1 107:3,13 108:19 116:3,11
Hollow 7:24
home 39:16 62:12 70:5
honestly 19:8 114:5,12
hornets 111:1
hospital 52:19
hotline 70:4,8 79:10
hotlined 70:7
hotlining 83:15 83:23
hour 50:20 108:23
hours 110:22,23 114:1
HR 12:9 14:2 16:5,10 17:23 40:19 47:8 48:24 62:19 81:2 84:8 94:19 95:2 97:23 98:10 110:2
HRBP 115:1
HRIS 109:22
HRISs 112:1
human 20:25 57:12 72:25
hundred 17:18

I

idea 62:21
II 2:11
illegal 16:11,14 18:15,20 25:13 69:5
immediate 79:6 80:3
immediately 21:5,9 59:6 66:5 72:24 96:15,16 98:2 99:19
immune 72:13
immunity 60:7 60:12
impartial 21:18 21:21
impartiality 21:24
impeding 46:7
implying 23:25
imposed 72:14
improper 21:20
improvement 26:23 45:1 46:2 91:15
inappropriate 91:2 101:18
inbox 115:18
inboxes 113:1
incidence 11:3
incident 12:18 21:5 22:21,23 36:21 54:21 96:16 103:7,11 106:12 108:12
include 18:15 22:7,20 25:8 94:13
includes 20:7 25:22
including 17:25 23:10 26:4 54:1
incorrect 55:13 98:22
increased 25:25
incurred 72:14
independent 78:14,17
individual 19:4 24:16 25:7
individuals 22:22
inform 106:25 107:11
informal 8:10
information 32:6 56:24 57:19 58:9,13 59:7 110:2
informed 67:12
informing 59:17
infraction 93:17
infractions 35:20 54:9 83:20
initial 103:7 106:9
initiate 53:1
initiated 82:7
instructed 62:9 62:16 77:24
instruction 39:11
instructions 104:21,23
insubordinate 31:18,22 103:11 103:17,21 106:21 108:2
insubordination 29:5 30:5 34:8 36:1 39:1 39:6 42:4 43:20 44:3 45:10 58:22 58:24 60:21 91:22 93:18 102:16 103:4 103:16 104:18 105:4 108:1,15 108:18
insubordinati... 46:24
Insubordinati... 34:10
intent 23:25 24:2
intention 73:22
interest 117:14
internal 83:13
internally 22:16
interpret 23:13 23:14 75:24
interpretation 43:23
interview 23:1
interviews 22:7 22:20
intimating 96:25
intro 6:17
introduce 6:17
introducing 27:17
investigate 23:8 85:25 86:11 90:11 97:11 99:4
investigated 21:9 31:9 37:2 95:2 96:17 98:2,4,20 99:20
investigation 21:14,22,25 22:7,19 23:3 23:15,17 25:12 25:13 29:21 31:6 72:11 78:14,17 86:6 86:19,20 87:9 87:12 90:13,16 90:21,24 92:16,19 95:15 95:19,20,22 95:22 96:21 97:1 98:6,8,15 98:23 101:16
investigator 21:18

involuntary 11:17
involve 53:8 56:17
involved 19:1 22:21 24:2 26:12 52:20 54:22 77:12 87:24 89:19 89:22,23 90:4 95:9 97:20 110:23
involvement 87:1
involves 32:9
involving 17:15 102:16 108:3
ISNP 61:11
issue 11:21 52:19,24 53:2 62:10
issued 53:18 54:1 80:18,21
issues 14:9 26:13 28:5,6 32:1 55:3 61:14 70:6 76:8 103:9
it'll 22:10 57:24 59:22
item 53:13,17,18
items 47:16

J

JAMES 2:11
JENNIFER 5:17
Jenny 1:25 6:13 117:5,22
jeopardize 39:17
jholland@fish... 2:14
Jim 6:21
job 24:18 39:17 55:8 56:8 72:7
Jonathan 12:2 13:10,21
judgement 71:9 73:5,13,17 75:21 79:12
judging 27:10 87:13
July 26:21 29:7 36:3 59:10 61:10,13 62:11 62:12
jumbled 83:7
June 1:17 5:7 6:3
justify 81:14

K

Kami 11:1 15:16 30:16,23,24 31:7 38:25 75:2 79:1 85:18,22 86:16 87:14,16 87:18,19 88:7 89:2 90:15 94:21,24
Kami's 79:11 83:6,10
Kansas 2:6,13
keep 16:8 79:9 104:7
Kelly 30:17,24 31:10
Ketchum 3:9,11 3:17,19,20,22 3:24 4:3,4,7 4:12 10:22 15:8 26:21 27:7 30:7,22 31:23,25 34:3 35:3,4 36:11 44:23 45:25 48:1 50:10,17 51:10,22 63:1 69:14,16 70:1 74:6 75:4 78:9,25 80:12 82:6,11 83:3 87:17 91:9,13 92:11 103:22
Ketchum's 39:9 39:23 77:13
kicked 30:13 36:16
kidding 83:4
Kim 110:8 113:14
Kimberly 109:19 109:21
kind 13:24 14:16 15:21 17:4 18:10 28:9 37:8,15 111:19 114:12
knew 16:22 32:22 97:20 109:23 115:22
know 10:21 18:10 19:10 27:3,19 33:1 35:5 47:17 48:5 50:1,18 52:4 54:2 56:6 71:12 76:24 79:4 82:25 83:13 86:14 90:19 94:13 95:16 97:5 98:7,9 99:6 102:25 108:21 110:21 111:3 114:11,12
knowingly 67:23
knowledge 13:23 22:24 69:4
known 24:21

L

L 5:1
Label 104:9
labeled 96:4
laid 13:12
language 34:23 35:15 41:13 42:15 45:15 46:25 54:8 55:18 66:10 74:8,12 91:19 92:1 102:17 108:3,4,8
late 27:4 28:9
launch 90:16,20 92:19
launched 90:14 90:24 95:23 97:1,2
law 2:4,11 73:18 73:21 114:1,5,8
laws 68:25
LCR 1:25 5:17 117:22
leaders 102:15
leadership 39:14
learned 67:9,18
leave 70:10 71:1 73:24
leaving 114:9
led 100:10
left 60:1 106:6
legal 6:15,15 18:10 55:2 68:6 84:4 99:25
let's 9:7 24:4 103:2
letter 85:11
Lexitas 6:15
liabilities 72:13
liability 47:1 52:24 54:22
Licensed 117:5 117:23
life 104:24 105:3
likewise 9:9
limited 25:9
line 37:25 61:10 65:19 75:15
lines 37:7,13 38:4 64:3 75:6 76:9
list 65:23
listed 112:1
lists 61:15
little 8:9 112:12
living 105:9
LLC 1:7 5:6 6:7
LLP 2:12
local 57:20
location 15:16
logical 95:23
long 12:11 61:19 98:10
long-term 7:17 18:22
longer 11:10 111:24
look 24:4 27:2 40:22 46:18 54:3,13 65:7 91:10 93:6 96:1
looked 41:14 60:20 94:5
looking 21:18 55:23
looks 19:18 26:22 28:9,13 28:14 34:2,4 35:2 43:19,21 44:25 52:5 54:7 60:3 61:3 79:16,21 82:7 82:12 88:23 91:14 93:11,12 94:8 102:5,11 110:10 115:1
loophole 70:11 71:1 73:25
loose 19:16 34:25 57:23 59:22
lot 60:3 63:3 106:4
low 9:16
Lynda 1:3 6:6 6:20 7:12 15:2 26:23 29:7

30:12,14 31:3,7 31:9,10 33:7 36:3,16,22 37:20 38:1,6 39:10,14 42:4 42:18 43:3 44:3 46:3 79:2,11 85:20 101:6 102:16 103:8,10 105:12 106:6 106:11,17,21 108:1,4 110:9

M

machine 117:9
mail 110:25
main 83:10
major 90:14
making 18:15,21 23:2 25:9,20 72:10,16
male 29:9,15 30:12 31:12 36:4,18 59:12 61:20 62:4 63:15,23,25 77:12,23 78:10
management 20:25 33:6,7 34:11 76:18 94:18 104:22
manager 40:24 69:19 102:18 103:5 106:9,18 106:20 107:1 107:11 108:5,7 109:22
managers 39:11
managing 106:12
mandate 110:20 113:25
mandated 84:14
mandates 71:5
mandatory 17:15,19 18:3,7 38:13 64:8 83:25 84:1
manner 21:10 62:22 63:6 96:18 98:3 99:20 113:23
manual 82:17,17
marathon 9:13
March 13:12
mark 20:5 92:23 100:16
marked 19:16 26:15,17 33:21 33:23 40:14 40:15 41:21,22 44:18,20 45:21,22 47:20,22 51:17,19 69:8 69:10 74:2,3 78:20,21 81:25 82:2 84:23 85:1 88:18,20 91:4 91:6 92:20,23 93:25 94:2 100:13,15,17,21 101:25 102:1 108:12 109:13 109:15 114:17 114:19
masters 16:4
material 33:8
matter 6:6 12:4 37:5 99:23 108:3 115:13
McEnaney 2:4 3:3 6:19,19 7:9 7:11 26:19 34:1 40:17 41:24 44:1,22 45:24 46:22 47:24 50:21 51:2,21 57:4,6,9 60:11 63:12 64:1 65:1 66:14 69:12 73:15 73:23 74:5 76:21 77:19,21 78:7,23 81:19 82:4 84:9 85:3 88:22 91:8 92:25 93:4,5 94:4 95:8 96:12 98:21 100:18 100:22,24 101:1,23 102:3 104:6 105:14 105:17,20,24 106:3,5 107:9 107:17 109:1,8 109:17 114:21 116:1,10
mean 8:18 23:18 29:18 31:21 58:11 67:11 87:22 95:13 97:4 98:9 99:12 110:16 112:6
means 111:21
medical 55:1
Medtronic 12:6 12:7
meeting 35:16 49:18 50:4 61:11,14 90:18
meetings 35:16 49:24,25 50:17 52:15
member 36:4 36:15,18 52:4 52:25 53:9 56:18
members 20:24 36:6 36:20 39:15 52:14,17,21 61:13 83:12
memory 12:22
mention 63:15 77:17 78:10
messages 10:19 12:1 15:13
met 7:11 15:2,8 15:19
method 53:25
mid 13:12 14:7,7
middle 16:4 37:15 45:11 48:22 69:15
minutes 42:9 51:24 63:4 102:5 113:24
misappropriat... 72:17 80:2
mischaracteri... 101:20 108:20
misdemeanor 68:1
Missouri 1:1 6:9 17:25 18:4 40:24 49:18 57:11 59:25 64:3,7 73:18 73:21 93:20 114:4,11
misstates 43:25 63:10 76:14 77:16,16 84:4 95:4 98:16 107:3,13,14
mistreatment 79:5 80:1
mixed 83:6
Mm-hmm 20:18 21:2 22:25
MO 2:6,13
moment 50:22 60:17 108:6 109:3
Monday 27:5 28:11,12 34:3 61:10
morning 85:20 89:2 94:8 112:15,16
motion 97:10
mouth 49:15,20
mute 49:17 50:3

N

N 2:1 3:1 5:1
name 6:13,14 7:20 12:20 13:2 17:5
name's 54:23
named 117:13
names 27:25
Nashville 5:7 6:12 117:6
natural 14:16
nature 111:17 112:2 115:6,13
necessarily 73:14
necessary 22:21 23:3 102:25
need 9:12,13,17 28:11 49:14 75:7,11,17 83:13 86:25
needed 30:13 49:3,16 50:2 109:24
needs 75:13,16
negative 25:24 25:24
neglect 7:17 18:17,22 60:4 67:25 72:17 79:5 80:1,10 107:20
neglected 64:11 66:5
nests 111:2
never 38:3 41:6 45:11 70:4 77:12 108:15 113:18
new 11:20 54:1 113:20
NHA/DON 69:23

nodding 8:16
Nominally 13:2
Notary 117:24 117:25
note 80:16
notice 5:8,10 64:20 110:9,21 112:24 115:8
notices 113:5,5 115:12
notified 75:2
notify 72:25 74:14,22 75:17 75:22
NP 29:23 54:25 62:4 77:23
nuh-uh 8:17
number 6:7 8:1 26:18 28:23 32:8,12,18 33:12,24 34:8 34:21 35:20 40:14,16 41:23 44:19,21 45:23 47:7,23 49:14 51:20 57:3 60:23 68:20 69:11 74:4 78:22 82:3 85:2 88:21 91:7 94:3 102:2 104:10 109:16 110:11 111:10,11 114:20
numbers 20:2 82:12,14,20 83:5
numerous 33:5
nurse 29:22 56:19,22 65:20,20 66:1 66:1
nursing 36:17 113:3

O

O 5:1
oath 8:11 51:5 109:10
object 43:24 50:13 63:17 66:11 73:10,19 77:15 84:3
Objection 63:8 64:22 76:14 81:15 95:4 98:16 101:19 107:3,13 108:19
objections 5:12
obligated 18:9 66:22 84:11
observations 33:3 47:6
observe 18:8 66:22 84:10
observed 22:22
occasion 12:3 87:7
occasions 33:5
occupations 65:16,24 66:2
occur 95:20
occurred 19:17
occurrences 61:12
offensive 32:15 34:23 35:15 91:19 92:1 102:16 108:4
offer 16:25
offered 17:2
officer 73:1
offices 5:6 117:6
official 85:11
oftentimes 81:9
oh 20:9 22:14 40:10,12 58:16 78:6 82:10 114:25
okay 9:2,19 14:2 14:17 17:6 20:11 22:12 28:21 37:10 40:12 43:5,14 43:22 46:21 52:5 53:19 58:1 63:2 66:24 67:16 71:3 75:23 78:6,12 80:11 81:7 82:10 86:5 87:14 97:9 99:1,7,10 100:7 101:3 103:2 105:6 105:22,23 108:14,17 109:3 111:9 114:17,25 115:1
old 100:17
omission 106:22
once 112:14 115:20
one's 92:22
ones 46:17
online 49:24
operative 92:12
opinion 37:5 40:23 43:8 61:8 78:6
opportunity 11:20
order 53:1 116:8 117:16
orders 32:9 46:5 52:15 54:22 56:10
original 4:22,22 117:17
osmosis 14:16
outcome 117:15
outlined 102:10 102:14
overwhelm 32:22

P

P 2:1,1,4 5:1
p.m 1:17 6:4 50:23 51:1 89:7 91:12 94:7 109:4,7 112:21 116:7,13
PAF 44:2 53:18 54:14,18 58:22,24 60:21 61:4 67:14 77:18,22 91:19,19,23 101:6 103:4
PAFs 45:1 48:15 63:3 89:24 108:11
page 3:2,7 4:1 19:20 20:1,12 20:13 22:3,10 22:10,11 24:4 24:24,25 28:17 32:17 34:7 35:11,24 37:16 39:7 40:9 41:2,5,11 41:13 45:3,14 46:10,19 48:20 49:13 49:13 52:8 54:3,7 58:17 68:13 71:20 72:3,6 82:8 85:9 91:18 96:4 102:13 104:8,12
pages 20:10
pagination 20:6 20:7
pants 36:19
paperclip 59:23
paragraph 22:5 22:15 23:5 24:8 25:17 58:21 93:13
paraphrasing 64:8
pardon 26:1
part 14:6 20:8 44:14 83:25 77:19 95:16 102:10,14 117:17
participating 25:11
particular 10:25 12:3 108:12
particularly 71:14
parties 6:18 22:20 117:13
partner 38:21 70:6
partners 1:6 6:7 17:22 19:19 24:9 32:3 56:2 83:15,23
Partners' 22:6 22:19 25:5
pass 52:25
pasted 79:17
patient 29:9,15 29:17,23 30:8 30:10,12 31:5 31:12 32:9 38:19,22,23 46:5 52:4,16 52:19,21,25 54:23,24,24 56:10,20 59:12,13 76:3 76:13
patient's 62:8
patient/reside... 72:17
patients 29:11 30:4 53:8 56:12,17 79:24 83:15
PC 2:5
PCP 29:22 52:18,18,22 54:25
PDF 112:23
peer 40:19

pending 9:20 102:18
penis 29:16 36:19
Pennsylvania 2:12
people 14:13 29:24 30:9 61:15,25 99:21 99:22 103:23
percent 17:18
percolated 112:23
perfect 115:20
perform 24:17 104:20
performance 26:22 28:5 44:25 46:2 55:8 56:8 91:15
permission 85:21 88:6 97:19
person 14:5,17 15:3,8,19 20:23 23:2 67:21 68:20 72:10,15 77:6 87:7,19 90:11 90:22 91:2 101:18 109:23 112:6 113:21
personal 11:24 93:11
personally 8:23 62:18
personnel 10:4 34:12,18 35:10 35:14,25 45:8 47:9 49:1 52:9 55:19 87:2 91:14 93:16 104:22
persons 76:18
Peter 1:15 5:4 6:5 7:2,22 35:5 46:19 47:8 52:2 79:1 81:2 117:8
Phillips 2:12 5:6 6:22
phone 8:1 11:22 15:5,11 47:13 49:17 50:3
PHR 16:6
physician 55:1
picking 106:6
pickup 53:2
PIP 28:13,15 33:18 45:6 46:1 47:9 48:10 49:1 52:12 53:14,16 53:16 54:1 67:14 80:18 81:1 89:24 92:3,4,6,8,12 92:17,17 108:11
PIPs 10:6 63:3 87:2
place 61:12 80:23
placed 39:19
Plaintiff 1:4,16 2:3 5:5 6:20
plan 26:23 30:20 45:1 46:2 53:9 56:18 91:15
please 6:16,24 7:18,20 8:21 8:25 9:12,20 12:22 20:12 22:3 24:24 35:24 39:7 49:15 50:23 52:5 60:17 70:22,23 82:22 89:2 96:2 101:2 104:7 107:8 109:4 113:19
plus 53:17
point 19:25 28:8 37:4 49:14 64:15,17 83:11 86:1,13 87:3,12 88:14 90:14 92:25 95:14 97:21 107:16 108:24 109:2 110:23
points 33:18
policies 55:4
policy 24:6 25:3,6 59:2,17 71:22,24 79:22 81:14 82:12,14,16,17 82:19 99:18 103:8 106:11 107:4,10,19,21
poor 73:17 79:12 102:23
portion 17:24 45:11
position 13:14 14:20 58:3 62:19
positions 61:15 65:16
positive 75:16 75:21
possess 10:16
possibilities 11:3
possibility 11:4
possible 36:12 49:2 57:21 58:16 86:5 110:25 111:1
possibly 36:5
post 15:22
potentially 74:15
practice 114:14 115:11
practitioner 56:19 65:20 66:2
pre 15:21
precedence 76:13
prepare 9:23 11:7
present 2:17 6:16 61:16
presented 61:11 103:5
presumably 73:6 75:3 80:20
presume 73:11 86:17,17
presumed 72:11
presuming 73:8
pretty 83:19 90:15 99:16 115:19
prevent 70:7
previous 33:3 33:17 36:8 40:9 46:17 47:6 78:9 83:5 94:5 112:18,20
previously 115:14
prior 10:2 13:1 14:15 49:3,9 103:9 106:7 106:20
proactive 113:13 113:22 115:21
probably 27:4 48:9 59:22 65:4 86:13 87:4 102:23 107:18 112:12
problem 20:23 27:15,16,20 85:16 88:4 106:3
problems 38:24
procedural 53:25
procedure 5:9 20:15,19 53:23
proceed 7:6
proceeding 5:16
proceedings 117:15
process 24:5
professional 16:10 21:10 48:24 62:19 96:17 97:23 98:3 99:20 117:7
professionalis... 32:13 34:22 46:25 108:13
professionals 76:4
program 17:3 69:19
prohibit 25:6
prohibition 60:8,12
promote 25:23
prompted 58:25
promptly 23:8
proof 38:23
proper 111:3
properly 23:8
property 72:18 80:2
proposed 23:16 39:23 74:12
protected 25:7 25:8 98:1
protection 71:22 72:7
protects 23:6
provide 24:10 40:7,8 84:1
provided 10:11 49:2,6,6 56:25 64:20 68:17
provider 52:23
providers 61:19

providing 57:19
provision 18:15
psych 29:22 62:4 77:23
Public 66:13 67:2 117:24
purposes 5:8
pursuant 68:17
purview 50:16
put 54:8 108:7

Q

qualified 24:11 24:15
quality 70:5
quarantine 62:12
question 8:24 9:3,5,8,10,20 9:20 24:18 54:23 63:20 70:17,22,23 74:13 75:21 81:18 98:19 101:22 107:6,7
questioned 29:24 30:8
questions 5:13 7:9 116:3,5
quietly 110:19 111:12
quote 64:9

R

R 2:1,11
reached 14:13
read 5:14 20:25 21:10 22:24 23:11 24:12,21 25:15 26:4 27:5 29:11,25 30:7,20,25 31:14,18,24 32:3,23 34:13 35:7 36:6 37:23 38:13 39:20 40:25 42:7,12 43:17 46:7 47:10 49:20 52:5 53:5,9 55:10 56:4 59:2,7,14 62:5,13,22 63:5 64:12,17 65:12 68:18 69:1,19,23 70:8,12,21 72:21 73:1 74:17,22 75:18 76:6 79:1,6,14 80:4 81:23 82:22 83:7,17 89:9 93:20 94:14,22 96:18 102:19 103:12 104:24 106:13,23 108:9 115:8
reading 5:20 64:14
really 8:8 19:4 43:7 46:17 50:15 55:25 62:23 70:10 70:25 73:24 84:8 87:11 95:14 103:1
realtime 102:17
reason 9:14 21:17 42:12,22 44:7 54:19 55:12 58:10 93:1 113:16
reasonable 21:23 24:3,10 24:19 25:19 33:15 64:9 66:3 67:24 69:7
reasonably 19:24 24:20 104:23 105:2
reasons 44:7,11
recall 10:10,25 12:4 15:7 17:17 17:22 19:4,6,8 26:14 27:9 28:25 32:10 34:5 41:10,19 44:13 47:15 49:4 53:22 55:17,25 56:1 56:3,7,13 57:18,19 58:7 62:24 77:25 78:2,11 80:23 80:25 86:18 87:11 88:14,17 89:15 90:17,19 92:13 93:24 103:1 107:15 108:13
receipt 102:18
receive 98:13
received 49:11 85:24 86:10 99:4 113:18
receiving 48:18 72:18 93:22
recognize 19:20 26:24 28:17,19 35:9 35:10 48:2 54:16 57:15 61:4 85:5
recollection 12:19 42:14 44:15 64:19 89:12
recommend 94:21,24
recommendat... 15:1
record 6:3 7:21 8:15 50:23,25 51:3 77:17,20 109:4,6,9 116:7
records 62:8
recuse 86:24 86:25 89:18 95:10
recused 90:6
red 41:15,18 42:11,15 44:6 44:9,13 45:15 102:10,14,20 105:18,21
reduced 34:9 117:10
refer 14:14 20:8
reference 46:16 48:9
referenced 82:14
references 25:25
referred 14:18 87:18
referring 27:19 30:9 111:6,9
reflect 89:11
reflects 103:5
reflesh 44:14
refrain 8:16
refresh 12:22 42:14 44:14 89:11
refusal 25:23 104:20
regard 111:2,4
regarding 10:14 12:2 33:5 55:7 83:12 93:17
Regardless 51:13
regards 49:18 53:3 54:21 83:14
regional 29:22
regions 14:3
register 9:16
Registered 117:6
regulation 114:2
related 117:12
relating 10:19 26:13
relations 12:8 13:16
relationship 13:20 32:2
relative 72:16
relatively 8:10 100:8
relevant 10:17 22:23
Relias 17:3,4 82:18
religion 25:14
relive 56:1
relying 64:21
remarks 52:12
remember 27:25 32:15 51:13 64:14 77:22 84:21
remembered 115:5
remind 8:21
reminder 108:7
removed 46:4 46:13 47:1,16 53:13 61:20
removing 53:17
rep 14:2 17:23
repeat 8:25 42:17
repeats 37:22
repercussions 18:11 68:6
rephrase 9:1 70:23 86:14
report 18:9,11,21 21:5 31:4 38:12 40:3,7 58:25 59:6 60:6,7 64:11 66:5,6,23 67:22,22,24 68:7,24 69:6 69:21 70:1 72:10,16 76:2 76:2 77:8 79:12,25 84:11

96:15 103:6,11 107:19,22
reportable 71:10 73:5 74:21 79:11,13 103:25
reported 1:25 13:22,25 29:20 30:14 36:12,21,23 42:5,19 69:18 74:16 75:8,12 75:16 76:18 77:5 80:9 106:19 108:3 117:7
reporter 5:18 6:24 8:18 17:16,20 18:3 18:7 38:13 60:10 64:8 84:1 96:11 116:8 117:5,7 117:23
reporter's 6:13 117:1
reporting 7:16 13:20 18:16 19:12 38:17,18 59:11 64:7 70:11,15 71:2,6 73:25 84:14 96:22 103:8 103:22 106:8 106:12,20
reports 13:18 60:5 68:16 103:10 105:12 106:7
represent 6:18 7:12
reproduction 117:17
request 9:19 95:15 98:6
requested 32:7 33:8 38:3 41:7 45:12 102:19
requesting 25:14 96:20
required 67:21 67:25 74:13
requirement 28:25 33:14
requires 107:10
resent 49:3
reserved 5:13
resident 64:10 66:4
resident/patie... 80:2
residents 60:5 79:23
resign 11:19
resigned 11:18 13:7 112:7
resolve 70:5
resources 20:25 72:25
respect 99:24
respective 112:25
respond 23:9 42:9 54:4 57:20 80:13 94:16 102:4
responded 83:19 85:20 86:15 89:6
responds 54:18 89:3 110:13
response 4:15 58:4,9 61:3 101:10 115:4
restate 70:24 107:7
result 80:3
resulted 103:6
retaliate 16:14 18:16,20 68:23 69:5
retaliated 72:19
retaliation 7:16 7:16 17:9 19:12 23:22 25:6,18 26:2 42:5,18 43:4,21 44:4 60:8,13 72:24 93:19 95:20 95:24 97:25 98:14 99:16
return 31:10 39:18
review 9:23 10:1 10:6,8 26:8 47:9,10 52:12 55:3 79:20 82:13,21 101:6 101:9,13 102:5 103:3,3
reviewed 55:21 82:16,18 87:16
revised 46:3 53:17 92:7,16
ridiculous 98:19
RIF 13:13
RIF'd 13:24 112:7
right 16:12 17:25 19:25 26:8 30:10 32:3 36:9,13 37:18 40:3,20 44:8 45:16 47:18 48:21 53:20 65:19 70:1 73:1 75:1,4,9 79:14 80:19 81:23 83:1 87:25 90:4,15 93:13 97:21 98:6 99:3,11 99:20 105:9 114:15 115:8,12 115:16 116:4
Rights 57:12
RK 6:8
rmcenaney@s... 2:7
Road 7:24
role 12:9,14 94:19
room 36:18
rough 52:3
RPR 1:25 5:18 117:22
rude 8:22
rule 114:13
rules 5:9 8:8 35:21 56:23
run 74:8
Ryan 2:4 6:19 7:10 57:3 92:22 107:5

S

S 2:1 3:6 5:1,1
SAITH 116:12
Santa 16:3
saw 28:17 36:9 43:1 92:10
saying 8:16 75:20 90:8 107:21
says 20:2 21:3 24:9 25:5 27:1 28:10 29:7 30:12,22 31:16,25 32:5 33:4 34:9,12 35:5 36:3 38:5,16 39:2,4 39:10 42:3 43:16 44:3 46:4 47:8 48:22 49:14 52:2 54:18 58:24 61:9 62:2,7 63:22 63:25 64:3,6 64:23 65:14 65:20 66:1,15 67:20 68:16 69:21 70:4,10 70:25 72:1,7,8 72:10,15 73:4 74:12 75:7,15 76:1 79:22 80:17 81:5,7 82:9,13 83:4 85:10,18 88:2 94:9 96:9 97:9 101:5 102:14 106:16 109:22 114:8
schedule 33:9
scope 72:1,4 79:22
second 22:5,13 22:18 29:4 45:7 46:19 48:20 49:13 58:21,24 69:15 80:16 81:1 91:22 93:13 98:24
secret 79:9
section 20:15 24:5 25:2 39:10 42:11,22 44:6,9 67:20 67:22 68:17 71:21 72:6,15 78:25 79:19 96:5 103:3 104:16
see 20:2,17 21:5 23:11 27:4 30:2,4,18 31:4 34:12 37:12,17,17 38:6,7 39:2 41:5,7,8,16 42:4,18 43:3 44:4 45:2 48:20 51:25 57:13 60:1,8 60:13 61:16,22 63:24 64:4 65:10,16,20 66:7 68:2 69:1 71:10 72:1 72:8 74:9 75:7 82:21 83:4,20 85:18

85:23 86:15 89:2 91:16,20 92:1,4 93:13 96:5 102:6 104:16
seeing 54:24 77:22
seen 18:12 25:18 57:17 58:5,12 71:24 77:2
sees 43:20
send 33:8 38:2 44:2 52:19 83:21 85:12,17 86:16 87:14 87:20 89:1 94:11 110:4
sending 48:1,5 51:10 85:9,14 88:3 94:20,21 94:24 113:25
sends 82:11
sense 15:23 18:8 43:15 55:7 86:8 111:25 112:4
sent 28:9 32:6 34:4 40:24 51:24 64:24 82:15 83:6 85:4 94:6,9 101:6,13 102:6 113:17,23
sentence 21:8 22:6,13,18 23:13 24:8 30:2,5 59:10 70:16 80:17 93:14 103:18
sentences 41:15 43:1 76:1 96:7
separation 110:9,21 112:24 113:4
September 12:12
serious 99:16
service 72:18
services 55:5,6 55:16 117:19
set 60:16
setting 8:11
sexual 20:16,20 25:10 59:12,18
sexually 29:10 30:3 36:5
short 13:3 50:24 51:4 100:9 109:5,18
shorthand 117:9
shred 23:24
sic 36:22
side 60:16 75:9
sign 48:2 54:19 54:20
signaling 112:10
signature 117:17
signed 65:2
signing 5:20
similar 53:13 106:4 114:11
similarly 59:22
simple 99:23
simply 62:21 83:19
Siro 2:5
sit 98:14
sites 79:25
sitting 55:23
situation 55:10
six 64:3
skilled 113:3
skills 117:9
skip 37:7,25 38:4 65:13 68:22 75:6
skipped 13:25
skipping 25:17
skips 66:2
Smith 2:5,18 6:14
smoothly 8:9
somebody 18:16 73:16,17 98:7 110:18 112:19 113:17 114:8
somebody's 95:21
someone's 105:3
soon 110:25
sorry 7:19 17:13 22:9 38:17 57:1 96:13,23 97:3 102:9 104:10 105:22 106:1
sound 27:11
sounds 27:12,17 110:18
source 49:19
speak 9:7,14 49:15 61:24
speaking 49:19
speaks 63:18
specialist 12:8 13:16
specific 38:2
specifically 25:6 29:1 48:7 50:1 98:15
specifics 19:3 28:7
spell 12:20
spits 112:25
split 112:14
splitting 107:23
spoke 30:23,24 47:12 53:4 62:3,4 77:11 77:23
spoken 11:7 15:5 15:10 27:7 54:25 63:16 63:23,25 78:10
squelch 23:19 23:20
staff 36:17 39:14 52:22 53:1
stand 110:1
standing 29:16 36:18
Stanley 7:22
start 13:11 22:5 37:8 38:5,17 42:1 58:20 61:9
started 86:6 97:10
starting 14:11 16:1 22:12
Starts 37:11
state 5:18 7:18 7:20 14:7,10 16:4 17:24 19:13 30:14 31:12,13,22 36:23 38:8 39:16 42:6,19 52:14 67:5,8 74:17 93:19 103:6,10,22 106:7,19 107:1 107:12,22 110:20 117:3 117:24
stated 29:14 36:15,22 52:17
statement 5:11 58:3
states 1:1 6:8 55:5 56:16 64:7 69:17 113:7
statute 59:25 64:3,7,21 65:9 70:14 71:4 84:4,15,18,19 114:12
statutes 17:16 17:20 18:3,7,14 54:5 66:21 68:5 69:5 84:1
step 88:25
Stephanie 114:23,24
stink 115:23
stir 111:1
stop 11:13 37:2
stopping 108:24 109:2
Strides 61:14
strike 102:22
striking 102:9
string 69:13
structure 94:18
style 50:4
subject 10:25 23:9 46:1
subjected 72:23
subsection 65:12 67:21 68:1,13 104:16
sued 7:13
suggest 102:9
suggesting 25:20 63:5
Suite 2:12
summaries 77:13
SUMNER 117:4
supervise 12:13
supervising 13:11
supervisor 12:17 13:6 20:22,24 34:11 39:11 59:7,11,18 66:13 67:1 79:4,6 85:13 87:23 88:12 94:25 103:9 104:5 107:20
supervisors 75:13,17,22 85:13
supervisory 104:21

suppose 24:2
supposed 90:18 94:11,12 114:9
supposedly 77:6
sure 17:18 24:1 34:6 42:3 50:4 65:13 70:17 75:7,11 78:3 86:1 90:15 110:13 113:11,22 115:21
surveillance 25:25
suspect 59:5
suspected 36:5 59:1,12,18 68:25 72:16 79:4 80:1,9 107:19
SW 62:3
swear 5:19 6:24
sworn 7:4
system 110:2 112:22,24 115:20

T

T 3:6 5:1,1
T-O-N-I 14:19
Tab 19:18 54:12
take 8:23 9:21 39:12 46:18 65:7 83:16,24 93:6 96:1
taken 1:16 5:5 8:4 17:19 22:15 61:12
takes 99:9
talk 28:10,11,12 30:16
talked 84:20
talking 48:25 49:24 51:8 97:14 111:18
team 52:14 61:13 108:4,8
Teams 49:24
tell 27:3 36:4 38:8 39:14 56:5,6 100:5 100:8 108:5 115:5
telling 100:1
tells 89:14 97:6
ten 19:9 86:4 107:4,18
tended 14:9
Tennessee 5:7 5:19 6:13 7:25 14:6,7,7 16:4 17:24 18:3 113:3 114:1,5 117:3,6,19,24
tentative 33:9
term 35:15 73:12 115:7,13
terminate 111:23
terminated 86:3 87:15 112:19
Terminating 111:21
termination 7:14 12:23 23:11 25:22 26:4 100:10 110:6 110:12,17 111:6 111:18 112:2,3,6 112:10 115:24
terminations 111:11,15,19 112:18
terms 113:8
territory 14:21
testified 7:4 42:25 58:8 68:4 84:10 89:21 90:3 95:1,10 101:15 113:24
testimony 8:12
63:11 69:4 95:5,18 98:12 98:17 101:20
text 10:19,22 11:2 12:1 15:13 27:1 46:3 52:2 89:15 90:17
thank 22:14 35:7 46:20 78:5
thanks 43:17 100:25 104:14 110:14
Theft 117:19
theoretically 95:25 112:20
theory 92:18
thereon 5:16
thin 95:24
thing 50:10 73:14 83:13 93:7
things 46:4,12 81:9 87:8 113:15
think 8:22 9:15 10:24 15:23 17:17 18:23 21:23 27:3 33:15 35:5 37:19 49:23 50:5,7 70:19 73:14,21 74:14 74:20 83:10 86:8 87:3 90:23 94:11 98:18 99:24 102:10,22 107:23 111:25
thinking 42:10 44:5 89:20
third 58:17 61:9 91:25
Thompson 4:20 57:24 114:23 114:24
thoroughly 21:9
96:17 98:2 99:19
thought 23:16 29:10 30:3 36:15 42:6,20 89:17 115:7
threats 25:23
three 29:24 30:9 35:3 41:15 42:9 43:1 44:25 91:14
three-point 92:8
thumb 114:13
time 6:4 9:7 10:2 12:18 13:4 13:6 14:22 28:16 32:21 33:6,7,7 35:3 35:6 47:2 49:11 67:17,24 76:17 80:19 85:15 86:7,13 88:3 99:9 100:9 108:25 110:8,22 114:7 114:10,25 115:6 116:6
timeline 87:13 103:5 106:22
timely 62:22 63:6 65:6 113:23
times 89:4 107:5,19 113:15
timing 115:15
TN 117:23
today 6:11 16:23 19:17 55:23 58:8 77:2 89:4
today's 6:3 9:24 11:7
told 29:8 30:14 30:15,22 31:7 31:9,11,17,23
31:25 37:18 38:11,20,25 39:5 52:13 67:11 76:17 77:3 97:7,8 103:23
tolerated 26:2
tomorrow 35:6
Toni 14:19 21:16 40:18 86:21 86:23 87:6 112:14
top 22:5,13 35:19 57:24 59:23 100:19 103:2 115:4
topics 60:3
tracking 25:3 42:22
training 16:25 17:2,7,9,11,15 17:19 26:8
trainings 17:4
transcript 4:22 8:10,19
transfer 117:18
translates 109:23
trial 5:15
tried 115:17
tries 23:19,20
Trinkler 4:18 109:19,21 112:11
true 11:11 43:4 76:6,12 88:1 108:16 117:16
TruHealth 7:14 20:2 22:11 24:24 35:12 45:8 58:18 71:20 96:4 104:13
TruHealth's 59:4,16
trust 71:9 73:4
try 8:15

trying 74:7 82:13
turn 49:16 50:2 104:8
turned 38:9 39:16
turnover 113:6
Tutera/Highla... 30:17
two 29:10 30:4 43:13 45:1 46:4,12 52:14 55:12,25 61:12 76:1,8 80:25 82:15 96:7 99:21 100:6
typewritten 117:11
typical 53:23 53:25 111:16,17
typically 21:15 111:14

U

U 5:1
uh-huh 8:16 16:9 18:1 20:14 30:21 32:25 35:8,13 48:23 50:8 55:20 58:23 60:22 65:25 69:20 91:17 92:9 93:15 94:15 101:8 110:7,15
Ultimately 94:16
UltiPro/UKG 109:24
un 76:12
unable 70:5
unambiguous 66:9
unauthorized 117:17
unaware 67:7
uncomfortable 85:14
uncommon 65:5
underline 41:9
underlined 41:6 44:16
understand 7:12 8:13,17,24 11:10 16:11 29:17 31:21 51:4 99:24 109:10
understanding 18:6,14 37:4 66:21 68:5,11 84:13,20
understood 9:4 9:11 36:25
undue 24:12
United 1:1 6:8
University 16:2
unjustified 25:23,24
unnecessary 76:5
unprofessional 108:8
unreasonable 26:1
unsatisfactory 55:8 56:8
unsubstantiat... 76:20,22
unsure 55:9
upper 60:1
use 100:15,16 112:5 114:13

V

Vaguely 32:11
valid 16:19 75:14
value 71:7
variety 17:2
various 76:18 87:8
version 36:8 100:17
versions 80:25
versus 6:6
video 49:24
video-recorded 6:5
videographer 2:18 6:2,15,23 7:6 50:19,22 50:25 108:22 109:3,6 116:4
videotaped 1:14 5:4 117:8
violation 35:21 68:25 102:17 117:18
violations 68:25
vis-à-vis 15:21
visitor 20:22
visitors 79:24
voice 9:15
voluntary 11:16
VP 30:17
vs 1:5

W

W/C 29:17,18 36:20
waiting 31:9
waived 5:11
walked 29:15 36:17
want 8:15 11:14 32:21 48:25 70:10,25 73:24 79:20 92:23 100:15 100:16,18 116:8
wanted 42:21 88:11 110:24
wants 39:13 79:2 83:20 98:7
warning 52:3
wasn't 32:9 36:24 37:2 46:6 52:4,16 52:21,25 56:11 56:11 99:12 110:19 113:11
way 23:15,18 30:11 33:20 48:14 94:17 101:14
We'll 70:21
we're 8:13 51:3 97:14 105:9 109:9
we've 45:6 50:19 60:20 62:25 77:4 82:24 107:18 108:22
website 82:17
Wednesday 51:14,23
week 9:17 49:18 64:16
weekly 33:9
Welfare 66:13 67:3
went 14:10 26:7 70:15 71:5 78:8,8 84:15 84:18 96:7 104:2 108:11
weren't 71:12 97:11
West 5:6 6:12
western 1:1,2 6:9,10 14:6
whatnot 77:5 87:2
wheelchair 29:18 36:21
willful 23:25 24:2
willfully 45:18
wish 35:6
witness 5:19,21 6:24 7:3 25:11 37:21 46:20 50:15 57:8 63:9,20,24 66:12 73:11,20 76:16 78:5 81:17 84:7 95:7 98:18 101:21 104:1,4 107:7,15 108:21
words 32:14 43:9,11 68:22
work 11:2,21 12:2,5 15:16 26:1,1 30:18 32:20,23 38:21 46:6 47:2 99:23 104:21 109:24 111:22
Workday 112:5
worked 14:15 15:15 19:23 27:22 84:16 87:7 112:1 113:2
worker 65:15
working 10:23 11:13,22 16:3 18:25 98:10 99:9
workplace 20:16,20 59:6
works 83:11 93:4 100:24 111:24 113:16
wouldn't 50:18 86:2 92:16
write 30:14 38:1
write-up 43:19
write-ups 3:15 42:1 82:15
writes 103:4
written 34:19 48:10,15
wrong 54:21
wrongful 7:14

X

X 3:1,6

**Y**

**yeah** 15:24 22:17 28:19 37:17 54:17 58:16 63:7 70:13 75:3,5 77:8 86:8 92:2 93:4 104:1 106:1 114:16,25 115:1 116:11
**year** 11:14 12:12
**years** 43:11 56:1 100:6
**Yep** 17:10 72:22 104:19

**Z**

**0**

**000118** 20:2

**1**

**1** 28:23 33:12 65:12 67:21
**1.10** 60:23 82:20 93:17 104:16
**1.34** 82:20
**1.53** 54:9 55:4 55:15,24 56:14 82:20
**1.54** 54:9 55:8 56:13 82:20
**1:01** 1:17 6:4
**1:30** 91:12
**10** 22:10
**10:30** 94:7
**1001** 58:18
**102** 4:15
**104** 20:15 96:5
**105** 24:5,9
**108** 25:2
**109** 4:17
**10th** 86:15 91:12 95:17 97:8,13 97:16 98:20 99:2,5
**11** 35:20 68:20
**11:00** 101:7
**11:22** 3:11 34:3
**114** 4:19
**1167** 7:24
**126** 20:12 96:4
**127** 22:11
**13** 24:25
**130** 24:24
**13th** 94:7
**14th** 98:23
**15** 51:24 52:9
**15th** 29:7 36:3 59:10
**1621** 2:5
**17** 60:17 63:13 63:22
**174** 104:9,13,14
**176** 71:21
**17th** 101:7
**18** 61:1 64:2 78:4,5
**18th** 62:12
**192.2500** 68:17
**198.070** 59:25 64:7 65:9
**19th** 12:24 110:5

**2**

**2** 28:17 34:8 47:7 49:14
**2:05** 50:23
**2:14** 51:1
**2:30** 89:7 90:18
**20** 54:12,13
**2019** 82:18
**2020** 12:24 16:22 52:13 59:10 61:10 64:18 85:5
**2022** 1:17 5:7 6:3
**20th** 110:4
**21** 13:12
**24** 113:25
**26** 3:8
**26th** 11:15

**3**

**3** 32:8 67:20
**3:40** 109:4
**3:50** 109:7
**3:58** 116:7,13
**30** 93:3,6 94:6 108:23
**31st** 26:21
**32** 100:23 101:2 105:16,17,20
**33** 3:10
**3310** 5:6 6:12
**37** 102:5
**384** 35:12
**38401** 7:25
**385** 37:14
**39-14-104** 117:19
**394** 41:2
**395** 41:13
**3rd** 35:4

**4**

**4** 19:18,18 32:12 34:21 60:23 71:15 96:1 104:8
**4:21-CV-00920** 6:8
**4:21-CV-0092...** 1:5
**40** 3:12
**406** 45:8
**408)921-0936** 8:3
**41** 3:14
**42** 57:1,4,5
**426** 49:13
**44** 3:16
**45** 3:18 99:22
**4500** 99:22
**4622** 2:12
**47** 3:20
**48** 57:22 110:23 114:1
**4th** 44:24 52:13 80:21,22,24 81:3,4

**5**

**5** 32:18
**5/22/2023** 117:25
**5:00** 112:21
**50** 59:21 65:7
**51** 3:22 35:1,2
**542** 85:10
**55** 3:8 26:16,18
**56** 3:10 33:22 33:24
**57** 3:12 40:14,16 104:8,12
**58** 3:14 41:21,23
**59** 3:16 44:19,21 46:19 71:20
**5th** 47:25 51:14 51:23 74:7 82:6

**6**

**60** 3:18 45:21 45:23 47:7
**61** 3:20 47:21 47:23 51:9
**62** 3:22 51:18 51:20
**63** 3:24 69:9,11
**64** 4:2 74:2,4
**64108** 2:6
**64112** 2:13
**65** 4:4 78:20 78:22
**66** 4:6 82:1,3
**67** 4:8 84:24 85:2
**673** 73:3
**68** 4:9 88:19,21 91:11
**69** 3:24 4:11 91:5,7
**6th** 61:10 80:19 82:6

**7**

**7** 3:3
**7/14** 106:7
**7/15** 103:12 106:18
**7/31** 3:9
**7:00** 112:16
**70** 4:13,16 92:21 94:1,3,7
**702** 71:21 79:19
**71** 4:15 100:13 101:25 102:2 105:11,13
**72** 4:17 109:14 109:16 110:23
**73** 4:19 114:18 114:20
**74** 4:2
**78** 4:4
**7th** 11:15 61:13

**8**

**8** 68:13
**8/10** 4:12
**8/13** 4:14
**8/17** 105:25
**8/3/2020** 34:16
**8/4** 3:17
**8/4/2020** 34:13 47:10
**8/5** 3:20 4:2
**8/5-8/6** 4:6
**8:00** 112:16
**816)842-8770** 2:13
**816a)471-4881** 2:6
**82** 4:6
**85** 4:8
**88** 4:9
**8th** 62:11

**9**

**9** 1:17 5:7 20:13 96:4
**9:11** 51:14
**9:26** 3:22 51:23

**91** 4:11
**910** 2:12
**94** 4:13
**9th** 6:3 85:5 86:11