IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LYNDA G. CARLYLE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:21-cv-00920-RK |
| AMERICAN HEALTH PARTNERS, INC., TRUADVANTAGE, INC., TRUHEALTH, LLC, | ) ) ) ) ) |
| Defendants. | ) |

# ORDER

This is an employment-discrimination/retaliation and wrongful discharge action brought under the Missouri Human Rights Act ("MHRA") and Missouri's Whistleblower's Protection Act ("WPA"). Before the Court is Defendants' motion for summary judgment. (Doc. 42.) The motion is fully briefed. (Docs. 43, 46, 49.) After careful consideration and for the reasons explained below, the motion is **GRANTED in part** and **DENIED in part**, as follows:

(1) Summary judgment is granted in part and denied in part as to Plaintiff's MHRA discrimination claims in Count I. Summary judgment is granted in favor of Defendants as to Plaintiffs' MHRA age-discrimination claim and disability-discrimination claim based on pre-termination personnel actions, and is denied as to Plaintiff's disability-discrimination claim based on her termination;

(2) Summary judgment is granted in favor of Defendants as to Plaintiff's MHRA retaliation claim in Count II; and

(3) Summary judgment is denied as to Plaintiff's WPA claim in Count III.

## I. Background[1]

Defendant TruHealth, LLC d/b/a TruAdvantage, Inc., is a wholly owned subsidiary of Defendant American Health Partners, Inc. (collectively, "Defendants"). TruHealth contracts with long-term care facilities in Missouri to provide nurse practitioner ("NP") and other medical care

---

[1] Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

services to residents or patients of these facilities who have signed up for one of Defendants' health plans. Plaintiff Lynda Carlyle was hired by TruHealth as an NP on December 2, 2019. Plaintiff's immediate supervisor while employed as an NP with TruHealth was Clinical Program Manager Dawn Ketchum. Ms. Ketchum's supervisor was Director Kami Carlson.

One of the facilities at which Plaintiff was assigned to provide NP services for TruHealth was Highland Rehabilitation. (Doc. 46-2 at 11.) Plaintiff was working at Highland Rehabilitation, on July 13, 2020, when during a morning meeting the director of nursing for the facility said a CNA or charge nurse at the facility had recently reportedly walked in on a male resident and female resident in a sexually compromised position. Both residents involved were TruHealth patients. It was agreed at the morning meeting that the situation would be discussed further at a STRIDES meeting to occur the following day (a weekly mental health meeting involving Highland Rehabilitation's medical primary care providers, among others); the discussion would also include whether the male resident involved should continue to reside at Highland Rehabilitation.

The next day, July 14, 2020, Plaintiff filed a complaint with the Missouri Department of Health and Senior Services ("DHSS") reporting the alleged abuse by the male resident against the female resident. At the STRIDES meeting that same day, the decision was made to discharge the male resident from the facility.

The following day, July 15, 2020, Plaintiff called Ms. Ketchum and Chris Burkhart, the regional director of operations for the owner of Highland Rehabilitation, to discuss the situation. Plaintiff told Ms. Ketchum that she believed the male resident "should be reported to the State and that the facility wasn't doing anything about it." Plaintiff did not inform Ms. Ketchum that she had already reported the alleged abuse to DHSS. Ms. Ketchum told Plaintiff that she would call Ms. Carlson and Kelly Helms, Vice President of the company that owned Highland Rehabilitation, to determine whether the incident should be reported to DHSS. Ms. Ketchum and Ms. Carlson agreed that Plaintiff did not need to report the incident "since [Plaintiff] didn't see anything," "the female patient denied anything happening," and "the facility had done their investigation." (Doc. 46-1 at 29.) Ms. Ketchum then called Plaintiff and told her that she (Ms. Ketchum) and Ms. Carlson agreed there was nothing for Plaintiff to report; Plaintiff informed Ms. Ketchum that she had already made a report to DHSS the day before.

Three weeks later, on August 4, 2020, Plaintiff was issued a Personnel Action Form ("PAF") for insubordination regarding her July 14 DHSS report, in addition to a PAF regarding

her professionalism after referring to two members of a facility's management team as "butt buddies" in meetings. The next day, Plaintiff was issued a Performance Improvement Plan ("PIP") outlining three areas of performance concerns, including: timely completing charting duties; insubordination (specifically referring to the PAF "from 8/4/20202"), and "professionalism while on calls/meetings."[2] Plaintiff was also issued a PAF for providing medical treatment or services to a Highland Rehabilitation resident who was not a TruHealth member.

On August 9, 2020, Plaintiff submitted a grievance to Peter Boguski, a TruHealth Employee Relations Specialist, regarding personnel actions that had been taken against her the week before. Plaintiff asserted that the documents were inaccurate, false, or "backwards" facts.[3] The next day, Mr. Boguski asked Plaintiff to forward her grievance to Ms. Carlson, which she did. Plaintiff sent another complaint to Mr. Boguski on August 13, 2020, and Ms. Carlson on August 14, 2020, taking issue with various personnel actions. Ms. Carlson ultimately determined that Plaintiff was not insubordinate for making the DHSS report.

On August 18, 2020, while at Highland Rehabilitation, Ms. Ketchum went into an office shared by Plaintiff and the Case Manager, Heather Crouch. Plaintiff testified that in addition to herself and Ms. Crouch, the maintenance supervisor also had access to the office space, which was secured by a number keypad lock. When she went into the office, Ms. Ketchum found in plain view on Plaintiff's desk a pill bottle of hydrocodone that had been prescribed to Plaintiff. The following day, Plaintiff was terminated.

In the initial termination phone call, Ms. Carlson explained to Plaintiff:

> It was discovered yesterday that there were controlled substances prescribed to you left in your place of work inside the nursing home. This causes suspicion for you having been on duty while under the influence of opioids and calls into question your judgment as these opioids were negligently left in plain sight on a desk in a shared office where the physical access could not be controlled by you. These new findings qualify as gross misconduct and based on the understanding of the performance improvement plan as it was written and delivered to you on August

---

[2] The PIP initially included two other areas of performance concern – specifically, giving medical orders for a Highland Rehabilitation resident who was not a TruHealth member and for generally being behind in her work – both of which were removed after Plaintiff disputed them.
Additionally, Plaintiff had previously been issued an Employee Coaching Form two months before in June 2020 listing eight performance areas that needed improvement, including Plaintiff's failure to complete her charting duties in a timely manner.

[3] Plaintiff continues to dispute the "characterizations," substance, or representations as to her underlying conduct asserted in these various personnel actions, including whether the personnel actions were warranted or not.

3

> 4th, we are choosing to terminate your employment with TruHealth effective immediately.

The subsequent PAF notifying Plaintiff of her termination stated that Ms. Ketchum observed

> a bottle of Hydrocodone on one of the desk[s] with the name Lynda Carlyle on it. This was sitting in plain site [*sic*]. There is cause for suspicion of working under the influence of Opiods. [*sic*] Also negligence in securing a controlled substance properly, which is concerning. The Admin, DON, and maintenance have access to this room. It would also be a concern that patients could break into the room and take this medication or distribute to other patients and cause injury or harm. There has been a history of rooms in the facility being broken into. This would be considered Gross Misconduct.

Further facts are set forth as necessary.

## II. Legal Standard

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co.*, 893 F.3d at 1102 (citation and quotation marks omitted).

A party may be entitled to summary judgment if the opposing party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 464 (8th Cir. 2022) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). In other words, while the summary judgment "movant has the burden of showing that there is no genuine issue of fact, . . . the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Hodge*, 37 F.4th at 464 (citation and quotation marks omitted). Once a summary judgment movant has satisfied his or her burden, the non-movant must point to some "affirmative evidence, specific facts, showing that there is a genuine dispute" as to a material fact. *Id.* (citation and quotation marks omitted).

### III. Discussion

Plaintiff seeks relief under three counts: Count I – MHRA claims for age and disability discrimination; Count II – MHRA claim for retaliation; and Count III – unlawful discharge in violation of the WPA. Defendants seek summary judgment as to each of these claims.

#### A. Waiver

In her response, Plaintiff did not address Defendants' arguments as to her claims under the MHRA for age discrimination (Count I) or retaliation (Count II). Plaintiff has therefore waived these two claims, and summary judgment is entered in Defendants' favor as to Plaintiff's MHRA age-discrimination claim in Count I and Plaintiff's MHRA retaliation claim in Count II. *See Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 370 n.2 (8th Cir. 2018) (recognizing that district court correctly deemed as waived plaintiff's retaliation claim where plaintiff did not respond to defendant's summary judgment arguments as to that claim); *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014).

#### B. Count I – MHRA disability-discrimination claim

All parties agree that Plaintiff's disability-discrimination claim under the MHRA is governed by the *McDonnell Douglas*[4] burden-shifting framework applicable to discrimination claims based on indirect (rather than direct) proof of discrimination. *See Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 964 (8th Cir. 2006).

> Under *McDonnell Douglas*, the plaintiff initially has the burden to establish a prima facie case of discrimination. A prima facie case creates a rebuttable presumption of discrimination. The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination.

*Lake v. Yellow Transp., Co.*, 596 F.3d 871, 873-74 (8th Cir. 2010) (internal citations and quotations omitted). In considering a state-law claim of discrimination under the MHRA, federal courts primarily apply Missouri law but may also look to federal employment discrimination law to the extent it is "consistent with Missouri law." *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1019 (8th Cir. 2019) (citation and quotation marks omitted).

To succeed on an MHRA disability discrimination claim, Plaintiff must prove three things: (1) she has a disability, (2) Defendants took an adverse action against her, and (3) "her [disability]

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

5

was the motivating factor in the employer's adverse action[(s)]." *Hurt v. MFA Incorp.*, No. 20-cv-06106-SRB, 2021 WL 4139141, at *9 (W.D. Mo. Sept. 10, 2021) (citing Mo. Rev. Stat. §§ 213.055.1 & 213.010) (other citation omitted); *White v. Union Pac. R.R.*, No. 4:19-cv-00080-DGK, 2022 WL 1315089, at *7 (W.D. Mo. Jan. 11, 2022).[5]

Defendants do not dispute that Plaintiff is disabled.[6] Defendants argue instead that they are entitled to summary judgment because: (1) the coaching, PAFs, and PIP are not actionable adverse employment actions on their own; (2) Plaintiff cannot offer any evidence to support an inference that her disability was the motivating factor in any adverse employment decision; and (3) Defendants had legitimate non-discriminatory reasons for any adverse employment decision, which Plaintiff does not demonstrate were pretextual.

Generally, to establish an adverse action in the context of an MHRA discrimination claim, the plaintiff must have suffered "'damage'" as a result. *Watson v. Heartland Health Labs., Inc.*, 790 F.3d 856, 864 (8th Cir. 2015) (quoting *Keeney v. Hereford Concrete Prods., Inc.*, 911 S.W.2d 622, 864 (Mo. banc 1995) (holding that write-ups and extension of plaintiff's probationary period did not constitute adverse actions because they did not "reduce Watson's pay, lower her work hours, and did not change her job duties"); *see also Jackman v. Fifth Jud. Dist. of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (generally speaking, an adverse employment action is understood as a "tangible change in working conditions that produces a material employment disadvantage") (citation omitted). Defendants do not contest that Plaintiff's termination is an adverse employment action. In the context of federal discrimination law, being placed on a PIP does not (by itself) constitute an adverse employment action that can form the basis of a discrimination claim. *Davidson v. Tyco/Healthcare*, 416 F. Supp. 2d 690, 704 (E.D. Mo. May 25, 2005), *aff'd sub nom. Davidson v. Tyclo/Healthcare Mallinckrodt., Inc.*, 205 F. App'x 469 (8th Cir. 2003).

---

[5] The MHRA prohibits discrimination "because of" an individual's disability. § 213.055.1(1). Missouri law defines "because of" as meaning that "the protected criterion was the motivating factor"; and, in turn, "the motivating factor" is defined as meaning that "the employee's classification actually played a role in the adverse action . . . and had a determinative influence on the adverse action or decision." § 213.010(2) & (19).

[6] Under Missouri law, a "disability" is defined in relevant part as "a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job." § 213.010(5).

6

At the same time, however, the Eighth Circuit has recognized that personnel actions like an unfavorable evaluation can support a discrimination claim – and are therefore actionable – when "the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) (citations omitted). Here, the Court finds there is at least a question of fact whether the PIP Plaintiff was issued (which itself referenced the August 4th PAF) played a role or was considered in Plaintiff's termination. Ms. Carlson agreed at her deposition, for instance, that "because [Plaintiff] was on a PIP, [the prescription that had been left out in the office space] was . . . the final straw." (Doc. 46-5 at 33.) Accordingly, in addition to her termination, the Court finds there is at least a question of material fact whether the PIP and by internal reference the August 4th PAF issued to Plaintiff were also adverse actions.

Next, the Court considers whether Plaintiff has satisfied her burden to point to evidence that supports an inference that her disability was the motivating factor as to the actionable adverse employment actions. Plaintiff primarily relies on the temporal proximity between her disability and the disciplinary actions and subsequent termination. Specifically, Plaintiff argues that after she suffered a disabling non-work-related back injury in June "everything changed," and, as Plaintiff testified in her deposition, it became "very clear that [Ms. Ketchum] . . . was not satisfied with me in a lot of different ways." (Doc. 46-2 at 31.) In *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106 (8th Cir. 2001), the Court found a plaintiff established a prima facie case of disability discrimination under the ADA based on the temporal proximity (in that case, "a matter of weeks") between when the employer learned of plaintiff's disability and the adverse employment actions. *Id.* at 1113; *see also Moysis v. DTG Datanet*, 278 F.3d 819, 826 (8th Cir. 2002) (recognizing that "suspicious timing can support a finding of discrimination") (citation omitted); *Vung v. Swift Pork Co.*, 423 F. Supp. 3d 640, 660 (S.D. Iowa Oct. 28, 2019) (holding that plaintiff demonstrated a prima facie case of discrimination based on the timing of her termination within one week of turning in her doctor's note) (citations omitted). Accordingly, because Plaintiff has set forth sufficient evidence from which a reasonable jury could conclude that her disability was the motivating factor for the adverse employment actions, Plaintiff has satisfied her prima-facie burden under *McDonnell Douglas* for purposes of summary judgment, and the Court considers the remaining *McDonnell Douglas* factors.

In its motion for summary judgment, Defendants set out various legitimate, non-discriminatory reasons for the coaching, PAF, and PIP issued against Plaintiff, including issues with Plaintiff's job performance (such as failing to meet deadlines with respect to her charting responsibilities), insubordination, disrespectful comments about members of a customer's management team, and involving herself beyond what was required in the medical care of a "non-TruHealth member." (Doc. 43 at 34-35.) Plaintiff does not specifically challenge or attempt to show pretext as to these reasons and these adverse employment actions (assuming each qualifies as an actionable adverse employment action), beyond vaguely arguing that Defendants failed to follow their investigation policies when Plaintiff complained of retaliation. (Doc. 46 at 86.)

It is generally true that proof of an employer violating its own policies "may be indicative of pretext." *Anderson v. Durham D&M, LLC*, 606 F.3d 513, 522 (8th Cir. 2010) (citation and quotation marks omitted). The critical inquiry at this stage of the *McDonnell Douglas* framework, however, is whether a "genuine question of fact exists regarding [the employer's] motivations" in choosing to take the adverse employment action it did. *Id.* at 523. In other words, Plaintiff must "show not only that [Defendants'] proffered reason was suspect in some way, but that it was pretext for unlawful discrimination." *Id.* (citation omitted). In *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899 (8th Cir. 2015), for instance, the Court held that the plaintiff failed to demonstrate pretext in arguing that the employer "failed to follow its own EDR and Investigation guidelines" as to "fully investigat[ing] all relevant facts and information and . . . complet[ing] a report with full analysis of all factual disputes and inconsistencies." *Id.* at 904. The Eighth Circuit reasoned that in the context of that case, those facts did not "show that UPS was more likely motivated by race than by its proffered justification." *Id.* So it is here, at least as to the pre-termination personnel actions. Whether the investigative policies and procedures were followed when Plaintiff complained about the coaching, PAF's and/or PIP does not show that Defendants were more likely than not motivated by Plaintiff's disability in issuing these pre-termination personnel actions against Plaintiff.

"Even if the employer's acts are unfair, there has to be evidence connecting the unfairness to a discriminatory animus [for the employer's adverse employment action]." *Id.* Plaintiff has not identified any such evidence here regarding any of the asserted pre-termination adverse employment actions from which a reasonable jury could conclude that Defendants' proffered reasons for those actions were merely pretexts to discriminate against her because of her disability.

8

"[M]ore substantial evidence" is required to prove pretext than to demonstrate a prima facie case of discrimination. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (citation and quotation marks omitted). Plaintiff has not satisfied that greater burden as to any asserted pre-termination adverse employment action in this case.

As to Plaintiff's termination, however, the Court finds Plaintiff has at least raised a triable question of fact appropriate for the factfinder at trial whether Defendants' proffered legitimate non-discriminatory reason for terminating Plaintiff – i.e., improperly storing her prescription medication – was merely a pretext for discriminating against Plaintiff based on her disability. It is undisputed that at the time, Defendants asserted two reasons for terminating Plaintiff: (1) suspicion of working under the influence of opioids (medication prescribed to Plaintiff), and (2) that Plaintiff improperly secured her prescription medication. Both of these reasons were given in the phone call to Plaintiff and in the termination PAF. At summary judgment, however, Defendants argue that because it is undisputed that Plaintiff improperly secured or stored the prescription medication, it is entitled to summary judgment on this claim. It is true that Ms. Carlson testified in her deposition that the "primary concern" regarding the prescription medication issue was that it had been improperly left out on a desk in an office, rather than any suspicion that Plaintiff was working under the influence of the prescribed opioid. Defendants' argument, however, invites the Court to resolve the question of whether a suspicion that Plaintiff took or was under the influence of a prescribed medication "actually played a role" and "had a determinative influence on" the decision to terminate Plaintiff's employment, however. This is a question to be resolved by the factfinder; not the Court on summary judgment.[7] Accordingly, the

---

[7] Defendants do not argue that suspicion of working under the influence of a prescription medication (whether or not prescribed in relation to Plaintiff's uncontested disability) is itself a legitimate non-discriminatory reason for terminating Plaintiff's employment. In the absence of such an argument and in viewing the summary judgment record in a light most favorable to Plaintiff, the Court cannot overlook that suspicion of working under the influence of a medication prescribed in relation to Plaintiff's (then-recent and uncontested) disability was given as a reason at the time of Plaintiff's termination, and therefore appears to have played *some* role in Defendants' termination decision. Whether it was a motivating factor and whether the proffered reason was merely pretext to discriminate against Plaintiff because of her disability is, at this point, a material question for the factfinder, not the Court on summary judgment.

Defendants' argument in their reply only highlights the failure of this argument to win on summary judgment. There, Defendants argue that they have

> never claimed to have terminated Plaintiff for suspicion of taking opioids (prescribed or otherwise) while working. The termination PAF simply makes the statement that "[t]here is ***cause for suspicion*** of working under the influence of Opioids." It is uncontroverted

9

Court finds there is at least a triable question of material fact whether Defendants' proffered reason for terminating Plaintiff's employment (improperly storing or securing the prescription medication) was pretext for discrimination, particularly given the shifting explanation for Plaintiff's termination. Stated differently, the Court finds there is sufficient evidence from which a reasonable jury could infer that the Defendants' proffered rationale for terminating her employment was merely a pretext to discriminate against Plaintiff because of her disability.

Therefore, as to Plaintiff's disability-discrimination claim in Count I, summary judgment is denied as to Plaintiff's disability-discrimination claim based on her termination. Summary judgment is otherwise entered in favor of Defendants as to Plaintiff's disability-discrimination claim based on pre-termination personnel actions including coaching, PAF's and a PIP issued against Plaintiff.

### C. Count III – WPA retaliation claim

Next, Defendants argue that they are entitled to summary judgment as to Plaintiff's claim for unlawful termination under the WPA because (1) Plaintiff is not a "protected person" under the statute, and (2) Plaintiff cannot show any causal connection between her report to DHSS of suspected abuse and any adverse action.

The WPA, enacted by the Missouri General Assembly in 2017, prohibits employers from "discharg[ing] an individual defined as a protected person in this section because of that person's status as a protected person." Mo. Rev. Stat. § 285.575.4. Through its enactment of the WPA, the Missouri General Assembly explicitly expressed its intent in doing so as to "codify the existing common law exceptions to the at-will employment doctrine and to limit their future expansion by the courts." § 285.575.3. Together with the Missouri Human Rights Act (chapter 213 of the

---

that the reason for Plaintiff's termination was and always has been that she left opioids unsecured at a skilled nursing facility.

(Doc. 49 at 122 (emphasis in original).) Defendants' attempt to parse the PAF in this manner (which is consistent with the reported phone call between Plaintiff and Ms. Ketchum advising Plaintiff of her termination) is unavailing for purposes of summary judgment. The PAF and phone call referenced *both* the suspicion of working under the influence of prescribed opioids and the storage of that prescription medication. It is within the province of the factfinder to parse these statements and to weigh and consider the credibility of testimony and other evidence concerning the motivating factor(s) as to Defendants' termination decision. At this stage, the Court is left with Defendants' shifting explanations for its termination decision. Accordingly, there is at least a reasonable inference that Defendants' proffered reason (storage of the medication) is pretext for disability discrimination given its shifting explanations among other evidence regarding its termination decision.

Revised Statutes of Missouri) and Missouri's Workers' Compensation Law (chapter 287 of the Revised Statutes of Missouri), the WPA is the "exclusive remedy for any and all claims of unlawful employment practices." *Id.*

The first question – whether Plaintiff is a "protected person" under the WPA – raises a state-law issue of statutory interpretation. In applying state law, federal courts are bound to apply the law of the state as articulated by the state's highest court. See *Baribeau v. City of Minneapolis*, 596 F.3d 465, 475 (8th Cir. 2010). When the state's highest court has not spoken, it is the job of this Court to predict how the state's high court would resolve the issue. *Id.* In doing so, the Court may consider "relevant state precedent, analogous decisions, considered dicta, and any other reliable data." *David v. Tanksley*, 218 F.3d 928, 930 (8th Cir. 2000).

The Missouri Supreme Court has identified that "[t]he primary goal of statutory interpretation is to give effect to legislative intent, which is most clearly evidenced by the plain text of the statute." *State ex rel. Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 585 (Mo. banc 2018). Courts must give undefined statutory words "their plain and ordinary meaning as found in the dictionary." *Sun Aviation, Inc. v. L-3 Commc'ns Avionics Sys., Inc.*, 533 S.W.3d 720, 723 (Mo. banc 2017). "When the legislature provides a statutory definition, that definition supersedes the commonly accepted dictionary or judicial definition and is binding on the courts." *Cosby v. Treasurer of State*, 579 S.W.3d 202, 207 (Mo. banc 2019) (cleaned up).

The WPA defines a "protected person" as an employee of an employer who (1) "has reported to the proper authorities an unlawful act of his or her employer"; (2) "reports to his or her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation promulgated under statute"; or (3) "has refused to carry out a directive issued by his or her employer that if completed would be a violation of the law." § 285.575.2(4). In addition, the WPA expressly states that it is codifying the then-existing common law exceptions to the at-will employment doctrine. § 285.575.3. At common law, Missouri courts recognized a public-policy exception to the at-will employment doctrine. *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 346 (Mo. banc. 2010). This "'very narrowly drawn'" exception "provides a cause of action for an at-will employee who has been discharged in violation of a clear mandate of public policy." *Jones v. Galaxy 1 Mktg., Inc.*, 478 S.W.3d 556, 563 (Mo. App. E.D. 2015) (quoting *Margiotta*, 315 S.W.3d at 346). The Missouri Supreme Court "expressly adopt[ed]" as the public-policy exception the following:

11

> An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities.

*Fleshner v. Pepose Vision Instit., PC*, 304 S.W.3d 81, 92 (Mo. banc 2010) (citations omitted).

Plaintiff argues, in part, that she is protected under the WPA to the extent that "Missouri law required Plaintiff to report suspected abuse and neglect or face criminal liability." (Doc. 46 at 75) (citing Mo. Rev. Stat. § 198.070.3). Indeed, Missouri's Omnibus Nursing Home Act, *see* § 198.003, RSMo, provides that: "When any . . . nurse practitioner . . . has reasonable cause to believe that a resident of a facility has been abused or neglected, he or she shall immediately report or cause a report to be made to the [DHSS]." § 198.070.1. Subsection 3 of the same statutory provision makes it a criminal offense to "knowingly fail[] to make a report within a reasonable time after the act of abuse or neglect as required by this subsection." § 198.070.3; *see also Bachtel v. Miller Cnty. Nursing Home Dist.*, 110 S.W.3d 799, 802 (Mo. banc 2003) (recognizing that Missouri law "require[s] mandatory reporting by nursing home staff and doctors of suspected acts of abuse and neglect of residents").

Although not cited by either party, in *Keveney v. Missouri Military Academy*, 304 S.W.3d 98 (Mo. banc 2010), the Missouri Supreme Court held the public-policy exception unequivocally applied to a former teacher who reported suspected abuse of a student to the appropriate state agency – as required by law, specifically § 210.115, RSMo – and alleged he was terminated as a result of doing so. *Id.* at 104. The Missouri Supreme Court held:

> Employee has stated a claim for wrongful discharge for refusing to perform an illegal act. When Employee observed the student's bruises and suspected abuse, he was under a clear and specific statutory obligation to report that abuse to [the Division of Family Services]. If Employee failed to report the abuse, he was subject to criminal liability. The mandatory reporting statutes constitute a clear public policy mandate.

*Id.* (citing Mo. Rev. Stat. §§ 210.115, 210.165).[8]

As applied in *Keveny*, the Missouri common law public-policy exception prohibits discharging an employee who reports suspected abuse as they are required to do under state law;

---

[8] The mandatory reporting statute in *Keveney*, § 210.115, RSMo, largely mirrors the mandatory reporting statute Plaintiff argues applies here, § 198.070; both statutes mandate that certain persons make a report upon "reasonable cause to suspect" abuse or neglect. §§ 198.070.1 & 210.115.1.

in other words, reporting suspected abuse or neglect as required by state law is a clear public policy mandate. By its express terms, the WPA codified the existing common law exceptions to the at-will employment doctrine (including the public-policy exception). In *Yount v. Keller Motors, Inc.*, 639 S.w.3d 458 (Mo. Ct. App. 2021), the Missouri Court of Appeals, considering a similar question of statutory interpretation under the WPA, recognized that the prevailing interpretation of the statutory language must both "give[] meaning to all of the provisions [in the WPA], and respect[] the intent of the legislature in codifying existing whistleblower protections." *Id.* at 469. In applying this dual interpretative framework, the Missouri Court of Appeals held that under the WPA, the term "employer" and "protected person" encompass "a plaintiff who pleads that he or she reported unlawful acts or serious misconduct of co-employees" as part and parcel of Missouri's common law exception to at-will employment *Id.* Here, Defendants' proposed strict interpretation of the WPA would contravene the public-policy exception under Missouri law, both as recognized and applied by the Missouri Supreme Court in *Keveney* and as codified in the WPA. The Court finds, consistent with the interpretative framework applied in *Younts*, that Plaintiff is a "protected person" under the WPA.[9]

Even to the extent Plaintiff is covered by the WPA, Defendants argue they are entitled to summary judgment as to Count III because Plaintiff cannot establish the requisite causation for a claim under the WPA. Like the MHRA, the WPA makes it unlawful for an employer to discharge a protected person "because of that person's status as a protected person." § 285.575.4. The WPA defines "because of" to mean that "the person's status as a protected person was the motivating factor" for the adverse decision or action, meaning that "the employee's protected classification actually played a role in the adverse decision or action and had a determinative influence on the adverse action or decision." § 285.575.2(1) & (5). Defendants assert that it is undisputed that

---

[9] Defendants rely on a case from the Eastern District of Missouri for its argument that to be a protected person under the WPA, under a strict interpretation of the statutory language, "Plaintiff must be reporting the conduct of **her employer**." (Doc. 49 at 115 (citing *Ward v. G4s Secure Sols. (USA), Inc.*, No. 4:20CV891 JCH, 2020 WL 5291938 (E.D. Mo. Sept. 4, 2020).) *Ward* is distinguishable, however. In that case, the district court held that the plaintiff was not a protected person under the WPA to the extent he had reported to his supervisors a co-employee's prior conduct while that co-employee had been employed as a local police officer. *Ward*, 2020 WL 5291938, at *1. *Ward* did not involve mandatory reporting of abuse or neglect or a similar reporting requirement established by law, and it is not clear the report in *Ward* (of a then-co-employee's potential misconduct in the context of that co-employee's former employment) falls within a common-law exception to the at-will employment doctrine. And at any rate, *Ward* was decided prior to – and without the guidance of – *Younts*.

"Plaintiff's complaint to DHSS was not a factor at all in any of Defendants' decisions." (Doc. 43 at 42.) The Court disagrees. The August 4 PAF for insubordination founded on Plaintiff's July 14 DHSS report was specifically referenced in the August 5 PIP. Just over two weeks later, and after several complaints and grievances filed by Plaintiff regarding these personnel actions, Plaintiff was terminated. Ms. Carlson agreed at her deposition that "because [Plaintiff] was on a PIP, [the issue involving the prescription medication in the office space] was the . . . final straw." Moreover, Ms. Carlson ultimately determined that Plaintiff was not insubordinate for making the DHSS report. Although it is a close call, under these facts and viewing the summary judgment record in a light most favorable to Plaintiff, the Court finds that there is a genuine question of material fact whether Plaintiff was terminated because of her status as a protected person under the WPA as explained above.

Accordingly, summary judgment is denied as to Plaintiff's WPA claim in Count III.

IV. **Conclusion**

For the reasons explained above, summary judgment is **GRANTED in part** and **DENIED** in part as follows:

(1) Summary judgment is granted in part and denied in part as to Plaintiff's MHRA discrimination claims in Count I. Summary judgment is granted in favor of Defendants as to Plaintiffs' MHRA age-discrimination claim and disability-discrimination claim based on pre-termination personnel actions, and is denied as to Plaintiff's disability-discrimination claim based on her termination;

(2) Summary judgment is granted in favor of Defendants as to Plaintiff's MHRA retaliation claim in Count II; and

(3) Summary judgment is denied as to Plaintiff's WPA claim in Count III.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 8, 2023